UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DEWALT PRODUCTIONS, INC. an
Oregon corporation, dba FONTAINE
BLEAU, and RODNEY DEWALT,

                    Plaintiffs,

          v.

CITY OF PORTLAND, a municipal
corporation, THERESA MARCHETTI,
MARK KRUGER, MARK FRIEDMAN,
DAVID JACKSON, AMY ARCHER, PAUL
VAN ORDEN, ROBERT CRUSER,
CHARLES HALES, and STEVEN MARKS,

                    Defendants.

_____

Case No. 3:14-cv-1017-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

          Plaintiffs DeWalt Productions Inc. *dba* Fontaine Bleau ("DPI") and Rodney DeWalt

("DeWalt")(collectively "Plaintiffs"), filed this civil rights action against numerous state and city entities and officials.  Defendants City of Portland, Theresa Marchetti, Mark Kruger, Mark Friedman, David Jackson, Amy Archer, Paul Van Orden, Robert Cruser and  Charles Hales (collectively "City Defendants") and Steven Marks ("Marks") have filed motions to dismiss specific claims and allegations for failure to state a claim or based on sovereign, absolute, or qualified immunity.  Specifically:

1. City Defendants and Marks ("Defendants") seek dismissal of Plaintiffs' Second and Third Claims for Relief alleging procedural due process violations, Sixth Claim for Relief alleging a First Amendment violation based on the right to associate, Tenth Claim for Relief alleging intentional interference with economic relations, and Eleventh Claim for Relief alleging intentional infliction of emotional distress.

2. Marks seeks dismissal of Plaintiffs' First Claim for Relief alleging race discrimination under 42 U.S.C. §1981 and Plaintiffs' claim for punitive damages with regard to Plaintiffs' state law claims.

3. Theresa Marchetti, Mark Kruger, Mark Friedman, David Jackson, Amy Archer, Paul Van Orden, and Robert Cruser ("Individual City Defendants") seek dismissal on all claims generally, but specifically with regard to Plaintiffs' Seventh and Eighth Claims for Relief alleging a conspiracy to interfere with Plaintiffs' civil rights and negligent failure to prevent such interference, and the City of Portland ("City") seeks dismissal based on Plaintiffs' failure to adequately allege a claim for municipal liability.

4. City Defendants move to strike allegations of historical race discrimination by the City and its employees.

The court finds DeWalt has alleged a protected contract interest and Plaintiffs have alleged protected property and liberty interests and a right to post-deprivation process, but no causal relationship between City Defendants' actions and a violation of Plaintiffs' procedural due process rights; a conspiracy among Defendants to discriminate against Plaintiffs based on race and music preference and acts taken in furtherance of such conspiracy; improper means of interference with economic relations by Marks; adequate conduct supporting claims against some, but not all, of the Individual City Defendants; and a municipal liability claim against the City, but not a right to associate protected by the First Amendment. The court further finds Marks's employer waived its Eleventh Amendment immunity, Marks is not entitled to absolute immunity, and Defendants are not entitled to qualified immunity. Finally, the court finds Plaintiffs' general historical allegations are immaterial.

Accordingly, the court denies Marks's motion to dismiss DeWalt's § 1981 claim, Plaintiffs' procedural due process claims, and Plaintiffs' state law claims, and Individual City Defendants' motion to dismiss Plaintiffs' conspiracy claims. Defendants' motions to dismiss Plaintiffs' First Amendment claim for violation of the right to associate; City Defendants' motion to dismiss Plaintiffs' procedural due process claims; and Marks's motion to dismiss Plaintiffs' request for punitive damages with regard to their claim for intentional infliction of emotional distress are granted. Individual City Defendants' motion is denied with regard to Plaintiffs' Fourth, Seventh, Eighth, and Eleventh Claims for Relief for all Individual City Defendants, Plaintiffs' First and Tenth Claims for Relief for Mark Kruger and Robert Cruser, and Plaintiffs' Fifth Claim for Relief for Mark Kruger, Mark Friedman, and Robert Cruser. Finally, City Defendants' motion to strike is granted with regard to paragraphs 21, 23, 26, and 27.

*Background*

The following summary of facts is derived from the thirty-six page, eleven-claim first amended complaint filed by Plaintiffs on November 2, 2015 ("Complaint").  The summary also incorporates exhibits filed by Defendants in support of their motions to dismiss.  A district court ruling on a motion to dismiss "may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned."  *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (citing  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998), *superceded by statute on other grounds as stated in Abrego v. Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006)).  The exhibits were impliedly referenced in the Complaint and their authenticity is not questioned.  Accordingly, the exhibits are  properly before the court.

In 2012,  DeWalt, a black businessman with extensive experience in the nightclub business, arrived in Portland, Oregon ("Portland"), to open a night club.  (First Am. Compl., ECF No. 42 ("Compl."), ¶¶ 33, 34.)  Plaintiffs applied  for obtained and necessary licenses, including a liquor license (the "License"), to open a nightclub known as the Fontaine Bleau ("Fontaine").  (Compl. ¶¶ 8, 34.)  Plaintiffs opened the Fontaine for business in January 2013.  (Compl. ¶  35.)  The Fontaine played hip-hop music, curated hip-hop events, and catered to the black community.  (Compl. ¶ 2.) It was located on a four-lane major arterial in an area zoned "Commercial" by the City, adjacent to an area zoned "Employment," and surrounded by a sports arena, car dealerships and lots, other businesses, and a vacant warehouse.  (Compl. ¶ 48.)

Defendants allegedly conspired to "severely limit Mr. DeWalt's freedom to operate his business and ultimately to close the Foutaine Bleau" due to the racial identity of DeWalt and his customers.  (Compl. ¶¶ 2, 3.)  Alleged evidence of such conspiracy started less than two months after

the Fontaine opened.

On June 23, 2013, Portland Police Bureau ("Bureau") Officers Asheim and Dale arrested an individual two blocks from the Fontaine on a warrant and charged him with possessing a handgun. (Compl. ¶ 41.) On July 21, 2013, police officers responded to DeWalt's request for assistance with a combative customer of the Fontaine, arrested the customer, and charged him with trespassing. (Compl. ¶ 42.)

On July 27, 2013, Officer Asheim spotted and made contact with two known gang members in the vicinity of the Fontaine. (Compl. ¶ 43.) After Officer Asheim patted the individuals down for weapons and cleared them of any outstanding warrants, the individuals entered the Fontaine. (Compl. ¶ 43.) Officer Asheim did not notify DeWalt, or his security staff, of the presence or identity of the gang members. (Compl. ¶ 43.) However, Officer Asheim noted in a police report describing the interaction: "this bar has had multiple instances of large fights and we have caught known gang members carrying hand guns leaving this bar within the last month." (Compl. ¶ 43.) Plaintiffs allege both of these statements were false. (Compl. ¶ 43.)

Lisa Ball, an individual who lived in the only residence within two blocks of the Fontaine, complained of noise coming from the Fontaine, and from people walking and sitting in cars in the neighborhood nearly every week over a period of several months. (Compl. ¶ 49.) Bureau officers responding to Ball's complaints occasionally reported the music was undetectable or barely audible from inside Ball's residence or the vehicle reportedly playing the music had left the area. (Compl. ¶ 50.) One officer reported hearing a slight bass sound upon arrival and, when asked, the Fontaine agreed to turn the bass down. (Compl. ¶ 50.) However, while driving around the neighborhood on August 17, 2013, in response to one of Ball's complaints, Bureau Officer Hornstein felt noise

vibrations in her patrol car and heard loud music and people talking, and filed a report indicating the same. (Compl. ¶ 51.) Officer Hornstein did not leave her patrol car to investigate, verify the music exceeded allowable limits and was coming from the Fontaine, or enter the Fontaine to discuss the noise complaint with Dewalt. (Compl. ¶ 51.) DeWalt used a small bass speaker in the Fontaine and regularly measured the decibels coming from his sound system to make sure they were within the legal level. (Compl. ¶ 52.) Plaintiffs allege the City does not routinely respond to noise complaints against white-owned businesses catering to a white audience and playing music other than hip hop. (Compl. ¶ 59.)

On August 23, 2013, Sergeant Mark Friedman, a Bureau employee assigned to the North Precinct Street Crimes Unit ("Sergeant Friedman"), arrived at the Fontaine with ten to fifteen officers, as well as Portland Fire Bureau Fire Inspector Robert Cruser ("Inspector Cruser"), and advised DeWalt "the City of Portland does not like these types of events you are having, it does not like the type of music being played, and the City will not tolerate it." (Compl. ¶¶ 13, 17, 44.) Despite the absence of any known criminal activity at the time, several of the officers were outfitted in vests or other clothing suitable for a violent confrontation. (Compl. ¶ 44.)

Also on August 23, 2013, security personnel from the Fontaine contacted Sergeant Friedman and expressed concern for their safety at an "after party" to be hosted at the Fontaine the following evening. (Davis Decl. Ex. 1, at 2.) DeWalt agreed with the safety concerns of his security officers and indicated he intended to change his format. (Davis Decl. Ex. 1, at 3.) However, the next night, Bureau officers returned to the Fontaine in response to a call reporting fighting among a large group of people. (Compl. ¶ 45.) In his report, Bureau Officer McGuffey noted he observed no fighting, only "a very large group of black males and females (about 50-70) walking to their cars while some

yelled at each other" and, upon entering the Fontaine, which was then closed, identified an order of marijuana. (Compl. ¶ 45.)  The officers did not make any arrests or use any force in dispersing the crowd.  (Compl. ¶ 45.)

For three weeks in September 2013, Plaintiffs hosted events attended predominantly by white, gay women. (Compl. ¶ 46.) DeWalt planned these events in response to Sergeant Friedman's statement regarding the City's dislike of hip-hop music events.  (Compl. ¶ 46.)  The City did not issue any citations, or create any police reports, during this period.  (Compl. ¶ 46.)

On October 5, 2013, after the Fontaine returned to a hip-hop format catering to a black audience, Inspector Cruser visited the Fontaine and issued a formal warning to DeWalt for failing to keep a tally of his customers as they entered the Fontaine and advised DeWalt he would be fined the next time it happened.  (Compl. ¶ 60.)  Plaintiff alleges there is no legal requirement for businesses within the City to keep an ongoing count of customers as they enter premises and failure to do so does not provide legal basis for a warning or violation.  (Compl. ¶ 60.)

Also in early October, Paul Van Orden, the City's Noise Control Officer ("Van Orden"), working with Amy Archer, the City's Operations and Livability Programs Manager for Neighborhood Involvement ("Archer"), Theresa Marchetti, the Coordinator and/or Specialist in Neighborhood Involvement's liquor licensing program ("Marchetti") and Inspector Cruser, issued a noise violation citation based on Officer Hornstein's August 17, 2013 report (the "Citation"). (Compl. ¶¶ 11, 15, 16, 53.)  Despite knowing DeWalt was the manager and owner of the Fontaine, Van Orden issued the Citation to the Fontaine's off-site landlord thereby depriving DeWalt of standing to appeal the Citation.  (Compl. ¶¶ 54-56.)  Despite requests by DeWalt and the landlord to transfer the itation to DeWalt, the City, acting through Van Orden and Archer, refused to allow

DeWalt to participate in the adjudication of the Citation and advised the landlord, after he paid the $300 fine, any additional noise violation would result in a penalty of between $1,000 and $5,000. (Compl. ¶¶ 57-58.)

On October 10, 2013, DeWalt and his legal counsel met with various City representatives to discuss the City's concerns regarding police reports, primarily those related to noise, at the Fontaine. (Compl. ¶ 62.) Despite not having any involvement with gang activity, Inspector Cruser requested he be allowed to attend the hearing. (Compl. ¶ 62.) In an email to Marchetti, Inspector Cruser explained he had prior dealings with DeWalt who "told me the same thing about converting to a 'lesbian club' after we butted heads over his occupant load following the E-40 thing. I stopped by there during the 'Brotha Lov' event at the Refuge Saturday night and it turns out that he (Brotha Lov) is Dewalt's primary promoter. 'B-L's' primary following allegedly consists of Bloods according to Adrian from Gang Outreach." (Compl. ¶ 63.) Also present at the meeting were Marchetti, Van Orden, Bureau Officer David Jackson, assigned to the Drugs and Vice Division and a Liquor License Investigator ("Officer Jackson"), and other representatives of the Bureau, Fire Department, and Neighborhood Involvement. (Compl. ¶¶ 14, 62.)

At the meeting, Inspector Cruser reminded DeWalt of his obligation to honor the maximum capacity requirement to avoid any citations. (Compl. ¶ 64.) Officer Jackson advised DeWalt of the numerous noise complaints made with regard to the Fontaine and surrounding area. (Compl. ¶ 64.) Officer Jackson disagreed with DeWalt's position that he was responsible solely for the noise generated by the Fontaine and not the Fontaine's customers, and advised he would hold DeWalt responsible for people in the area, not just in the Fontaine. (Compl. ¶ 64.) Similarly, Marchetti explained to DeWalt he could be charged with loitering if he allowed customers to stand in front of

the Fontaine, characterizing them as lewd, vulgar, and filthy.  (Compl. ¶ 65.)  Officer Jackson also warned DeWalt known gang members and their affiliates frequented the Fontaine.  (Compl. ¶ 65.)

During the meeting, unidentified City representatives directed DeWalt to identify gang members frequenting the Fontaine; determine if customers were on probation or parole before allowing them in the Fontaine; control noise created by Fontaine customers within a two-block radius of the Fontaine, including preventing patrons from laughing, talking, or playing loud music as they walked to their cars; create and enforce a dress code; stop playing hip-hop music in the Fontaine; prevent a line of customers from forming outside of the Fontaine; and hire a security guard to patrol the streets surrounding the Fontaine.  (Compl. ¶ 66.)  Again, Plaintiffs allege these obligations are not imposed on businesses catering to non-black customers playing music other than hip hop.  (Compl. ¶ 67.)

DeWalt advised City representatives he was new to Portland and did not know the identity of local gang members.  (Compl. ¶ 68.)  He  represented his security guards "patted down" and searched each customer with a metal wand before allowing them to enter the Fontaine.  (Compl. ¶ 65.)  The guards were told to turn away any identified or suspected gang member and inform DeWalt of such activity.  (Compl. ¶ 68.)  DeWalt suggested the City could help alleviate issues by providing extra patrols in the area of the Fontaine on busy nights.  (Compl. ¶ 65.)  When DeWalt asked if the City had a list of banned promoters other than "Brotha Luv" and "Steve", City representatives replied "no".  (Compl. ¶ 68.)  Despite expressing concerns about DeWalt's ability to make the Fontaine a safe place, City representatives did not provide DeWalt with additional information or assistance, or the name of a designated contact to call when problems arise.  (Compl. ¶ 69.)

On October 13, 2013, Inspector Cruser returned to the Fontaine and conspicuously parked

his marked vehicle outside on the pretext of counting customers entering the premises.  (Compl. ¶ 61.)  DeWalt advised Inspector Cruser he felt harassed by Inspector Cruser's unnecessary surveillance of the Fontaine.  (Compl. ¶ 61.)

In early November 2013, DeWalt agreed to host the "Annual Scorpio Bash" scheduled for November 8, 2013 (the "Bash").  (Compl. ¶ 71.)  The Bash was billed as a semi-formal, black-tie event featuring a special guest celebrity from VH1's Love & Hip Hop.  (Compl. ¶ 72.)  DeWalt had discussed security concerns with Fontaine's head of security and manager, and all thought it would be safe to hold the event.  (Compl. ¶ 72.)  DeWalt required the promoter to provide six security guards for the Bash, four more than necessary for the Fontaine's occupancy limit of 155.  (Compl. ¶¶ 73, 79.)  DeWalt directed the guards to "secure the entrance from gang members, pat down the patrons for weapons, and enforce the age restrictions and dress codes."  (Compl. ¶ 79.)

The day of the event, the Bureau received an anonymous tip gang members would be attending the Bash.  (Compl. ¶ 74.)  The Bureau also was aware of the Bash promoter's history of attracting gang members to his events and of shootings at the most recent event.  (Compl. ¶ 75.)  When Bureau officers arrived at the Bash, they identified several gang members and received information from a security guard that a large number of gang members had entered the Fontaine.  (Compl. ¶¶ 76, 77.)  Officer Asheim left the vicinity with the other Bureau officers and  reported the presence of gang members at the Bash to the Bureau precinct officer.  (Compl. ¶ 78.)  No one from the Bureau provided any of this information to DeWalt that evening.  (Compl. ¶¶ 75-78.)

Sometime during the Bash, DeWalt entered the restroom and found three men arguing.  (Compl. ¶ 80.)  While DeWalt informed the occupants he would not tolerate a disruption at the Fontaine, a fourth man entered the bathroom and the dispute.  (Compl. ¶ 80.)  DeWalt briefly left

the restroom to evict the fourth aggressive male guest from the Bash. (Compl. ¶ 80.)  When DeWalt returned to the restroom, a small crowd had gathered and become more aggressive, prompting DeWalt to shut down the Bash, turn on the lights, and evacuate the Fontaine.  (Compl. ¶¶ 80, 82. 36.)  A security guard called the Bureau to report the "fight".  (Compl. ¶ 81.)  Shortly thereafter, a black man was shot and killed on the sidewalk outside the Fontaine.  (Compl. ¶ 84.)

On November 9, 2013, Captain Mark Kruger, assigned the to Bureau's Drug and Vice Division ("Captain Kruger"), wrote a letter asking the Oregon Liquor Control Commission (the "OLCC") to immediately suspend the License.  (Compl. ¶ 85; Manlove Decl., ECF No. 51, Ex. 1.) Captain Kruger explained: "[t]he City of Portland believes the lack of willingness or ability to control the location will [culminate] in further acts of violence . . . [and] feels that the emergency suspension will allow licensee an opportunity to meet with representatives from Portland Police, Portland Fire and OLCC to discuss how to implement an effective plan to safely operate the venue." (Compl. ¶ 85; Manlove Decl. Ex. 1 at 3-4.)

Later that day, Steven Marks, Director of the OLCC ("Marks"), issued an Order of Immediate License Suspension and Notice of Opportunity for Hearing (the "Order") citing alleged violations of OR. REV. STAT. § 471.315(1)(c) and referencing several incidents he described as creating a "history of serious and persistent problems involving disturbances, lewd or unlawful activities or noise either in the premises or involving patrons of the establishment in the immediate vicinity of the premises."  (Compl. ¶¶ 19, 87; Davis Decl., ECF No. 49, Ex. 1 at 1.)  For example, the Order noted that on June 23, 2013, Bureau officers arrested an armed individual leaving the Fontaine on an outstanding warrant.  (Davis Decl. Ex. 1, at 1.)  Additionally, the Order indicated that on July 20, 2013, the Bureau responded to a call from the Fontaine and arrested an aggressive customer who

refused to leave the premises.  (Davis Decl. Ex. 1, at 2.)  The Order also discussed the November 9, 2013 fight and shooting.  (Davis Decl. Ex. 1, at 2.)  The Order referenced a noise complaint investigated in June 2013 during which Bureau officers heard loud bass coming from the Fontaine and observed twenty-five people loitering by the front door.  (Davis Decl. Ex. 1, at 1.)  Finally, the Order stated a Bureau officer noted the odor of marijuana inside the Fontaine while responding to a fight call at the Fontaine on August 24, 2013.  (Davis Decl. Ex. 1, at 2.)

Based on these reported activities and several prior discussions with DeWalt regarding the dangerous activity at the Fontaine, Marks determined DeWalt did not have the ability to control the serious problems occurring in and around the Fontaine and the Fontaine "created a serious danger to the public health and safety."  (Davis Decl. Ex. 1, at 3.)  He concluded "[b]ecause the licensee has failed to take immediate and effective action to prevent this danger to the public health and safety, the Commission must impose this immediate suspension to keep the public from further harm."  (Davis Decl. Ex. 1, at 3.)  Plaintiffs characterize all of the incidents described in the Order as "pretextual."  (Compl. ¶ 88.)

The quick response to Captain Kruger's request was unprecedented, as evidenced by Marchetti's email comment: "We were able to get an emergency suspension within 24 hours – that's a first."  (Compl. ¶ 90.)  In a subsequent email congratulating those who assisted in obtaining the Order, Marchetti stated: "[T]he City would like to thank the OLCC for their collaboration in addressing the very serious situation at Fontaine Bleau this weekend.  This is exactly the type of situation that requires agencies to act quickly and definitively to ensure that the public is protected from further harm, and the OLCC acted as a strong partner to the [Bureau]."  (Compl. ¶ 91.)  Because liquor sales were the Fontaine's primary source of revenue, the Order, and resulting

suspension of the License, effectively shutdown the Fontaine on November 9, 2013.  (Compl. ¶¶ 87,

104.)

Plaintiffs allege the OLCC and Marks drafted a proposed settlement offer allowing the

reinstatement of License contingent upon Plaintiffs implementation of stricter operating methods,

but such agreement was never provided to Plaintiffs.  (Compl. ¶ 92.)  Additionally, Defendants did

not work with Plaintiffs to discuss how to implement a plan to safely operate the Fontaine and, in

fact, the OLCC advised DeWalt he would never hold an OLCC license again when he tried to renew

the License in mid-November 2013.  (Compl. ¶ 94.)

DeWalt appealed the Order and a hearing was scheduled for December 4, 2013.  (Compl. ¶

96.)  On November 27, 2013, City Mayor Charles Hales ("Mayor Hales") learned of a plan between

the City and OLCC to suspend the License permanently in the event DeWalt regained the License

at the hearing.  (Compl. ¶ 95.)  In an email, Marks assured  Mayor Hales's office: "that OLCC is

going to try their best to implement your recommendations for a permanent suspension."  (Compl.

¶ 95.)  Similarly, the day before the hearing, an OLCC employee advised Inspector Cruser that after

the hearing, the OLCC would be "pursuing a couple of violations to cancel the License."  (Compl.

¶ 97.)

At the December 4, 2013 hearing, DeWalt argued the OLCC failed to properly serve the

Order on Plaintiffs.  (Compl. ¶ 98.)  Allegedly, the hearings officer told DeWalt the absence of

proper service would result in a ruling in his favor and his liquor licence would be reinstated.

(Compl. ¶ 98.)  On December 11, 2013, DeWalt received a certified letter from the OLCC informing

him the License had been reinstated effective immediately.  (Compl. ¶ 98; Davis Decl. Ex. 2.)  Later

that same day, DeWalt received a second Order of Immediate License Suspension and Notice of

Opportunity for Hearing from the OLCC which was virtually identical to the Order (the "Second Order"). (Compl. ¶ 100; Davis Decl. Ex. 3.)

In a December 16, 2013 letter, Marks notified DeWalt the OLCC had initiated proceedings to permanently cancel the License based on violations of OR. REV. STAT. § 471.315(1)(c) (the "Notice"). (Compl. ¶ 102; Davis Decl. Ex. 4.)  The Notice identified more than forty noise complaints and incident reports relating to the Fontaine during the period from February 22, 2013, to November 9, 2013, most of which were not included in the Order or the Second Order. (Compl. ¶ 102; Davis Decl. Ex. 4.)  Plaintiffs claim many of these incidents and complaints were mischaracterized or unfounded. (Compl. ¶ 102.)

Any appeal of the Second Order by DeWalt would have required another hearing. (Compl. ¶ 103.)  In the meantime, the loss of the License violated the terms of the ten-year lease for the premises in which the Foutaine was located (the "Lease"), resulting in the eviction of the Fontaine, the cancellation of the Lease, and the loss of DeWalt's nearly $420,000 investment in the Fontaine. (Compl. ¶¶ 34, 103, 105.) In light of the OLCC's representation that DeWalt would never again hold an OLCC license, the eviction of the Fontaine, and the cancellation of the Lease, Plaintiffs elected not to purse an appeal of the Second Order or a hearing on the Notice and, instead, filed a notice of tort claim with Defendants on December 22, 2013. (Compl. at 5; ¶ 103.)  The License expired on December 31, 2013. (Manlove Decl. Ex. 6, at 7.)

In a March 19, 2014 Final Order by Default, the OLCC issued a letter of reprimand to Plaintiffs based on the allegations set forth in the Notice (the "Final Order"). (Manlove Decl. Ex. 6.) The OLCC made findings of fact recognizing numerous noise and other complaints reported to, and violations issued by, the City Defendants with regard to Plaintiffs and their customers in 2013.

The OLCC also noted DeWalt denied any responsibility for his customer's conduct after they left the Fontaine. (Manlove Decl. Ex. 6, at 3-7.) Specifically, the OLCC found Plaintiffs knowingly "permitted disorderly activities on the licensed premises or in the areas the licensee controls that are adjacent to or outside the premises in violation of OAR 845-006-0347(2)(a)" with regard to the November 9, 2013 shooting and riot; allowed an uncertified security to provide private security services in violation of OR. ADMIN. R. 845-006-0347(3); and permitted noisy activities on or around the licensed premises, as evidenced by the Citation, in violation of OR. ADMIN. R. 845-006-0347(2)(a), and that Plaintiffs has "neither the willingness nor the ability to adequately control the licensed premises and patrons' behavior in the immediate vicinity of the premises." (Manlove Decl. Ex. 6, at 8-11.)

The OLCC explained "that the 41 documented incidents in an eight and a half-month period constitute a persistent problem. Moreover, the incidents are serious because they involved illegal drugs, minors, and/or violence. Therefore, the Commission concludes that Licensee's record constitutes a history of serious and persistent problems. A violation of ORS 471.315(1)(c) has been established." (Manlove Decl. Ex. 6, at 8.) While two of the violations warranted cancellation of the License and two would have resulted in up to a thirty-day suspension or a $5,000 fine, in light of the previous expiration of the License the OLCC issued only a Letter of Reprimand. (Manlove Decl. Ex. 6, at 11.)

The OLCC issued a second Final Order by Default on April 3, 2014, finding the License was appropriately suspended by the Second Order (the "Second Final Order"). (Manlove Decl. Ex. 5.) The OLCC found Plaintiffs' "continued operation of the premises constituted a serious threat to public health and safety in violation of ORS 183.430(2);" the "Commission followed proper

procedures in issuing the Immediate Suspension Order;" and "the continued operation of the premises from December 11, 2013 through December 31, 2013, would have constituted a serious threat to public health and safety." (Manlove Decl. Ex. 5, at 3-4.) DeWalt moved to Minnesota in May of 2014 to open a restaurant but was denied a required change of use permit based on his history with the Fontaine. (Compl. ¶ 105.)

Plaintiffs allege Defendants' actions were based on the race and music preferences of DeWalt and his customers, and the City treats clubs playing hip hop music that are owned and frequented by non-black individuals differently than non-black clubs playing other kinds of music. (Compl. ¶ 1.) Plaintiffs generally allege the City Defendants created fraudulent reports and charges against the Fontaine and failed to meaningfully inform them of "known dangers and failed to take action to ensure public safety and prevent these dangers" (Compl. ¶¶ 31, 48.) In support of these allegations, Plaintiffs allege a history of racial discrimination in the state of Oregon predating the 1920s. (Compl. ¶ 21.) Plaintiffs summarize actions taken by the City against black-owned nightclubs and restaurants from 1920 to the present day, including "an inordinate amount of regulatory attention" from the City, the Bureau, the Fire Department, the OLCC, and Neighborhood Involvement, and the City's failure to assist black-owned nightclubs and restaurants with criminal activity, which ultimately resulted in the closure of the Fontaine. (Compl. ¶¶ 22-30.) Plaintiffs also allege facts establishing Defendants' historical preference for similarly situated non-black nightclubs. (Compl. ¶¶ 106-110.) Plaintiffs identify four nightclubs that catered to predominantly white clientele whose liquor licenses were not suspended despite a history of police involvement and shootings outside each club. (Compl. ¶¶ 106-109.)

Plaintiffs allege claims for race discrimination; procedural due process violations; equal

protection violations; violation of First Amendment rights, conspiracy to interfere with, and failure

to prevent the violation of, civil rights; intentional interference with economic relations, and

intentional infliction of emotional distress. Plaintiffs seek economic damages in the amount of

$2,500,000; non-economic damages in the amount of $5,000,000; punitive damages in the amount

of $15,000,000; and attorney's fees and costs. (Compl. at 36.)

*Legal Standard*

I.  Motion to Dismiss

A well-pleaded complaint requires only "a short and plain statement of the claim showing

that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2) (2016).  A federal claimant is not

required to detail all factual allegations; however, the complaint must provide "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "Factual allegations must be

enough to raise a right to relief above the speculative level." *Id*.  While the court must assume that

all facts alleged in a complaint are true and view them in a light most favorable to the nonmoving

party, it need not accept as true any legal conclusion set forth in the complaint.  *Ashcroft v. Iqbal*,

556  U.S. 662, 678 (2009).  Additionally, a plaintiff must set forth a plausible claim for relief – a

possible claim for relief will not do.  "In sum, for a complaint to survive a motion to dismiss, the

non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly

suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969

(9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678); *Sheppard v. David Evans and Assoc.*, No. 11-

35164, 2012 WL 3983909 at *4 (9th Cir. Sept. 12, 2012) ("The Supreme Court has emphasized that

analyzing the sufficiency of a complaint's allegations is a 'context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679)).

II.  Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that a court may, on its own or on a motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f) (2016).  "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded.'" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds, Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534-535 (1994) (citing 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1382, at 706-07 (1990)).  "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* at 711.

The purpose of a Rule 12(f) motion is to avoid the costs that arise from litigating spurious issues by dispensing with those issues prior to trial.  Motions to strike are generally viewed with disfavor and are not frequently granted.  *See Bassiri v. Xerox Corp.*, 292 F. Supp. 2d 1212, 1220 (C.D. Cal. 2003), *rev'd on other grounds, Bassiri v. Xerox Corp.*, 463 F.3d 927 (9th Cir. 2006).  Courts must view the challenged pleading in the light most favorable to the pleader.  *Id.*  Generally, "motions to strike should be denied unless it can be shown that no evidence in support of the allegation would be admissible, or those issues could have no possible bearing on the issues in the litigation."  *Gay-Straight Alliance Network v. Visalia Unified School Dist.*, 262 F. Supp. 2d 1088, 1099 (E.D. Cal. 2001).

/ / / / /

/ / / / /

*Discussion*

I.  Motion to Dismiss

A.  *First Claim for Relief – Race Discrimination under § 1981*

Plaintiffs allege Defendants deprived them of their right to make and enforce contracts based on their race and status as a night club catering to black customers in violation of 42 U.S.C. § 1981. Marks[1] moves to dismiss this claim with regard to DeWalt as the License was owned by DPI, not DeWalt.  Accordingly, DeWalt is unable to state a claim with regard to the License.  Plaintiffs contend they are asserting a § 1981 claim based on both the suspension of the License and the resulting termination of the Lease.

Section 1981 prohibits race discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(a) (2016). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contacts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (2016).   To establish a viable claim under § 1981, a plaintiff must allege: "(1) he is a member of a racial minority; (2) defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract." *Allen v. U.S. Bankcorp,* 264 F. Supp. 2d 945, 952 (D. Or. 2003). Additionally, the plaintiff must allege the impairment of a contract "under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  A shareholder or contracting officer of a corporation has no rights under the corporation's contracts.  *Id*. at 477.

It is clear from the correspondence between the OLCC and Plaintiffs that DPI, not DeWalt,

---

[1]City Defendants join in Marks's motion to dismiss on this issue.  (Partial Joinder of City Defs. to Def. Marks's FRCP 12 Motions Against Pl.'s First Am. Compl., ECF No. 54 ("City Defendants' Joinder").)

was the owner of the License.  Consequently, DeWalt had no contractual rights under the License

and may not pursue a § 1981 claim based on the License.  However, DeWalt alleges "he held a real

property interest in Fontaine Bleau as the commercial lessee."  As the lessee, DeWalt was a party

to the Lease and had rights under the Lease.  DeWalt has alleged an adequate contract right in the

Lease to support his § 1981 claim.  Marks's motion to dismiss DeWalt's § 1981 claim is denied.

### B.  Second and Third Claims for Relief – Procedural Due Process

Plaintiffs allege Defendants deprived them of their right to procedural due process with

regard to both liberty and property interests.  In the Second Claim for Relief, Plaintiffs allege

Defendants conspired to, and did in fact, deprive DeWalt of his "ability to work in his chosen

occupation and area of business, damaged his reputation, and grossly interfered with his contractual

and business relationships" without requisite procedural due process in accordance with the City's

policy, practice, or custom to discriminate against night clubs based on the race or musical

preferences of the club owner or customers.  (Compl. ¶¶ 125-128.)  Plaintiffs allege similar intent,

conspiracy, and conduct with regard to Plaintiffs' property interest in the Fontaine and related

economic endeavors.  (Compl. ¶¶ 132-137.)  Plaintiffs specifically allege Defendants violated their

procedural due process rights by "intentionally denying Plaintiffs the right to appeal from a noise

citation, serving the OLCC Shutdown Order illegally, and denying Plaintiffs the right to have their

appeal from the Shutdown Order fully adjudicated."  (Compl. ¶ 133.)

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life,

liberty, or property, without due process of law."  U.S. CONST.  amend. XIV, § 1.  "The Due Process

Clause forbids the governmental deprivation of substantive rights without constitutionally adequate

procedure."  *Shanks v. Dressel*, 540 F.3d 1082, 1090-91 (9th Cir. 2008).  To prevail on a procedural

due process claim plaintiff must establish: (1) a constitutionally protected liberty or property interest; (2) a deprivation of that interest by the government; and (3) the lack of adequate process. *Id*. at 1090. Though the property interest in question may be created and defined by state law, the type of process due when one is deprived of that interest is a question of federal law. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 540-41 (1985). Due process generally requires that those who have a protected property interest be afforded notice and an opportunity to respond before being deprived of property. *Id*. at 542. "When state remedies are adequate to protect an individual's procedural due process rights, a section 1983 action alleging a violation of those rights will not stand." *Brogan v. San Mateo County*, 901 F.2d 762, 764 (9th Cir. 1990).

City Defendants move to dismiss Plaintiffs' procedural due process claims contending Plaintiffs have failed to allege violation of a property interest,[2] and all Defendants move to dismiss the claims arguing the post-deprivation procedures available to Plaintiffs were adequate. Additionally, City Defendants argue their inability to suspend or cancel the License eliminates any causal link between their actions and the deprivation of Plaintiffs' liberty and property interests.

### 1. Property Interest

Defendants argue the loss of Plaintiffs' liberty and property interests are based solely on the loss of the License. Defendants contend the License is not property interest entitled to procedural due process protections. Accordingly, Defendants move to dismiss Plaintiffs' Second and Third Claims for Relief for failure to state a claim.

"The requirements of procedural due process apply only to the deprivation of interests

---

[2]Marks joins in the City Defendants' motion to dismiss on this issue. (Partial Joinder of Def. Marks to City Defs.' Rule 12 Motions to Dismiss and Strike, ECF No. 53 ("Marks's Joinder").)

encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). While the Supreme Court has interpreted the terms liberty and property interest broadly in the context of the Fourteenth Amendment, it has recognized that "the range of interests protected by procedural due process is not infinite." *Id.* at 570.

A property interest sufficient to support a claim for procedural due process exists when an individual has a reasonable expectation of entitlement deriving from "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already-acquired in specific benefits." *Id.* at 576. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. Property interests take many forms, such as an interest in continued receipt of welfare benefits and an interest in continued public employment under the terms of a contract. *Id.* at 576-77.

Defendants argue the Oregon statutes describing the characteristic of the License require a finding the License did not qualify as a property interest for the purposes of procedural due process. OR. REV. STAT. 471.292(1)(g) expressly states a license granted under the Liquor Control Act "shall not constitute property." However, "the property interests protected by due process extend well beyond actual ownership of real estate, chattels, or money." *Roth*, 408 U.S. at 572.

Oregon statutes also provide that a liquor license will "[b]e valid for the period stated in the license" and may be cancelled or suspended before expiration of this period if the OLCC finds, or

has reasonable grounds to believe, the licensee has engaged in listed prohibited actions or activities. OR. REV. STAT. 471.292(1)(b); 471.315 (2015). The court finds these facts are similar to those found by the Ninth Circuit to create a "protectible interest in retaining . . . existing license tags. *See Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 64 (9th Cir. 1994). In *Wedges/Ledges*, the manufacturer, distributor, and operators of arcade amusement games filed an action claiming the revocation of existing license tags issued to their machines violated their procedural due process rights. *Id*. at 60. The Ninth Circuit, overruling the district court's finding the operators did not have a protected property interest in their game licenses, noted the city code provision governing such licenses provided the license was issued "for the life of the machine *so long as the machine is not altered and the license fees remain paid*." *Id*. at 64. The court found the language of the statute to create a substantive limitation on the discretion of the City to revoke the licences. "I[t] only allows the City Treasurer to intervene in the event that the tag holder alters the machine or fails to pay the license fee." *Id*. Accordingly, the game operators had a reasonable expectation of entitlement to the license during the life of the machine. *Id*. at 62, 64.

Here, the OLCC issued the License to DPI for a specified term and did not have unfettered discretion to revoke the License at any time. Rather, the OLCC was allowed to intervene only if the Fontaine violated the provisions set forth in OR. REV. STAT. 471.315. Consequently, DPI had a reasonable expectation, or a legitimate claim of entitlement, to the continuation of the License through the end of its term. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) ("a state operating license that can be revoked only 'for cause' creates a property interest.").

Additionally, DeWalt had a protected liberty interest in his right to pursue an occupation of his choice. Liberty interests are not limited to freedom from bodily restraint but also include the

right of an individual to "contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Roth*, 408 U.S. at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).  The Ninth Circuit has unequivocally held an individual's interest in pursuing the occupation of bar owner is a liberty interest entitled to due process protections.  *Benigni v. City of Hemet*, 879 F.2d 473, 478 (9th Cir. 1989).  Plaintiffs have adequately alleged liberty and property interests constitutionally protected under the Fourteenth Amendment.

> 2.  Adequate Process

"The fundamental requirements of procedural due process are notice and an opportunity to be heard." *Conner v. City of Santa Ana*, 897 F.3d 1487, 1492-93 (9th Cir. 1990).  The determination of what procedural protections are required under the Constitution in a particular case is based on three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 355 (1976).  Generally courts applying this test have found "when a government-created property interest is at stake, due process principles require at least notice and an opportunity to respond in some manner, whether in writing or at an oral hearing, before termination of that interest." *Raditch v. United States*, 929 F.2d 478, 480 (9th Cir. 1991).  However, in some circumstances, "a statutory provision for a post-deprivation hearing, or common-law tort

remedy for erroneous deprivation, satisfies due process." *Zinermon v. Burch*, 494 U.S. 113, 128 (1990). Such extraordinary circumstances exist where the necessity of quick action by the State makes a pre-deprivation process impracticable or the potential length of the deprivation minimizes the likelihood of serious loss. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978).

a. Pre-Deprivation Process

Plaintiffs contend the process afforded them prior to the issuance of the Order was inadequate. Plaintiffs were provided no process prior to the issuance of the Order, which was issued less than twenty-four hours after the November 9, 2013 shooting. Defendants assert their interest in public safety justified an immediate suspension of the License and the post-deprivation procedures provided in the statutes adequately protected Plaintiffs' interests.

There is no doubt Plaintiffs' interest in the License and chosen occupation as a bar owner is substantial. However, the state has a substantial interest in the safety of its citizens. This interest is recognized by the Oregon legislature, which explicitly authorizes the OLCC to suspend or cancel any liquor license if the OLCC reasonably believes:

> That there is a history of serious and persistent problems involving disturbances, lewd or unlawful activities or noise either in the premises or involving patrons of the establishment in the immediate vicinity of the premises if the activities in the immediate vicinity of the premises are related to the sale or service of alcohol under the exercise of the license privilege. Behavior that is grounds for cancellation or suspension of a license under this section where so related to the sale or service of alcohol, includes but is not limited to obtrusive or excessive, noise, music or sound vibrations; public drunkenness; fights; altercations; harassment or unlawful drug sales; alcohol or related litter; trespassing on private property; and public urination. Mitigating factors include a showing by the licensee that the problems are not serious or persistent or that the licensee has demonstrated a willingness and ability to control adequately the licensed premises and patrons' behavior in the immediate vicinity of the premises which is related to the licensee's sale or service of alcohol under the

licensee's exercise of the license privilege.

OR. REV. STAT. 471.315(1)(c) (2015).  The OLCC may suspend a liquor license without a hearing or notice to the affected party upon finding the activities are a serious danger to the public health or safety, and by providing specific reasons for such a finding in writing.  OR. REV. STAT. 183.430(2) (2015); OR. ADMIN. R. 137-003-0560(1) (2015).  Generally, the licensee is entitled to demand a hearing within ninety days of the suspension and, if requested, the OLCC must hold such hearing as soon as practicable after the demand and issue an order confirming, altering, or revoking the suspension.  OR. REV. STAT. 183.430(2).  Specifically, once a timely request for a hearing is received, the OLCC must refer the request to Office of Administrative Hearings ("Office") within seven days, the Office must complete a hearing and close the evidentiary record within thirty days of the referral and must issue a proposed or final order within fifteen days of closing the evidentiary record, and the OLCC must issue a final decision based on a proposed order within fifteen days of receiving such proposed order.  OR. ADMIN. R. 137-003-0560(3) (2015).

The Supreme Court has "traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety."  *Mackey v. Montrym*, 443 U.S. 1, 17 (1979). Similarly, the Ninth Circuit has held when a state legislature determines swift action may be necessary to protect public safety, the court must defer to such determination.  *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1382 (9th Cir. 1989)(citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 301-02 (1981)); *Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1318 (9th Cir. 1989)).  The existence of an important state interest, when coupled with a prompt administrative proceeding that definitely determines the issues, provides a licensee adequate process under the Constitution.  *Barry v. Barchi*, 443 U.S. 55, 64-65 (1979); *see also Holman v. City of Warrenton*,

242 F. Supp. 2d 791, 806-07 (D. Or. 2002) (summary governmental actions taken in emergent situation to protect citizens' safety and general welfare do not violate due process).

The OLCC's interest in protecting public safety and welfare, viewed in conjunction with the statutory provision of a prompt administrative proceeding intended to result in an order addressing the relevant issues, eliminates the requirement of pre-deprivation process. Plaintiffs were not entitled to notice and an opportunity to be heard prior to the issuance of the Order, which was issued with the purpose of protecting the public in an emergent situation, based upon reasonable belief, and supported by specific reasons. Plaintiffs are unable to state a claim for procedural due process violation based on the absence of pre-deprivation safeguards.

### b. Post-Deprivation Process

#### i. Noise Complaint

Plaintiffs allege Defendants violated their procedural due process rights when they denied DeWalt the opportunity to respond to the Citation. Plaintiffs' procedural due process claims are based on a property right in the License and a liberty interest in a chosen occupation, of which they were deprived when the OLCC issued the Order and Second Order. Plaintiffs have failed to allege any connection between the Citation and the Order or Second Order. The Citation is not identified in either the Order or Second Order and Plaintiffs do not allege Marks considered the Citation in conjunction with the issuance of such orders. In the absence of such connection, Plaintiffs may not rely on alleged procedural deficiencies with regard to the Citation in support of their procedural due process claims.

#### ii. Service of Order

Plaintiffs allege Defendants intentionally served the Order on Plaintiffs illegally to deprive

Plaintiffs of their due process rights. Due process principles require notice and an opportunity to to be heard. Plaintiffs clearly received sufficient notice of the Order. In fact, Plaintiffs timely requested an administrative hearing, raised the legality of the service, and addressed the merits of the Order at the hearing which occurred less than thirty days afer service of the Order. Plaintiffs are unable to allege a violation of their procedural due process rights based on the improper service of the Order.

### iii. Appeal of Order

Finally, Plaintiffs allege Defendants deprived them of a right to a timely, fully-adjudicated appeal by reinstating the License before the hearings officer could issue his findings. Unreasonable delay in the provision of meaningful post-deprivation remedies may support a procedural due process claim. "Prompt and adequate administrative review provides an opportunity for consideration and correction of errors made in initial eligibility determinations. Thus, the rapidity of administrative review is a significant factor in assessing the sufficiency of the entire process." *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975).

Plaintiffs requested and participated in a hearing on the Order on December 4, 2013. To this point, Plaintiffs had received the post-deprivation process to which they were entitled. However, apparently concerned the arguments made by Plaintiffs at the hearing were justified and would result in findings that favored Plaintiffs, Defendants reinstated the License on December 11, 2013, before the hearings officer issued his opinion. This action deprived Plaintiffs of an opinion addressing the issues raised in the hearing, as required under OR. REV. STAT. 183.430(2) and OR. ADMIN. R. 137-003-0560(3)(c). While the OLCC issued an order reinstating the License, such order was not issued pursuant to the hearing and did not resolve the issues presented at the hearing. Accordingly, the

OLCC effectively deprived Plaintiffs of meaningful  post-deprivation process.

Furthermore, Plaintiffs have alleged a viable procedural due process claim based on the absence of a timely hearing.  The OLCC prevented Plaintiffs from obtaining resolution of the issues presented in the Order by reinstating the License, apparently in an attempt to remedy the improper service.  The issuance of the Second Order, which was virtually identical to the Order, essentially extended the time in which Plaintiffs would receive meaningful review of the allegations contained in both orders.  Had the OLCC allowed the hearings officer to issue an opinion on the merits of the issues alleged in the Order, the opinion would have necessarily resolved the identical issues alleged in the Second Order, making the filing of the Second Order superfluous.  If the hearings officer, given the opportunity to issue an opinion, found in Plaintiffs' favor on the issues raised in the Order and reinstated the License on the merits, the defective service issue would have been irrelevant.  The OLCC's attempt to remedy the service issues by temporarily reinstating the License prevented the possibility of such outcome, to Plaintiffs' detriment.

During the unnecessary period of delay created by the momentary reinstatement of the License and the issuance of the Second Order, the Lease was cancelled, the Fontaine was evicted from the premises, and DeWalt lost his investment in the Fontaine.  "Due process 'requires provision of a hearing "at a meaningful time."  At some point, a delay in the post-termination hearing would become a constitutional violation.'" *Cassim v. Bowen*, 824 F.2d 791, 798 (9th Cir. 1987) (quoting *Loudermill*, 470 U.S. at 547).  The significance of a delay is evaluated with regard to the "importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood the interim decision may have been mistaken." *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242

(1988).

Here, the harm to Plaintiffs' interest in their business created by the delay was great. Defendants' actions creating the delay were questionably justified and were not necessarily related to the underlying governmental interest. Viewing the allegations of the Complaint in a light most favorable to Plaintiffs, Plaintiffs have stated a viable claim for a procedural due process violation based on the reinstatement of the License prior to receipt of an opinion addressing the merits of the Order and the issuance of the Second Order, which effectively deprived Plaintiffs of the opportunity to be heard at a meaningful time and in a meaningful manner.

### 3. Causal Link

City Defendants assert they lack the authority to suspend or cancel the License. Accordingly, Plaintiffs are unable to establish any causal relationship between City Defendants' actions and the suspension or cancellation of the License, defeating any claim against City Defendants for violating Plaintiffs' procedural due process with regard to such suspension or cancellation. Plaintiffs argue City Defendants' "generation of a pretextual record of violations by Plaintiff was the driving force behind the suspension and cancellation" of the License. (Pls.' Resp. to City Defs.' Rule 12 Mots. to Dismiss and Strike, ECF No. 59, at 10.)

Plaintiffs' Second and Third Claims for Relief allege claims under 42 U.S.C. § 1983, which provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State... subjects, or causes to be subjected, any citizen of the United States... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). This "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Crowe v. County of San Diego*, 608 F.3d 406, 430 (9th Cir. 2010).

Plaintiffs assert they have alleged a causal relationship by pleading City Defendants' participation in the conspiracy to suspend or cancel the License or setting in motion the events that resulted in the suspension cancellation. The court agrees Plaintiffs have sufficiently alleged the City Defendants' participation in the conspiracy to suspend or cancel the License and deprive DeWalt of his ability to engage in his chosen occupation of bar owner. Plaintiffs' claims for procedural due process violations, however, do not hinge on the deprivation of Plaintiffs' liberty and property interests, but rather the process provided to Plaintiffs with regard to such deprivation.

Plaintiffs' due process claims are grounded in the OLCC's momentary reinstatement of the License and immediate suspension of the License in the Second Order, which allegedly deprived Plaintiffs of a timely and meaningful resolution of the issues outlined in the Order. While Plaintiffs allege Mayor Hales and Marks cooperated with regard to a "contingency plan between the City and the OLCC to suspend the license permanently should Mr. DeWalt regain his license at the OLCC hearing," such communications occurred on November 27, 2013, well before the December 4, 2013 hearing during which the defective service issue was raised. There are no allegations City

Defendants participated in, or set in motion, the OLCC's decision to reinstate and immediately resuspend the Licence to remedy the defective service. Consequently, City Defendants' actions were not causally related to the violation of Plaintiffs' procedural due process rights based on the reinstatement and immediate resuspension of the License.

### 4. Conclusion

Plaintiffs have alleged property and liberty interests sufficient to support a claim for procedural due process violations based on the OLCC's reinstatement of the License and immediate resuspension of the License by the Second Order, which allegedly deprived Plaintiffs of a timely and meaningful resolution of the issues raised in the Order and argued at the hearing. Plaintiffs have failed to allege City Defendants participated in such actions and, therefore, have failed to allege a viable claim for due process violations against City Defendants. City Defendants are entitled to the dismissal of Plaintiffs' Second and Third Claims for Relief. Marks's motion to dismiss the claims is granted with regard to pre-deprivation process, the Citation, and defective service, but denied with regard to actions taken after the hearing.

### C. Sixth Claim for Relief – First Amendment Right to Associate

In their Sixth Claim for Relief, Plaintiffs allege Defendants' actions curtailed their "protected right guaranteed by the First Amendment to associate freely with artists who perform hip-hop music catering to the black community and attracting a predominantly black audience, and patrons who enjoy hip-hop music." (Compl. ¶ 162.) Defendants move to dismiss this claim arguing Plaintiffs have failed to allege a constitutionally-protected right of association.

The First Amendment guarantees the freedom to associate in "two distinct senses" – the freedom of intimate association and the freedom of expressive association. *Roberts v. United States*

*Jaycees*, 468 U.S. 609, 617-18 (1984).   The freedom of intimate association "protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Lee v City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)(quoting *Board of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1987)).   On the other hand, the freedom of expressive association protects associations of people engaged in expressive activity.   *Boy Scouts of America v. Dale*, 530 U.S. 640, 655 (2000). "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622.   For instance, the Supreme Court has held that the Boy Scouts is an "expressive association" — a group disseminating certain values — which warrants constitutional protections.   *Dale*, 530 U.S. at 656.

The Sixth Claim for Relief relies, in part, on Plaintiffs' right to associate with their black clientele.   Plaintiffs' association with individuals who frequent the Fontaine do not constitute an intimate or highly personal human relationship entitled to protection under the First Amendment. *See Freeman v. City of Santa Ana*, 68 F.3d 1180, 1188 (9th Cir. 1995) (bar owner's relationship with patrons and employees were not deep attachments and commitments required to support First Amendment violation of associational rights); *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470, 484 (M.D. Pa. 2012) ("[T]he relationship between a nightclub and its patrons is not a protected association.")   Plaintiffs also base their Sixth Claim for Relief on an alleged constitutional right to engage in expressive associations by playing hip-hop music and sponsoring

hip-hop events attended primarily by the black community and patrons who enjoy hip-hop music. This argument is equally unavailing.

In determining whether a group falls within the First Amendment's protection for expressive associational rights, the courts must consider whether the group engages in "expressive association." *Dale*, 530 U.S. at 648. To qualify for the protection afforded expressive associations, a group must "engage in some form of expression, whether it be public or private." *Id*. Plaintiffs' Sixth Claim for Relief relies on their right to associate with people who enjoy or play hip-hop music. These individuals are not members of an organized group gathering regularly for an expressive purpose. They are customers of the Fontaine, many of who are strangers both to each other and to Plaintiffs. An unplanned, fortuitous grouping of individuals to enjoy a music genre does not constitute expressive activity. *See Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)("[W]e do not think the Constitution recognizes a generalized right of 'societal association' that includes chance encounters in dance halls.") Furthermore, Plaintiffs fail to allege facts showing Fontaine's patrons gathered with the intent to foster a particular set of beliefs or advocate any viewpoints, political, social, or otherwise. This does not mean Plaintiffs' right to express themselves through music is not protected under the First Amendment,[3] only that Plaintiffs are unable to state a claim based on an asserted right to associate with strangers while expressing themselves in this manner. Defendants' motions to dismiss are granted with regard to Plaintiffs' Sixth Claim for Relief.

D. *Seventh and Eight Claims for Relief – Conspiracy*

In the Seventh Claim for Relief brought under 42 U.S.C. § 1985(3), Plaintiffs allege

---

[3]In their Fifth Claim for Relief, Plaintiffs allege a free speech First Amendment violation based on their right to express themselves by playing hip-hop music and holding events at which hip-hop artists perform.

Defendants, with the exception of the City, conspired to deprive Plaintiffs of equal protection under the law by writing pretextual and unsubstantiated reports, suspending the License, and effectively shutting down Plaintiffs' business, all because DeWalt was black.  Plaintiffs' Eighth Claim for Relief, a derivative of their Seventh Claim for Relief, alleges the same defendants had knowledge of the conspiracy and negligently failed to prevent it, in violation of 42 U.S.C. § 1986.  The Individual City Defendants move to dismiss these claims, arguing Plaintiffs have failed to allege facts showing actionable conduct that resulted in injury or a meeting of the minds to discriminate against Plaintiffs based on DeWalt's race.

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3) (2016).  The Supreme Court has made clear that to state a claim under § 1985(3) a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either  injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)).  The purpose of § 1985 is to remedy conspiracies by government officials that have "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102.  A plaintiff's failure to state a viable claim under § 1985 defeats the plaintiff's claim under § 1986 as well. *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988) ("A claim can be stated under section 1986 only if the

complaint contains a valid claim under section 1985.").

The Ninth Circuit succinctly described the evidence necessary to support a § 1985 claim in

*Mendocino Envtl. Center v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999). The court explained:

> To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate
> the existence of an agreement or meeting of the minds to violate constitutional rights.
> The defendants must have, by some concerted action, intend[ed] to accomplish some
> unlawful objective for the purpose of harming another which results in damage.
> Such an agreement need not be overt, and may be inferred on the basis of
> circumstantial evidence such as the actions of the defendants. For example, a
> showing that the alleged conspirators have committed acts that are unlikely to have
> been undertaken without an agreement may allow a jury to infer the existence of a
> conspiracy. Whether defendants were involved in an unlawful conspiracy is
> generally a factual issue and should be resolved by the jury, so long as there is a
> possibility that the jury can infer from the circumstances (that the alleged
> conspirators) had a meeting of the minds and thus reached a understanding to achieve
> the conspiracy's objectives. To be liable, each participant in the conspiracy need not
> know the exact details of the plan, but each participant must at least share the
> common objective of the conspiracy.

*Mendocino*, 192 F.3d at 1301-02 (internal quotation marks and citations omitted). The court further

cautioned "[d]irect evidence of improper motive or an agreement among parties to violate a

plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be

necessary to infer such agreements from circumstantial evidence or the existence of joint action.

Moreover, [q]uestions involving a person's state of mind . . . are generally factual issues

inappropriate for resolution by summary judgment." *Mendocino*, 192 F.3d at 1302 (internal

quotation marks and citations omitted).

Plaintiffs clearly allege the requisite animus of Defendants to deprive Plaintiffs of their

livelihood due to the race of DeWalt and his clientele. Plaintiffs also allege Defendants used their

status as City and State officials in a concerted effort to create a record of pretextual and unwarranted

incidents by Plaintiffs to further a plan or policy to rid the City of black-owned nightclubs playing

hip-hop music and catering to black patrons.  Finally, Plaintiffs allege communications between Defendants regarding a desire to suspend the License and specific actions of Defendants, both individual and joint, to effectuate the plan.  Viewing the allegations of the Complaint in a light most favorable to Plaintiffs, the court finds Plaintiffs have alleged sufficient facts to support their Seventh and Eighth Claims for Relief.

### E.  Tenth Claim for Relief – Intentional Interference with Economic Relations

Plaintiffs allege Defendants, other than the City, intentionally interfered with their business relationships with their customers, suppliers, and landlord by issuing pretextual violations and defamatory communications for the improper purpose of shutting down the Fontaine.  Marks moves to dismiss this claim arguing the State of Oregon has not waived its Eleventh Amendment immunity in this instance.  Marks also contends Plaintiffs failed to allege Marks interfered in any way with Plaintiffs' economic relations.

#### 1.  Eleventh Amendment

"The Eleventh Amendment creates an important limitation on federal court jurisdiction, generally prohibiting federal courts from hearing suits brought by private citizens against state governments without the state's consent."  *Sofamor Danek Group v. Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997) (citing *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)).  Eleventh Amendment immunity extends to suits against state agencies.  *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993).  The Eleventh Amendment also bars suits against state officers who are sued in their official capacity for damages or other retroactive relief, but allows suits for prospective declaratory or injunctive relief against state officials acting in their official capacity.  *Ex parte Young*, 209 U.S. 123, 155-56 (1908).  Additionally, the Eleventh Amendment does not bar

claims for damages against a state official in his personal capacity.  *Pena v. Gardner*, 976 F.2d 469,

472 (9th Cir. 1992).  As explained by the  Supreme Court:

> The 11th Amendment was not intended to afford [state officials] freedom from
> liability in any case where, under color of their office, they have injured one of the
> state's citizens. To grant them such immunity would be to create a privileged class,
> free from liability for wrongs inflicted or injuries [threatened].  Public agents must
> be liable to the law, unless they are to be put above the law.

*Hopkins v. Clemson Agr. College of South Carolina,* 221 U.S. 636, 643 (1911).  Thus, state officials

acting in their individual capacities are not shielded from liability under the Eleventh Amendment

and may be subject to suit.

Plaintiffs have asserted claims for monetary damages against Marks in his individual

capacity, not his official capacity.   Accordingly, Marks is not protected under the Eleventh

Amendment.

Marks argues he was acting within the scope and course of his employment with the OLCC

while engaged in the conduct alleged in the Complaint, making the State of Oregon the substantial

party in interest in this action and barring Plaintiffs' claims unless the State of Oregon  has waived

its sovereign immunity.  Plaintiffs contend the State of Oregon waived such immunity in the Oregon

Tort Claims Act ("OTCA") or by participating in the removal of this action to federal court.

A state may waive its Eleventh Amendment immunity.  *Hill v. Blind Indus. & Servs. of Md.*,

179 F.3d 754, 758 (9th Cir. 1999).  However, "[a] general waiver of sovereign immunity, although

sufficient to subject a state to suit in its own courts, is insufficient to waive a state's Eleventh

Amendment immunity from suits in federal court."  *McVay v. Becker*, No. 3:10-CV-1484-AC, 2012

WL 1890374,  *9  (D. Or. Mar. 21, 2012) (citing *Atascadero State Hospital v. Scanlon*, 473 U.S.

234, 241 (1985)).  Thus, "[a]lthough the OTCA waives the State of Oregon's immunity to actions

in state court, it is not a waiver of Eleventh Amendment immunity" in federal court. *Jenkins v. Goldston*, No. 09-CV-900-BR, 2011 WL 30582, at*8 (D. Or. Jan. 5, 2011) (citing *Estate of Pond v. Oregon*, 322 F. Supp. 2d 1161, 1165 (D. Or. 2004)). Consequently, contrary to Plaintiffs' argument, the OTCA is not a waiver of the State of Oregon's Eleventh Amendment immunity to be free from suit in federal court.

A state may also waive its Eleventh Amendment immunity by failing to assert it timely. Eleventh Amendment immunity is an affirmative defense that must be raised early in the proceeding to provide fair warning to the plaintiff. *Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001). Because it is an affirmative defense, it can be waived if not timely asserted. *Hill*, 179 F.3d at 758. Moreover, a state may waive its Eleventh Amendment immunity by conduct that is "incompatible with an intent to preserve that immunity." *Id*. Federal courts generally find a waiver of sovereign immunity "if the state makes a 'clear declaration that it intends to submit itself to [federal] jurisdiction." *Demshki*, 255 F.3d at 989 (quoting *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999)).

Plaintiffs filed this action in state court. The OLCC, as well as OLCC employee David Luster, who was named in his official and individual capacities ("Luster"), were named as defendants. On June 24, 2014, the OLCC and Luster removed the action to this court based on original jurisdiction. The invocation of federal jurisdiction by a state, such as by removing a case to federal court, is incompatible with an intent to preserve Eleventh Amendment immunity and may be viewed as a waiver of such. *Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226, 1235 (10th Cir. 1999) (Eleventh Amendment bar to suit against State effectively waived by removal of case from state to federal court); *Newfield House, Inc. v. Massachusetts Dept. of Pub. Welfare*,

651 F.2d 32, 36 n.3 (1st Cir. 1981) (state waived is Eleventh Amendment immunity by having the case removed to federal court).  The court finds the State of Oregon waived its sovereign immunity when it removed this action from state court to federal court.

### 2.  Interference

To prevail on a claim for intentional interference with economic relations, a plaintiff must establish six elements: "(1) the existence of a professional or business relationship (which could include, e.g., a contract or prospective economic advantage),  (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).  The tort "arises when a defendant induces a third party not to enter into or not to continue a business relationship with the plaintiff." *Dial Temporary Help Service Inc. v. Shrock*, 946 F. Supp. 847, 855 (D. Or. 1996).  The interference must be wrongful "by some measure beyond the fact of the interference itself.  Defendant's liability may arise from improper motives or from the use of improper means.  They may be wrongful by reasons of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession."  *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978).

Marks contends Plaintiffs claim for intentional interference with economic relations is based solely on the conduct of the City Defendants.  While Plaintiffs' specific allegations in their Tenth Claim for Relief do relate to actions taken by the City Defendants, Plaintiffs incorporate by reference the allegations setting forth Marks's communications with various City Defendants and cooperation in their plan to shut down the Fontaine due to the race of its owner and clientele.  In fact, Plaintiffs

allege Marks issued the Order suspending the License in furtherance of the plan and then took actions to deprive Plaintiffs of a timely and meaningful hearing on the Order, resulting in the violation and cancellation of the Lease and closure of the Fontaine.[4]  Plaintiffs have adequately alleged improper means of interference by Marks.

### F.  Eleventh Claim for Relief – Intentional Infliction of Emotional Distress

In their Eleventh Claim for Relief, Plaintiffs allege Defendants, other than the City, engaged in conduct intended to inflict severe emotional and mental distress on DeWalt.  Marks again asserts Eleventh Amendment immunity with regard to this claim, and seeks to dismiss Plaintiffs' claim for punitive damages.

The court has already addressed Marks's Eleventh Amendment argument and found Plaintiffs able to assert a claim for money damages against Marks in his individual capacity and that the OLCC waived its sovereign immunity when it removed the state action to this court.  With regard to punitive damages, Plaintiffs concede punitive damages are not available on claims brought pursuant to the Oregon Tort Claims Act in their opposition brief.  Accordingly, Marks is entitled to the dismissal of Plaintiffs' claim for punitive damages in their Eleventh Claim for Relief.

### G.  Insufficient Conduct Alleged

Individual City Defendants move to dismiss all of Plaintiffs' claims asserted against them based on insufficient allegations of conduct by such defendants.  Individual City Defendants assert Plaintiffs' allegations of a conspiracy are conclusory and insufficient in the absence of specific

---

[4]Marks signed the Order and the Notice as Executive Director of the OLCC while Merle Lindsay, Deputy Director of the OLCC, signed the reinstatement order and the Second Order. (Davis Decl. Exs. 1-4.)  The OLCC's Policy and Procedures provide that only the Director, or Marks, may recommend cancellation suspension.  (Davis Decl. Ex. 5.)  Consequently, Lindsay's actions were taken under the authority and direction of Marks and are imputable to Marks.

conduct to further such conspiracy by all named defendants.  Individual City Defendants also allege the absence of causation between the actions alleged and the resulting damages.  The court recommends dismissal of Plaintiffs' Second and Third Claims for Relief alleging procedural due process violations with regard to City Defendants and the Sixth Claim for Relief alleging a First Amendment violation based on freedom to associate with regard to all Defendants.  Consequently, the court will limit its consideration of Individual City Defendants' argument on insufficient conduct to the remaining claims.

      1.  Marchetti

Plaintiffs allege Marchetti participated in the issuance of the Citation.  Plaintiffs' First Claim for Relief is based on interference with Plaintiffs' rights in the License and the Lease.  The court has found the Citation was not identified in the Order or the Second Order and, therefore, was not causally related to the suspension of the License and resulting cancellation of the Lease. Accordingly, any conduct relating to the Citation does not support Plaintiffs' First Claim for Relief.

In their Fourth Claim for Relief, Plaintiffs allege a violation of their constitutional right to equal protection and seek, in addition to economic damages related to the loss of the License and their business, damages for loss of future business and reputation, emotional and mental distress, degradation, embarrassment, and humiliation, as well as punitive damages.  The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  In other words, all persons similarly situated should be treated alike.  *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Accordingly, in order to establish a violation of the Equal Protection Clause, a plaintiff must establish he was treated differently from other similarly-situated individuals with respect to a

governmental act, statute, or regulation. *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). "Under this theory of equal protection, the plaintiff must show that the defendants' actions were a result of the plaintiff's membership in a suspect class, such as race." *Romero v. Yates*, No. 1:08-cv00669-LJO-MJS (PC), 2011 WL 1899826, at *5 (E.D. Cal. May 19, 2011) (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005)). Such discrimination also must be intentional such that "a defendant acted at least in part *because of* a plaintiff's protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979))(emphasis in original).

Plaintiffs allege Defendants' actions were intended to racially discriminate against Plaintiffs in furtherance of a policy, practice, or custom to treat black clubs differently than clubs owned by and catering to non-black individuals. Read together, and in a light most favorable to Plaintiffs, Plaintiffs plausibility allege Marchetti issued the Citation with the intent to discriminate against Plaintiffs based on DeWalt's race, and that of the Fontaine's clientele, and would not have issued a noise citation to a non-black club under similar circumstances. Such allegations sufficiently allege an equal protection claim.

In their Fifth Claim for Relief, Plaintiffs allege Defendants intentionally targeted the Fontaine based on their choice of music for the purpose of curtailing Plaintiffs' speech and their right to play hip-hop music in violation of the First Amendment right to free speech and expression. "State action designed to retaliate against and chill political expression strikes at the very heart of the First Amendment." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). Accordingly, a city or state official violates a person's First Amendment rights if his actions "would chill or silence a person of ordinary firmness from future First Amendment activities" and the official  intended to

inhibit such activities by his actions. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999)(citations omitted).

Plaintiffs allege Defendants intended to inhibit, and in fact chilled or deprived, Plaintiffs of their right to play hip-hop music. Specifically, Plaintiffs allege Defendants' conduct forced Plaintiffs to attempt to change the format of the Fontaine and then, eventually, forced the Fontaine out of business. The Citation was issued after Plaintiffs attempted a new format catering to white, gay women and, therefore, could not have been the impetus for the change. Similarly, as the Citation was not considered in the suspension of the License, it is not causally related to the closure of the Fontaine.

The Seventh and Eighth Claims for Relief are based on allegations of a conspiracy to deprive Plaintiffs of their constitutional rights. The court has denied City Defendants' motion to dismiss these claims and finds the issuance of the Citation is an act alleged to have furthered the conspiracy.

Plaintiffs Tenth Claim for Relief alleges Defendants engaged in conduct with the intent to interfere with Plaintiffs' economic relations resulting in the disruption of business at the Fontaine, suspension of the License, cancellation of the Lease, and closure of the Foutanine. Plaintiffs do not allege the Citation resulted in any disruption of business and the court has found it is not causally related to the suspension of the License and resulting closure of the Fontaine.

In the Eleventh Claim for Relief, Plaintiffs allege Defendants engaged in conduct intended to inflict severe emotional and mental distress on DeWalt, and that such actions did, in fact, result in emotional distress. The Citation, which Plaintiffs allege to be unsubstantiated and issued to the landlord, rather than DeWalt, is properly alleged to be one of those acts.

Plaintiffs also allege Marchetti attended the meeting on October 10, 2013, advised DeWalt

no one should be allowed to stand in front of the Fontaine because his patrons looked lewd, vulgar, and filthy, and cautioned DeWalt he could be charged with loitering if he continued to allow people to stand in front of the Fontaine.  Such allegations do not allege conduct supporting Plaintiffs' First, Fifth, or Tenth Claims for Relief based on the absence of a causal relation between the meeting and Marchetti's comments, and the change in format or suspension of the License.  However, they do adequately allege conduct supporting Plaintiffs' Fourth, Seventh, Eighth and Eleventh Claims for Relief in that such conduct was allegedly based on DeWalt's race, and that of his patrons, to further the conspiracy, and intentionally resulted in emotional distress.

Plaintiffs also allege Marchetti authored emails acknowledging the unprecedented swiftness in which the Order was issued and congratulating the alleged conspirators on the immediate issuance of the Order.  These allegations support the existence of a conspiracy and Marchetti's participation in it.  As such, they are relevant with regard to the conspiracy claims alleged in the Seventh and Eight Claims for Relief.  However, these emails were issued after the suspension of the License and, therefore, do not support any other claim.

### 2. Captain Kruger

Plaintiffs allege Captain Kruger wrote a letter to the OLCC hours after the November 8, 2013 shooting in which he requested immediate suspension of the License, worked in concert with Mayor Hales and Marks to shut down the Fontaine permanently, and failed to meet with Plaintiffs to work out an agreement to reinstate the License, all because of DeWalt's race, the race of Fontaines' patrons, and their mutual enjoyment of hip-hop music.  Plaintiffs further allege Captain Kruger had not engaged in such conduct with regard to non-black bar owners or clubs catering to non-black patrons facing similar situations.

Captain Kruger took actions to further the conspiracy for the purpose of violating Plaintiffs'
constitutional rights with the intent to suspend the License and shutdown the Fontaine and such
actions are causally related to such suspension and shutdown.  These allegations adequately support
Plaintiffs' First, Fourth, Fifth, Seventh, Eighth, Tenth, and Eleventh Claims for Relief.

### 3.  Sergeant Friedman

Plaintiffs allege on August 23, 2013, Sergeant Friedman appeared at the Fontaine with
several officers unnecessarily prepared for a violent confrontation, and advised DeWalt the City did
not like the kind of events the Fontaine was holding or the type of music being played, and that the
City would not tolerate it.  Plaintiffs allege Sergeant Friedman's warning prompted them to change
their format and host events for a predominantly white, gay-women clientele in September 2013.
The Order does not reference this appearance or conversation.  However, it does mention security
personnel at the Fontaine contacted Sergeant Friedman on August 23, 2013, to inform him of an
event scheduled at the Fontaine that night and their concerns for their safety.

Plaintiffs' response to Sergeant Freidman's warning arguably supports the free speech claim
found in the Fifth Claim for Relief and intentional infliction of emotional distress claim in the
Eleventh Claim for Relief.  Additionally, the warning on behalf of the City supports the conspiracy
claims alleged in Plaintiffs' Seventh and Eighth Claims for Relief and the equal protection claim
found in the Fourth Claim for Relief.  Neither the communication nor Friedman's appearance was
relied on in the Order, defeating Plaintiffs' First and Tenth Claims for Relief with regard to Sergeant
Friedman.

### 4.  Officer Jackson

Plaintiffs alleged Officer Jackson attended the October 10, 2013 meeting, informed DeWalt

of the existence of several noise complaints about the Fontaine, the City was currently preparing the Citation, and the City would be closely watching the Fontaine for future noise violations.  Officer Jackson also advised DeWalt of his responsibility for individuals in the area of, not just in, the Fontaine and that known gang members, and their affiliates, frequented the Fontaine.

Officer Jackson's presence at the meeting and communications to DeWalt were not mentioned in the Order and, consequently, have no causal relationship to the suspension of the License defeating Plaintiffs' First, Fifth, and Tenth Claims for Relief.  Such presence and communications do establish Officer Jackson's participation in the conspiracy and properly support Plaintiffs' Seventh and Eight Claims for Relief.  The general allegations of unequal treatment by Defendants adequately infer Officer Jackson treated Plaintiffs differently than similarly-situated, non-black bar owners catering to a non-black audience and support the equal protection claim alleged in the Fourth Claim for Relief.  Finally, the allegations establish Officer Jackson acted intentionally for the purpose of inflicting emotional distress on Plaintiffs and did just that.  The Eleventh Claim for Relief against Officer Jackson is viable as well.

### 5.  Archer

Plaintiffs allege Archer participated in the issuance of the Citation, refused to allow DeWalt to participate in the process related to the Citation, and advised DeWalt any additional noise violation would result in a large penalty being assessed against the landlord.  These allegations are substantially similar to those asserted against Marchetti with regard to the Citation and warrant the same analysis and findings.  Accordingly, the court finds Plaintiffs have stated a valid claim against Archer in their Fourth, Seventh, Eighth, and Eleventh Claim for Relief but not in their First, Fifth, or Ninth Claims for Relief.

### 6.  Van Orden

The allegations against Van Orden are identical to those against Archer with the additional allegations Van Orden made the decision to issue the Citation to Plaintiffs' landlord and attended the October 10, 2013 meeting.  Based on the reasoning set forth above, which is equally applicable to the allegations against Van Orden, the court finds Plaintiffs have stated a valid claim against Van Orden in their Fourth, Seventh, Eighth, and Eleventh Claim for Relief but not in their First, Fifth, or Ninth Claims for Relief.

### 7.  Inspector Cruser

Inspector Cruser is alleged to have appeared the Fontaine on August 23, 2013, with Sergeant Friedman and on two occasions in October 2013.  On the first October visit, Inspector Cruser issued a formal warning based on DeWalt's failure to keep track of his occupants and advised DeWalt the next failure would result in a fine.  He reiterated this threat at the October 10, 2013 meeting.  On the second October visit, Inspector Cruser parked outside the Fontaine and apparently counted customers.  Inspector Cruser also participated in the issuance of the Citation.

The Order contains references to numerous conversations between DeWalt and Inspector Cruser regarding capacity issues and DeWalt's allowing a crowd of over two-hundred patrons inside the Fontaine on November 9, 2013.  Similarly, the Final Order by Default with regard to the Second Order references a violation issued to Plaintiffs on October 5, 2013, for not keeping an accurate count of occupants.  Accordingly, Plaintiffs' allegations with regard to Inspection Cruser create a causal relationship, if somewhat tenuous, with regard to the Order and suspension of the License. In light of this relationship, the court finds Plaintiffs have stated a viable claim against Inspector Cruser in their First, Fifth, and Tenth Claim for Relief.  Plaintiffs have also adequately alleged

Inspector Cruser's participation in the conspiracy in support of their Seventh and Eighth Claims for Relief, as well as actions taken with regard to Plaintiffs that would not have been taken with regard to established owned by, and catering to, non-blacks in support of their Fourth Claim for Relief. Plaintiffs also specifically allege Inspector Cruser's presence at the Fontaine made DeWalt uncomfortable, providing even more support for Plaintiffs' Eleventh Claim for Relief for intentional infliction of emotional distress.

### 8.  Conclusion

Plaintiffs have alleged conduct sufficient to support their Fourth, Seventh, Eighth, and Eleventh Claims for Relief with regard to all Individual City Defendants.  Plaintiffs' First and Tenth Claims for Relief fail with regard to Marchetti, Sergeant Friedman, Officer Jackson, Archer, and Van Orden; and their Fifth Claim for Relief fails with regard to Marchetti, Officer Jackson, Archer, and Van Orden.

### H.  Absolute Immunity

Marks argues he is entitled to absolute immunity on Plaintiffs' federal claims asserted in their First-through-Eighth Claims for Relief.  Marks contends his involvement in the suspension and cancellation proceedings were exercises of quasi-prosecutorial or quasi-judicial authority entitled to absolute immunity.  Plaintiffs concentrate primarily on Marks's actions which prevented prompt adjudication of the issues alleged in the Order.  Plaintiffs claim such conduct violated the relevant provisions of the Oregon Administrative Procedures Act which resulted in the extended suspension of the License and the closure of the Fontaine.

Federal law controls the question of immunity in cases where a plaintiff alleges a 42 U.S.C. § 1983 claim.  *Martinez v. State of California*, 444 U.S. 277, 284 n.8 (1980).  Absolute immunity

shields individuals from § 1983 liability if they perform a function that enjoyed absolute immunity at common law. *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003). It is only the specific function performed and not the role or title of the official that matters. *Id*. Officials acting in a prosecutorial or judicial role, or performing functions closely associated with the judicial process, are entitled to absolute immunity. *Id*. at 896-98. These functions include "the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 269. The United States Supreme Court has "been 'quite sparing' in recognizing absolute immunity for state actors." *Id*.

Prosecutorial or quasi-judicial immunity protects prosecutors from liability for conduct in "initiating a prosecution and in presenting the State's case," or when their activities are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)(extending the common law absolute liability to malicious prosecution and false or defamatory statements made by a prosecutor in judicial proceedings to § 1983 actions). The application of absolute prosecutorial immunity depends on the nature of the allegedly unlawful actions. *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003).

> Thus, in deciding whether to accord a prosecutor immunity from a civil suit for damages, a court must first determine whether a prosecutor has performed a quasi-judicial function. If the action was part of the judicial process, the prosecutor is entitled to the protection of absolute immunity whether or not he or she violated the civil plaintiff's constitutional rights.

*Id.* (citing *Imbler*, 424 U.S. at 430). The Supreme Court has extended absolute prosecutorial immunity to state attorneys and agency officials performing functions similar to those of a prosecutor

in initiating and pursuing administrative enforcement proceedings. *Butz v. Economou*, 438 U.S. 478, 515-517 (1978).

Marks is clearly entitled to absolute immunity with regard to his decision to issue the Order and the Notice. In doing so, Marks was making discretionary, quasi-prosecutorial decisions to initiate administrative proceedings for the purpose of protecting the public. However, the question of whether Marks is entitled to absolute immunity with regard to his decision to reinstate the License after the hearing on the Order and then immediately issue the Second Order is not so clear.

The Supreme Court extended prosecutorial immunity to agency officials initiating administrative proceedings based, in part, on the provision of safeguards present in agency adjudications similar to those in the judicial process providing "ample opportunity to challenge the legality of the proceeding." *Id*. at 513, 516. The Court explained:

> An administrator's decision to proceed with a case is subject to the scrutiny in the proceeding itself. The respondent may present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified. His claims that the proceeding is unconstitutional may also be heard by the courts. Indeed, respondent in this case was able to quash the administrative order entered against him by means of judicial review.

*Id*. at 516. The Court also noted the importance of the parties receiving "finding and conclusions on all of the issues of fact, law, or discretion presented on the record." *Id*. at 513.

Here, Plaintiffs were provided the opportunity to present evidence and arguments at an administrative hearing on the Order. However, the actions of Marks in reinstating the License prevented the issuance of an opinion addressing the merits of the issues identified in the Order and deprived Plaintiffs of their right to effectively challenge the legality of the Order. While Plaintiffs had the right to contest the legality of the same issues in the Second Order, Marks's action prevented

the timely resolution of the issues and obligated Plaintiffs to reassert their arguments at a second hearing and incur additional, unnecessary costs.  This action was in violation of the Oregon Administrative Procedures Act, which requires an agency to complete a hearing within thirty-seven days of a request for hearing and issue a proposed or final order no less than fifteen days thereafter, thereby defeating any claim of absolute immunity for such conduct. *Chalkboard*, 902 F.2d at 1379-80 (agency official who fails to follow statutory mandates has not served in prosecutorial capacity and is not entitled to absolute immunity).

Furthermore, Marks unilaterally reinstated the License, without seeking leave or approval from the hearings officer.  Such action was not taken in furtherance of prosecution of the Order or with regard to the administrative proceeding.  Rather, the action was an administrative decision purportedly taken to remedy an error in service, which ultimately prevented Plaintiffs from receiving the ruling on the merits to which they were entitled. *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997) (prosecutorial immunity does not apply to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.").  The action, in effect, halted rather than furthered the administrative proceeding.

The decision to reinstate the Licence and then immediately resuspend the Licence on the same grounds previously argued to the hearings officer served merely to delay a ruling on the merits of the Order in violation of the Oregon Administrative Procedures Act and did not further the prosecution of the Order.  Accordingly, the court finds Marks, the individual vested with the authority to initiate and prosecute the emergency suspension and cancellation of the License, was not acting in the role of a prosecutor when reinstating the License and issuing the Second Order. Marks is entitled to absolute immunity with regard to the Order and Notice, but not the reinstatement

of the License and the Second Order.

I. *Qualified Immunity*

Marks asserts he is entitled to qualified immunity with regard to Plaintiffs' procedural due process and free association claims asserted in the Second, Third,[5] and Sixth Claims for Relief, based on the absence of a knowing violation of a constitutional right. Similarly, City Defendants move for a finding of qualified immunity for all Individual City Defendants on all § 1983 claims.

Defendants contend they are entitled to qualified immunity as individuals for any alleged violations of Plaintiffs' § 1983 rights. The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, public officials are generally immune from civil liability unless their actions violated clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id*. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent of those who knowingly violated the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)(citation and internal quotations omitted). The key inquiry in determining whether an officer has qualified immunity is whether he or she has "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).

To determine whether the doctrine of qualified immunity applies to individual defendants, the court must decide whether a plaintiff has shown a constitutional or statutory right has been

---

[5]Marks identifies the Third and Fourth Claims for Relief as the procedural due process claims. However, Plaintiffs' procedural due process claims are alleged in the Second and Third Claims for Relief while the Fourth Claim for Relief alleges an equal protection claim.

violated and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223 236 (2009).

The clearly established inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Officials may be held liable only for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id*. at 202. Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Id. To be clearly established, the law need not be a "precise formulation of the standard" where "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id*.

### 1. Marks

The court has found Plaintiffs failed to allege a constitutional violation in their Sixth Claim for Relief but have alleged violations of their procedural due process rights in their Second and Third Claims for Relief. Accordingly, the only issue remaining to resolve regarding Marks's qualified immunity argument is whether Plaintiffs' procedural due process rights in this specific context were clearly established at the time of the alleged violation.

Marks concedes an individual's right to procedural process has been clearly established, but argues a violation of such right by the reinstatement and immediate resuspension of the License did not violate a clearly established right. Marks argues such conduct remedied the defective notice and,

in fact, provided Plaintiffs more notice.  However, Plaintiffs do not allege a lack of notice as the right

violated.  Rather, they allege Marks's conduct deprived them of a meaningful and timely ruling on

the legality and propriety of the issues set forth in the Order.  Marks's conduct deprived Plaintiffs

of the due process they were entitled to under the Oregon Administrative Procedures Act – to have

a hearing completed within thirty-seven days of their request and obtain a ruling on the evidence and

arguments raised at such hearing within fifteen days of the hearing.  These statutory provisions were

clearly established at the time of Marks's alleged conduct.  Furthermore, Plaintiffs alleges Marks

intentionally engaged in this action for the purpose of depriving them of their right to have the Order

fully adjudicated.  Viewing the allegations in a light most favorable to Plaintiffs, they have alleged

Marks intentionally deprived them of clearly established right of which Marks was, or reasonably

should have been, aware.  Marks is not entitled to qualified immunity based on the allegations

supporting the Second and Third Claims for Relief.

### 2. Individual City Defendants

The court has recommended dismissal of Plaintiffs' Second and Third Claims for Relief with

regard to City Defendants, Sixth Claim for Relief with regard to all Defendants, and a number of

individual defendants on certain claims.  Consequently, the relevant § 1983 claims are Plaintiffs'

First Claim for Relief for race discrimination with regard to a contract against Captain Kruger and

Inspector Cruser; Fourth Claim for Relief for equal protection against all City Defendants; Fifth

Claim for Relief for free speech against Captain Kruger, Sergeant Friedman, and Inspector Cruser;

and Seventh and Eight Claims for Relief for conspiracy against all City Defendants. City Defendants

do not argue Plaintiffs have failed to allege constitutional violations in these claims, other than

addressed above.  Accordingly, the issue before the court is whether each Individual City Defendant

engaged in conduct which they reasonably should have known would violate Plaintiffs' statutory or constitutional rights.

Plaintiffs allege Defendants acted with an intent to discriminate against them because DeWalt and the Fontaine's patrons were black and treated businesses owned by, or catering to, non-blacks more favorably than Plaintiffs. Viewing these general allegations in conjunction with the allegations of specific conduct, the court can not find, as a matter of law, that any of the individual City Defendant are entitled to qualified immunity at this juncture. Based on the allegations in the Complaint, the court finds that the Individual City Defendants had fair warning and reasonably should have known their conduct coupled with their intent to discriminate were improper. The Individual City Defendants therefore are not entitled to quality immunity with regard to any remaining claim and defendant at this time.

*J. Monell*

The City moves for dismissal of all claims asserted against it arguing Plaintiffs have failed to allege the requisite existence of a custom or practice of the City. The City contends the allegations of disparate treatment are based primarily on the conduct of the OLCC, not the City Defendants.

Local governmental units or municipalities can be sued as a "person" under § 1983 when an official policy results in a constitutional violation. *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995) (citing *Monell v. Dep't of Soc. Servs.*, 463 U.S. 658, 690 (1978)). Municipalities and other local governing bodies may be liable under any of three theories: (1) an employee was acting pursuant to an expressly adopted official policy; (2) an employee was acting pursuant to a longstanding practice or custom; or (3) an employee was acting as a final policymaker. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). "A plaintiff cannot prove the existence of a municipal policy or custom based solely

on the occurrence of a single incident or unconstitutional action by a non-policymaking employee."

*Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989)(emphasis deleted).

> The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of County Com'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The Ninth Circuit "requires plaintiffs in civil rights actions against local governments to set forth no more than a bare allegation that government officials' conduct conformed to some unidentified government policy or custom." *AE ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

Here, Plaintiffs consistently and repeatedly allege the longstanding custom and policy of the City to intentionally discriminate against black nightclubs. In support of this allegation, Plaintiffs provide historical information on the allegedly poor treatment afforded by the City and its employees to businesses owned or frequented by blacks, specifically with regard to nightclubs catering to blacks, as well as statements made by City employees that reveal the City's dislike of such nightclubs. Plaintiffs additionally allege various actions taken by City Defendants in furtherance of this custom and policy, such as focusing inordinate regulatory attention of nightclubs owned or frequented by blacks, preparing unsubstantiated reports, issuing pretextual citations, and failing to provide assistance upon request. Summarized, Plaintiffs allege City employees "documented every interaction that could conceivably be connected to the Fontaine Bleau in an effort to create a record to put the club out of business, even when the interaction was so minor that the police would not ordinarily generate a report" and that such reports were used by the OLCC as justification for suspending, and then cancelling, the License. These allegations are sufficient, when viewed in a

light most favorable to Plaintiffs, to plausibly plead City employees engaged in actions which discriminated against Plaintiffs pursuant to a custom or policy of the City.  The City is not entitled to dismissal of the claims against it.

K.  Issue Preclusion

City Defendants[6] move to dismiss any claim or damage alleged by Plaintiffs dependent on the factual or legal justification for the suspension or cancellation of the License asserting such claims and damages are barred by issue preclusion.  City Defendants specifically reference Plaintiffs' Seventh and Eighth Claims for Relief for conspiracy and Tenth and Eleventh Claims for Relief for intentional interference with economic relations or infliction of emotional distress.

As a preliminary matter, the court notes "[u]nder the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must 'give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'"  *Caligiuri v. Columbia River Bank Mortg. Group*, No. 07-3003-PA, 2007 WL 1560623, at *4 (D. Or. May 22, 2007) (quoting *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).  Therefore, this court must apply the principles of issue  preclusion set forth under Oregon law.  *See Lucke v. Multnomah County,* No. CV-06-1149-ST, 2008 WL 4372882, at *17-48 (D. Or. Sept. 22, 2008) (stating "[t]his court must apply Oregon law in determining the preclusive effect of state court judgments[,]" and applying the issue preclusion analysis set out by the Oregon Supreme Court in *Nelson v. Emerald People's Utility Dist.*, 318 Or. 99 (1993)).

Issue preclusion arises when an issue of ultimate fact has been determined in a prior proceeding.  *Nelson*, 318 Or. at 103.  The premise is that if "one tribunal has decided an issue, the

---

[6]Marks joins in the City Defendants' motion to dismiss on this issue.  ("Marks's Joinder").

decision on that issue may preclude relitigation of the issue in another proceeding." *Fisher Broadcasting v. Dept. of Revenue*, 321 Or. 341, 347 (1995). In *Nelson*, the Oregon Supreme Court set forth an issue preclusion test with five requirements:

1. The issue in the two proceedings is identical[;]

2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding[;]

3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue[;]

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding[; and]

5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

*Nelson*, 318 Or. at 104 (citations omitted). Oregon law imposes a "strict standard for the 'identity of issues' requirement and require[s] that 'the precise question was raised and determined in the former suit.'" *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1007 (9th Cir. 2007) (quoting *State v. Hunt*, 161 Or. App. 338, 985 P.2d 832 (1999)).

Plaintiffs argue the OLCC rulings on the Second Order and Notice do not support issue preclusion because the issues are not identical to those currently before the court, the issues were not actually litigated, Plaintiffs did not have a full and fair opportunity to be heard on the issues, and the OLCC proceedings are not entitled to preclusive effect. The court agrees with Plaintiffs with regard to the first two elements, making analysis of the other two unnecessary.

The issues currently before the court are not identical to those before the OLCC and, consequently, were not actually litigated. In the underlying proceedings, Marks relied on the existence of the reports written and citations issued by City employees in determining suspension

of the License and a letter of reprimand were appropriate.  In other words, Marks found the reports and violations existed, not that they were properly issued or supported.  He then found the reports were evidence of a history of serious and persistent problems at the Fontaine, these problems presented a danger to the public, and the OLCC's actions were justified.  Marks did not consider the validity of the reports, the pretextual nature of the citations, or the intent – discriminatory or otherwise – of the City employees in issuing the reports and citations, all of which are at issue here. Issue preclusion does not apply.

### K.  Rooker-Feldman Doctrine

Marks offers an alternative argument to the City Defendants' issue preclusion, asserting the *Rooker-Feldman* doctrine bars Plaintiffs' First through Eighth Claims for Relief.[7]  Marks argue Plaintiffs, in effect, seek a review of the OLCC's rulings on the Second Order and the Notice in their federal claims and, therefore, such claims are barred.

The principle underlying *Rooker-Feldman* is relatively straightforward:  "Under *Rooker-Feldman*, a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court.  The United States Supreme Court is the only federal court with jurisdiction to hear such an appeal."  *Noel v. Hall*, 341 F.3d 1148, 1154 (9th Cir. 2003).  The difficulty in applying *Rooker-Feldman* arises where the attempted appeal is not outright.  An action brought in federal court constitutes an appeal for the purposes of *Rooker-Feldman* if "claims raised in the federal court action are 'inextricably intertwined' with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to

---

[7]The City Defendants join in Marks's motion to dismiss on this issue. ("City Defendants' Joinder").

interpret the application of state laws or procedural rules." *Reusser v. Wachovia Bank*, 525 F.3d 855, 859 (9th Cir. 1008)(quoting *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003)).

*Rooker-Feldman* is not applicable.  Plaintiffs do not seek to appeal the rulings of the OLCC nor do they ask the court to rule on their validity.  Instead, Plaintiffs ask the court to consider the propriety of Defendants' actions leading up to the suspension of the License and the motivation for such actions.  A ruling in Plaintiffs' favor on their federal claims would not invalidate the OLCC's actions or serve to reinstate the License.  Such a ruling would only establish Defendants intentionally discriminated against Plaintiffs based on DeWalt's race, and the race of the Fontaine's patrons, for the sole purpose of closing the Fontaine pursuant to a policy or custom of the City.

## II.  Motion to Strike

City Defendants[8] move to strike the historical allegations of the City's alleged custom and policy to discriminate against blacks, and the businesses they own and frequent, found in paragraphs 21 to 32 of the Complaint.  City Defendants contend the allegations are immaterial and impertinent.

The Ninth Circuit has held that in a § 1983 claim alleging discrimination based on the music played by a nightclub and the black patrons attracted by such music, a court may look to "pre-limitations period events as evidence of an unconstitutional motive," and a "City's allegedly discriminatory treatment of other clubs playing rap and hip-hip music and catering to African American patrons may be relevant evidence of an unconstitutional purpose."  *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062 (9th Cir. 2002).  The court finds Plaintiffs' allegations relating to the City's treatment of other nightclubs owned by and catering to black individuals, and playing music that attracts primarily black patrons, are material and pertinent.  However, Plaintiffs' purely

---

[8]Marks joins in the City Defendants' motion to strike these allegations.  ("Marks's Joinder").

editorial comments, such as those found in paragraphs 21, 23, 26, and 27, are not relevant to a nightclub but, rather, relate to the treatment of black citizens of the City in general and are stricken. While paragraph 32 does not relate specifically to a nightclub, it is relevant to the music played at the Fontaine as well as the establishment of the music as protected speech and are not stricken.

*Conclusion*

Marks's motion (ECF No. 48) to dismiss is GRANTED with regard to Plaintiffs' Sixth Claim for Relief for violation of the First Amendment right to freedom of association and Plaintiffs' request for punitive damages in their Eleventh Claim for Relief for intentional infliction of emotional distress and DENIED in all other respects. City Defendants' motion (ECF No. 50) is GRANTED with regard to Plaintiffs' Second Claim and Third Claims for Relief for procedural due process violations and Sixth Claim for Relief for violation of the First Amendment right to freedom of association. City Defendants' motion to dismiss Plaintiffs' First Claim for Relief under § 1981 for race discrimination and Tenth Claim for Relief for intentional interference with economic relations is GRANTED with regard to Marchetti, Sergeant Friedman, Officer Jackson, Archer, and Van Orden. City Defendants' motion to dismiss Plaintiffs' Fifth Claim for Relief for violation of the First Amendment right to free speech and expression is GRANTED with regard to Marchetti, Officer Jackson, Archer, and Van Orden. City Defendants' motion to dismiss Plaintiffs' Fourth Claim for Relief for equal protection violations, Seventh Claim for Relief under § 1985(3) for conspiracy to interfere with civil rights, Eighth Claim for Relief under § 1986 for negligence in failing prevent interference with civil rights, and Eleventh Claim for Relief for intentional infliction of emotional distress is DENIED. City Defendants' motion to dismiss is DENIED in all other respects. City Defendants' motion to strike historical allegations is GRANTED with regard to the general

allegations found in paragraphs 21, 23, 26, and 27, and DENIED in all other respects.

DATED this 17th day of October, 2016.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge