UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


DEWALT PRODUCTIONS, INC. an                          Case No. 3:14-cv-1017-AC
Oregon corporation, dba FONTAINE
BLEAU, and RODNEY DEWALT,                              OPINION AND ORDER

                          Plaintiffs,

         v.

CITY OF PORTLAND, a municipal
corporation, THERESA MARCHETTI,
MARK KRUGER, MARK FRIEDMAN,
DAVID JACKSON, AMY ARCHER, PAUL
VAN ORDEN, ROBERT CRUSER,
CHARLES HALES, and STEVEN MARKS,

                          Defendants.
_____

ACOSTA, Magistrate Judge:

*Introduction*

         In this lawsuit, plaintiffs DeWalt Productions, Inc., dba Fontaine Bleau ("DPI"), and Rodney

DeWalt ("DeWalt")(collectively "Plaintiffs") claim defendants, the City of Portland (the "City"), Theresa Marchetti ("Marchetti"), Mark Kruger ("Kruger"), David Jackson ("Jackson"), and Charles Hales ("Hales")(collectively "City Defendants"),[1] and Steven Marks ("Marks"), discriminated against them based on DeWalt's race, the type of music played at Plaintiffs' nightclub, the Fontaine Bleau ("Fontaine"), and the race of the Fontaine's customers. Currently before the court are summary judgment motions filed by the City Defendants and Marks, and a motion for partial summary judgment filed by Plaintiffs on their due process claims.

Plaintiffs failed to establish Defendants acted with the intent to discriminate against DPI based on its imputed racial identity as African-American, against DeWalt, as an African-American, or against either of them, based on the type of music played at the Fontaine. Accordingly, the City Defendants' and Marks's motions for summary judgment on Plaintiffs First Claim for Relief for violation of 42 U.S.C. § 1981, Fourth Claim for Relief for Equal Protection, Fifth Claim for Relief for a First Amendment violation based on protected expression, and Ninth Claim for Relief for violation of 42 U.S.C. § 2000d are granted.[2] Because Plaintiffs' sole argument in support of their state law claims is based on evidence of discriminatory intent, the court's finding of lack of discriminatory intent is fatal to Plaintiffs' state law claims; thus, City Defendants' and Marks's motions for summary judgment on Plaintiffs'' Tenth Claim for Relief for intentional interference with economic relations and Eleventh Claim for Relief for intentional infliction of emotional distress are also granted. Marks's decision to reinstate DPI's liquor license and issue a second emergency

---

[1] Plaintiffs stipulated to the dismissal of defendants Mark Friedman, Amy Archer, Paul Van Orden, and Robert Cruser in a stipulated limited judgment of dismissal filed January 19, 2018.

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

suspension order did not necessarily delay a ruling on the merits of the suspension or harm Plaintiffs in any appreciable manner. Consequently Marks's motion for summary judgment on Plaintiffs' Second and Third Claims for Relief for procedural due process violations is granted, and Plaintiffs' motion for partial summary judgment on these claims is denied.

*Preliminary Procedural Matters*

In their reply brief, the City Defendants object to the deposition and hearing transcripts offered by Plaintiffs without proper authentication, and declarations from witnesses not previously identified. The City Defendants also object to specific statements found in various declarations and references to newspaper articles as inadmissible hearsay.

Plaintiffs contend the objections should be overruled due to the City Defendants' failure to confer and submit a certification to that effect. Local Rule 56-1(b) expressly provides "[e]videntiary objections in a response or reply memorandum are subject to the certification requirement of LR 7-1(a)." Local Rule 7-1(a) provides, in pertinent part:

> (1) . . . the first paragraph of every motion must certify that:
>
> > (A) In compliance with this Rule, the parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so; or
> >
> > (B) The opposing party willfully refused to confer.
>
> *   *   *
>
> (2) When conferring about a dispositive motion, the parties must discuss each claim, defense, or issue that is the subject of the proposed motion.
>
> (3) The Court may deny any motion that fails to meet this certification requirement.

Local Rule 7-1 governs motions and therefore, on its face, is inapplicable to evidentiary objections asserted in a responsive pleading. While Local Rule 56(b) imposes the requirements of Local Rule 7-1 on evidentiary objections asserted in a responsive pleading, it is not entirely unreasonable for an attorney to mistakenly rely on the express language of Local Rule 7-1 and omit a certification with regard to objections raised in a responsive pleading, rather than a motion. Because Local Rule 7-1(a)(3) affords the court discretion in addressing a party's failure to meet the certification requirement, the court finds denial of the evidentiary objections on this ground is not appropriate. Moreover, Plaintiffs' response to the evidentiary objections makes clear conferral would have not have resolved the identified disputes.

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c) (2018). A party filing a motion for summary judgment will generally support that motion with affidavits or declarations. Rule 56 requires that the affidavits or declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). The court must determine what evidence is admissible, relevant, and substantive. FED. R. EVID. 104 (2018). In ruling on a motion for summary judgment, the court will consider the admissibility of the proffered evidence's contents, not its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its content."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

I.  Authentication of Transcripts

The City Defendants assert excerpts offered by Plaintiffs from the depositions of Robert Cruser ("Cruser"), Mark Friedman ("Friedman"), Paul Van Orden ("Van Orden"), Allison Webster ("Webster"), and Chad Stover ("Stover"), and from the December 4, 2013 emergency suspension hearing held by the Oregon Liquor Control Commission ("OLCC") before Webster (the "Hearing"), lack the requisite authentication.   Plaintiffs argue the objections are improper under Federal Rules of Civil Procedure 56(c)(2), which provides: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."   Plaintiffs claim because they can offer the excerpts, or the testimony contained therein, in an admissible form at trial, the City Defendants' objection is without merit.

The court need not consider Plaintiffs' argument because, with the exception of the Cruser deposition, the deposition excerpts offered by Plaintiffs have been authenticated by either the City Defendants or Marks (collectively "Defendants").   "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a) (2018).  A deposition excerpt is ordinarily authenticated "by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted." *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002).  However, "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity." *Orr*, 285 F.3d at 776.  The City Defendants offered properly authenticated excerpts from the depositions of Van Orden and Stover, and Marks offered properly

authenticated excerpts from the depositions of Friedman and Webster, and the Hearing. The excerpts offered by Plaintiffs are consistent, both in content and appearance, with the properly authenticated excerpts offered by the City Defendants and Marks. Consequently, the court will consider Plaintiffs' deposition and hearing excerpts in this opinion.

Only Plaintiffs offered excerpts of the Cruser deposition. However, the City Defendants offered the declaration of Cruser. A comparison of the excerpts to the declaration reveals the relevant information in the deposition excerpts is also found in the declaration. Accordingly, the material contained in the Cruser deposition excerpts are properly before the court through the Cruser declaration. The City Defendants' objections to the deposition excerpts offered by Plaintiffs are overruled.

The excerpts offered by Plaintiffs are not highlighted to identify the portions of the transcripts they deem material and, on numerous occasions, fail to include the questions to which the witness is responding, making the context of the testimony unclear. *See* United States District Court, Oregon, Local Rule ("LR") 56-1, "Motion for Summary Judgment" ("(a) Supporting Factual Positions. A party's factual positions must be supported by citations, by page and line as appropriate, to the particular parts of materials in the record."); *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("Courts have no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)(internal quotation marks omitted). Moreover, the Plaintiffs have failed to offer exhibits about which the witnesses are testifying. To the extent the relevant testimony, and the context in which the testimony was given, is clear from the excerpts offered by Plaintiffs, it has been included in the background summary and considered by the court.

PAGE 6 - OPINION AND ORDER

II.  Failure to Disclose Witnesses

The City Defendants moved to strike the declarations of Bradley Macomber ("Macomber"), Leigh Feldman ("Feldman"), Bendrea Andrews ("Andrews"), and David Harmsen ("Harmsen"), arguing Plaintiffs failed to disclose the identity of these witnesses in their initial disclosures or at any time during discovery. Under Rule 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  This is an "either/or" standard; nondisclosure must be either substantially justified or harmless to avoid being excluded under the rule. *Galentine v. Holland America LineWestours, Inc.,* 333 F. Supp. 2d 991, 993 (W.D. Wash. 2004) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001))(other citation omitted).  "The sanction is automatic and mandatory unless the sanctioned party can show that its violation . . . was either justified or harmless." *Salgado v. General Motors Corp.,* 150 F.3d 735, 742 (7th Cir. 1998); *see also Yeti by Molly,* 259 F.3d at 1107.

In an order entered July 25, 2018, the court found Plaintiffs failed to disclose these witnesses or to provide substantial justification for such failure, but that any prejudice resulting to the City Defendants could be remedied by permitting them to take the depositions of the unidentified witnesses.  (Order dated July 25, 2018, ECF No. 182.)  The court allowed Defendants to depose Plaintiffs' unidentified witnesses, and Plaintiffs to depose Gene Balcomb ("Balcomb"), a witness the City Defendants failed to identify, and file supplemental briefs addressing  information obtained  in the depositions.  Defendants deposed Macomber, Feldman, and Harmsen, and filed supplemental briefing incorporating the new information into their summary judgment motions.  Consequently, the City Defendants' motion to strike the declarations of

these three unidentified witnesses is denied as moot.

With regard to Andrews, on September 14, 2018, Plaintiffs informed the court and Defendants they were unable to persuade Andrews to cooperate or voluntarily appear for a deposition. (Simon Decl. dated November 20, 2018, ECF No. 186 ("Simon Decl."), ¶ 7.) On October 5, 2018, the City's process server attempted to serve Andrews with a subpoena for his October 22, 2018 deposition at the address provided by Plaintiff for Andrews's employer, who said Andrews no longer worked at the company. (Simon Decl. ¶¶ 8-10.) Six days later, the City attempted to serve Andrews at an address obtained from social media and was informed by Andrews's spouse he was not normally home before 6:00 p.m. (Simon Decl. ¶ 12.) Andrews contacted the process server later that evening, reportedly acting hostile and demanding specific information about the subpoena. (Simon Decl. ¶ 12.) Over the next eight days, the City made six additional attempts to serve Andrews both before and after 6:00 p.m. (Simon Decl. ¶¶ 14-16.) On October 19, 2018, the City Defendants cancelled the deposition due to their inability to serve Andrews. (Simon Decl. ¶ 17.) Based on the previous finding Plaintiffs failed to disclose Andrews or provide substantial justification for such failure, and the inability of the Defendants to remedy the resulting prejudice by deposing Andrews, the court finds the City Defendants' motion to strike the Andrews declaration is well taken and is granted. Accordingly, the Andrews declaration is stricken and will not be considered by the court in conjunction with the pending motions for summary judgment.

## III. Hearsay Objections

The City Defendants object to numerous statements in the declarations of Macomber, Feldman, Roger Mitchell ("Mitchell"), and Kenny Scott ("Scott") as inadmissible hearsay. Plaintiffs assert the statements are not offered for the truth of the matter asserted and, therefore, are not hearsay. Additionally,

Plaintiffs contend the statements were made by Defendants' agents or co-conspirators and qualify for an exception to the hearsay rule.

Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801 (2018). Hearsay is admissible only if it qualifies as an exception to the general hearsay rule. The Ninth Circuit has generally applied the limitations found in the hearsay rule, set forth in Rule 802 of the Federal Rules of Evidence, to evidence offered by parties at the summary judgment stage. *Orr v. Bank of America*, 285 F.3d 764, 778 (9th Cir. 2002); *Beyenne v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule. FED. R. EVID. 805 (2015); *United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997).

A statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D). However, this rule requires the proffering party to lay a foundation establishing the existence of an agency relationship and that an otherwise excludable statement relates to a matter within the scope of the agent's employment. *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999).

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). The proponent of the statement must demonstrate by a preponderance of the evidence the existence of, and participation in, the conspiracy. *United States v. Peralta*, 941 F.2d 1003, 1005 (9th Cir.1991) (citing *Bourjaily v. United States,* 483 U.S. 171, 175

(1987)).

### A. Macomber Declaration

The City Defendants move to strike paragraph 11 of the Macomber declaration, which paragraph provides: "The OLCC, the City of Portland, and the Portland Police were displeased that we played hip-hop music and told us to stop playing hip-hop. The city did not want us attracting 'urban' kids to downtown." (Macomber Decl. dated February 28, 2018, ECF No. 157 ("Macomber Decl."), ¶ 11.) Macomber, a Caucasian, owned a nightclub with three other Caucasians called the Crown Room which was open from 2007 to 2013 in Portland, Oregon ("Portland"). (Macomber Decl. ¶¶ 2, 6; Macomber Dep. dated August 28, 2018, ("Macomber Dep.")[3] 11:16-12:16.) The Crown Room played hip-hop music on Saturday nights and drew an ethnically diverse crowd on the weekends. (Macomber Dep. 16:17-17:4, 18:11-20.)

Plaintiffs do not contest the statements found in paragraph 11 are hearsay or argue they qualify for any exception. Consequently, Plaintiffs appear to concede these statements are hearsay and inadmissible. The City Defendants' objection is sustained. The court will not consider paragraph 11 of the Macomber declaration.

### B. Leigh Feldman

Feldman, a Caucasian, worked as a promoter with a primary focus of hip-hop music in Portland nightclubs from 2006 to 2014. (Feldman Decl. dated February 21, 2018, ECF No. 158 ("Feldman Decl."), ¶¶ 2, 4.) The City Defendants object to statements in Feldman's declaration attributed to

---

[3]The "Macomber Dep." is filed as Exhibit 71 of the Simon declaration (ECF No. 186-1).

unidentified Portland Police Bureau ("Bureau") officers.

Specifically, the City Defendants object to the following statements: (1) "There was one officer in particular who I remember saying blatantly racists things to me, calling African-American patrons animals, using the N word, and calling them stupid. This officer appeared to believe that, because I am white, his racism would not offend me," found in paragraph 7; (2) "One of the police officers from the Entertainment Detail, knowing that I was the promoter, approached me during the event and said, 'Why can't you do more events like this? We like these events[,]'" when referring to a music format that drew a virtually exclusively white crowd, found in paragraph 8; and (3) "In another instance a police officer and member of the OLCC mentioned that if we stopped playing hip hop our problems would go away. . . . They also mentioned that if we stop serving Hennessey we wouldn't have as many issues," found in paragraph 9. (Feldman Decl. ¶¶ 7, 8, 9.) Plaintiffs contend the statements are not offered to prove the truth of the matter asserted. Rather, Plaintiffs offer the statements to establish the discriminatory practices of the City as voiced by the City's agent or co-conspirator.

To the extent Plaintiffs offer the statements solely to prove they were made to Feldman and establish the effect they had on Feldman, they are not hearsay and are admissible. For example, Plaintiffs may offer the statements in paragraph 7 to prove the officer referred to African-American patrons as "animals" and "stupid," and Feldman may testify to his response to such statements. Feldman's declaration, however, does not establish the officer made these statements as an agent of the City. Nothing in the declaration creates an inference that the officer made the statement as one within the scope of his agency, that he was authorized to make such statement as a representative of or on behalf of the City, or that the City ratified or adopted the statement. Furthermore, the officer's identity is unknown, which absence

prevents the court from determining whether the proffered statement fits within any of Rule 801(d)(2)'s exceptions. Accordingly, the statements in paragraph 7 of Feldman's declaration cannot be used, and are not admissible, to prove a City policy.

For the same reasons, the statements in paragraph 8 in which a Bureau officer expresses a preference for a specific type of "event" is not evidence of a City policy. Furthermore, the reference to "we" is vague. The court cannot discern whether the word refers to the Bureau officers then on-duty in that area of Portland, the Bureau's officers generally, or the City itself.

Finally, the statements in paragraph 9 Feldman attributes to a Bureau officer that if Feldman stopped playing hip-hop music or serving Hennessey his "problems" or "issues" would stop, do not establish a City or OLCC policy to discriminate against African-Americans. Again, Feldman provides no information that satisfies any of Rule 801(d)(2)'s exceptions. Feldman might have believed the statements "inferred" or "implied" the officer did not like clubs catering to African-Americans, but for the same reasons discussed regarding Paragraph 7 and 8, a single unnamed officer's statements do not equate to City or the OLCC policy.

The City Defendants' objections to the statements found in the Feldman declaration are overruled to the extent the statements are offered only to prove the statements were made and their effect on Feldman, and not to establish the truth of the matter asserted therein. The statements do not establish a City or OLCC policy of discriminating against promoters of hip-hop music that cater to African-Americans and, therefore, are inadmissible for that purpose.

*C. Roger Mitchell*

Mitchell, an African-American, was born in Portland and has lived in Oregon most of his life.

(Mitchell Decl. dated February 28, 2018, ECF No. 159 ("Mitchell Decl."), ¶¶ 2, 3.) He has nearly twenty-five years' experience working in bars and nightclubs in the Portland area, primarily in security, and is familiar with OLCC's rules, regulations, and enforcement strategies. (Mitchell Decl. ¶¶ 5, 6, 9.) DeWalt hired Mitchell to work as a security guard at the Fontaine in February 2013, and eventually promoted Mitchell to head of security for the nightclub. (Mitchell Decl. ¶¶ 11-13.)

The City Defendants object to Mitchell's statement in paragraph 40 of his declaratioon that "It is well-known in the industry that a business catering to a Black and African-American audience will not survive because the OLCC, Portland Police, and the City of Portland will work together and target that business for heavy-handed enforcement instead of engaging in problem solving with Black and African-American clubs." (Mitchell Decl. ¶ 40.) In light of Mitchell's involvement in the Portland bar and nightclub industry, and his description of the heavy-handed enforcement he witnessed, it appears this statement is based on Mitchell's personal experience and not on information provided by others. In this context, the statement is not hearsay and is admissible. The City Defendants' hearsay objection is overruled.

Mitchell describes a conversation between Bureau officers outside the Fontaine in Spring of 2013 during which an Asian officer said "I bet you a cup of coffee there will be a shooting here by July." (Mitchell Decl. ¶ 43.) Plaintiffs represent they are not offering the statement to prove the truth of the matter asserted therein. The statement is admissible to prove the statement was made and expressed a sentiment of the specific officer, but not to prove a City policy of discrimination, for the same reasons discussed regarding similar statements to which Feldman attested. The City Defendants' hearsay objection is overruled.

Mitchell represents the City, the OLCC, and Bureau officers told the owners of two nightclubs they

should not play hip-hop music if they wanted to stay in business. (Mitchell Decl. ¶¶ 46, 47.) Plaintiffs concede the statement in paragraph 46 is hearsay, because Mitchell merely repeats what the owner told him, but they argue they could properly offer the statement through the owner at trial. However, the owner's statement if one that summarized conversations he had with the City, the OLCC, and Bureau officers, which itself qualifies as a hearsay statement. Again, in the absence of evidence establishing the identity of the individuals making the statement to the owner or the context in which those statements were made, Plaintiffs fail to meet their burden of proving the statement was made by an agent of an opposing party during the existence of the relationship on a matter within the scope of the agent's employment or by a co-conspirator in furtherance of a conspiracy. The statement in paragraph 46 is hearsay and inadmissible.

In paragraph 47, Plaintiffs claim Mitchell has personal knowledge of the interactions, because Mitchell represents "I know that the City of Portland, the OLCC, and the Portland Police harassed and intimidated the owners and told them to change their venue to something other than hip-hop or they would be shut down." (Mitchell Decl. ¶ 47.) Mitchell may well have personal knowledge of, and have witnessed, actions which intimidated the owner, but Mitchell's testimony regarding what was said to the owner, even if Mitchell was present, still is hearsay. As with the statement in paragraph 46, Plaintiffs fail to prove the hearsay statement qualifies either as a statement by a party's agent or by a co-conspirator. The City Defendants' hearsay objections to the statement in paragraphs 46 and 47 of the Mitchell declaration are sustained.

The City Defendants object to Mitchell's statement that during a class on checking patrons' identifications held by the OLCC in the 1990s, "the OLCC instructors said the City of Portland did not want Black people partying across the river downtown." (Mitchell Decl. ¶ 48.) Plaintiffs claim the

statement is admissible because it was made by a co-conspirator in furtherance of the conspiracy, but they provide no evidence of who made the statement or the context in which it was made. Furthermore, approximately 20 years has passed between the statement's utterance and the events at issue, making Plaintiffs have failed to establish with the requisite evidence of the existence of, and participation in, a conspiracy by the unidentified "instructors." The City Defendants' hearsay objection is sustained.

Finally, the City Defendants object to Mitchell's statement "I learned later that the police were unable to determine where the shooter came from and did not arrest him for over a year." (Mitchell Decl. ¶ 68.) Plaintiffs contend the hearsay nature of the statement is contingent on the source of Mitchell's knowledge and that, in any event, the facts contained in the statement are uncontroverted. Plaintiffs are correct the statements may not be hearsay if one of the defendants, or an agent of the City, provided the information to Mitchell. However, Plaintiffs have the burden to lay the foundation showing the existence of an agency relationship and the context in which the information was provided, or that a conspirator made the statement in furtherance of an established conspiracy. Plaintiffs have failed to meet this burden and the statement must be viewed as hearsay.

Even if the statement were not hearsay, Plaintiffs supply no evidence to establish it as an uncontroverted fact. In addition, the statement is not relevant to the issues raised on summary judgment, because DeWalt conceded that both the shooter and the victim were customers of the Fontaine on the night of the shooting. (DeWalt Dep. dated June, 2017 ("First DeWalt Dep."),[4] 167:11-13.) The City

---

[4] The "First DeWalt Dep." was taken over a period of three days, from June 21, 2017, to June 23, 2017. The pages of the deposition transcript are numbered consecutively over all three days and are filed as Exhibit A of the Abrams declaration (ECF No. 120-1); Exhibit 1 of the Manlove declaration (ECF No. 126-1), Exhibit E of the Merrithew declaration (ECF No. 137-5); Exhibits 24, 27, and 28 of the

Defendants' objection to paragraph 68 of the Mitchell declaration is sustained.

### D. Kenny Scott

Scott also is an African-American man born in Portland and who has lived in Oregon his entire life. (Scott Decl. dated March 2, 2018, ECF No. 162 ("Scott Decl."), ¶¶ 2, 3.) For the past fifteen years, Scott has worked in nightclubs, bars, and restaurants in various capacities, including music promoter, promotions manager, security manager, and marketing manager. (Scott Decl. ¶ 5.) He has promoted numerous events, such as launch parties, wedding anniversaries, retirement parties, concerts, sporting events, birthday parties, fundraisers, and galas. (Scott Decl. ¶ 6.) Scott has experienced differential treatment by the Bureau, the OLCC, the City, and the Fire Marshall in the form of increased scrutiny when promoting music events featuring hip-hop, or when the crowd is expected to be at least twenty-five percent African-American. (Scott Decl. ¶¶ 7-8.)

The City Defendants object to paragraph 9 of the Scott declaration as hearsay. In that paragraph, Scott repeats conversations between several bouncers and the City regarding the negative impact of having a "ghetto element" listening to hip-hop music in a Portland club. (Scott Decl. ¶ 9.) Paragraph 9 reads:

> For example, a Portland club called Aura agreed to impose extremely strict dress codes at the behest of the City and used those codes to keep black people out of the club so that the ratio of Black and African-American people was only 1 out of 7 patrons. I know this because I know the bouncers who worked at that club and they told me and my business partner that City told them not to have a "ghetto" element at the club. Ghetto element means a high ratio of Black and African-American people. Based on what the bouncers told me from Aura and other clubs that are still able to run a business in Portland, maintaining this ratio of predominantly white clientele is the only way to avoid undue harassment and scrutiny by the Portland Police, OLCC, Fire Marshall and other city

Merrithew declaration (ECF No. 154-24, 154-27 and 154-28); and Exhibit 53 of the supplemental Manlove declaration (ECF No. 174-1).

entities.

(Scott Decl. ¶ 9.) Plaintiffs concede this paragraph contains hearsay but assert the impression left on Scott – that he must limit having African-Americans at his events – is admissible.

Scott may testify, based on his own experience, that Defendants did not react to events attracting a predominantly white clientele in the same way they reacted to events attracting a "ghetto element," or a high ratio of African-Americans. He may not testify Defendants told other bouncers "not to have a 'ghetto' element at the club" or "maintaining this ratio of predominantly white clientele is the only way to avoid undue harassment and scrutiny by the Portland Police, OLCC, Fire Marshall and other city entities." He also may not testify that Aura imposed a strict code to keep out African-Americans at the behest of the City because, again, he has no personal knowledge of that club's policies and the statements otherwise do not meet any of the hearsay exceptions. The City Defendants objections are sustained, in part, and overruled, in part.

In paragraph 10 of his declaration, Scott states:

"The OLCC called a meeting with the owners of the City Nightclub and told them that on our nights, the Black and African-American hip-hop nights, he could no longer serve Hennessey, Patron, and AMFs nor could he play Mac Dre, E40, or 'hyphy' music. Hennessey, Patron, and AMFs are traditionally ordered and consumed by Black and African-Americans.. Mac Dre, E40, and 'hyphy' music is hop-hop music. The owner explained to me and my business partner about these restrictions and that the Portland Police had recommended that the OLCC impose these restrictions."

(Scott Decl. ¶ 10.) The City Defendants object to these statements as hearsay. Plaintiffs argue testimony the owner met with the City and the OLCC, and subsequently imposed the listed restrictions, is not hearsay and thus admissible.

First, the statement indicates the owner met with the OLCC, not the City. Second, although Scott does not expressly state the owner imposed the recommended restrictions, only that the owner explained

"these restrictions," the statement's apparent purpose is to demonstrate that the owner expected Scott to refrain from playing the music types identified by the OLCC. On this point, the testimony is admissible to show the effect of the music restrictions on Scott and only against only the OLCC. The City Defendants' hearsay objections to paragraph 10 are sustained.

In Paragraph 14, Scott offers statements made by police officers to DeWalt and which DeWalt repeated to Scott. Specifically, Scott testifies: "I asked Mr. DeWalt what they said to him and he told me they had said that 'you cannot have hip hop events at the Fontaine Bleau,'" and "He told me that he was getting harassed so much that he wanted to try changing his format to something else so the Police would stop harassing him." (Scott Decl. ¶ 14.) Plaintiffs concede the statements are hearsay but argue they could be admitted at trial as a prior consistent statement if the City impeached DeWalt. The statements are consistent with DeWalt's deposition testimony and are properly before the court through DeWalt; thus, offering the statements through Scott is redundant. At the summary judgment stage, the court must view the evidence in a light most favorable to the non-moving party and deny summary judgment if a genuine issue of material fact exists. Impeachment, and evidence intended to overcome possible impeachment, are not relevant in the summary judgment context. The City Defendants' objections to paragraph 14 are sustained.

*E. Newspaper Articles*

Finally, the City Defendants object as hearsay to Plaintiffs' use of newspaper articles to attack the credibility of Bureau Officer Betsy Hornstein ("Hornstein") and contradict Marks's testimony as to the number of bars in the City owned by an African-American. (Pls.' Resp. to Defs.' Mots. for Summ. J., ECF No. 153 ("Pls.' Resp."), at 7 n.2, 65 n.6.) Plaintiffs do not respond to the objection and make no

attempt to demonstrate how the newspaper articles might satisfy a hearsay exception, thus impliedly conceding they are inadmissible hearsay. In any event, a cursory review of the articles reveals they contain numerous instances of hearsay and are inadmissible for the purposes offered by Plaintiffs. The City Defendants' objections to the articles are sustained and the information contained therein will not be considered by the court.

*Background*

I. The Parties

*A. Plaintiffs*

DeWalt is an African-American who, at the time he filed this lawsuit, had over thirty years of experience in the entertainment industry, specifically owning and managing restaurants and bars. (DeWalt Decl. dated March 2, 2018, ECF No. 155 ("DeWalt Decl."), ¶ 2; First DeWalt Dep. 14:10-13, 15:5-8.) DeWalt's venues offered music, primarily "R&B, Blues, Jazz," and occasionally hosted comedy shows. (First DeWalt Dep. 15:5-11.) DeWalt preferred to play R&B for an adult crowd in his clubs but occasionally would work with promoters who played more traditional "hip-hop," or the rap music enjoyed by a younger crowd. (First DeWalt Dep. 55:24-56:7.) DeWalt defined "hip-hop" as old school rhythm and blues for an adult crowd; he did not use it to refer to the rap music preferred by a younger crowd. (First DeWalt Dep. 54:18-55:23, 282:11-20.)

DeWalt was the sole owner and officer of DPI. (First DeWalt Dep. 27:2-7.) In January 2013, DPI opened a nightclub in Portland known as the Fontaine. (First DeWalt Dep. 47:7-12.) African-Americans predominantly comprised the Fontaine's customer base, and it "was one of the few remaining nightclub venues where Black and African-American people could feel comfortable and 'at home' in

Portland because they knew they could socialize with other Black and African-American people as they enjoyed Black and African-American culture." (Mitchell Decl. ¶¶ 17, 18.) Plaintiffs closed the Fontaine in November 2013 when the OLCC suspended the liquor license at the request of the City, based on numerous unfounded citizen complaints, violations, and police reports, and a fatal shooting that occurred just outside the Fontaine.

   B. *Defendants*

The City is a municipality of the State of Oregon. Hales was, at all material times, the Mayor of the City. (Hales Dep. dated November 17, 2016 ("Hales Dep."),[5] 16:18-17:1.) During the relevant period, Kruger was the Captain of the Bureau's Drug and Vice Division. (Kruger Dep. dated February 14, 2017 ("Kruger Dep."),[6] 13:25-14:9; Kruger Decl. dated January 11, 2018, ECF No. 135 ("Kruger Decl."), ¶ 1.) The Drug and Vice Division's principal function at that time was investigating mid- to high-level drug trafficking activities, but it also coordinated the liquor license application process for the Bureau. (Kruger Dep. 13:25-14:17.) Marchetti worked in the City's Office of Neighborhood Involvement (the "Office") and was the City's Liquor License Coordinator in 2013, responsible for coordinating the City's recommendations on liquor license applications and renewals, and communicating with the OLCC.

---

[5] The "Hales Dep." is filed as Exhibit F of the Abrams declaration (ECF No. 120-7), Exhibit 10 of the Manlove declaration (ECF No. 126-1), Exhibit 2 of the Merrithew declaration (ECF No. 154-2), and Exhibit 64 of the supplemental Manlove declaration (ECF No. 174-1).

[6] The "Kruger Dep." is filed as Exhibit E of the Abrams declaration (ECF No. 120-6), Exhibit 9 of the Manlove declaration (ECF No. 126-1), Exhibit 5 of the Merrithew declaration (ECF No. 154-5), and Exhibit 63 of the supplemental Manlove declaration (ECF No. 174-1).

(Marchetti Dep. dated February 13, 2017 ("Marchetti Dep."),[7] 8:19-22; 10:6-13; Marchetti Decl. dated January 17, 2018, ECF No. 134 ("First Marchetti Decl."), ¶¶ 1, 2.) Marchetti also administered the City's time, place, and manner ordinance found in Chapter 14B.120 of the Portland City Code and, as the principal member of the Office's Liquor License Team (the "License Team"), was involved with policymaking and community involvement on issues related to alcohol. (Marchetti Dep. 10:6-8, 14-18; Marchetti Decl. ¶¶ 2, 3.) Jackson, then a Bureau officer, was the Liquor License Investigator for the Drug and Vice Division and a member of the License Team during the relevant period. (Jackson Dep. dated February 15, 2017 ("Jackson Dep."),[8] 10:7-16; Jackson Decl. dated January 11, 2018, ECF No. 128 ("First Jackson Decl."), Ex. 1.) Marks served as the Executive Director of the OLCC, a position he assumed on October 24, 2013. (Marks Decl. dated January 18, 2018, ECF No. 117 ("Marks Decl."), ¶ 1.) Marks had no prior relationship with the OLCC. (Marks Decl. ¶ 1.)

II. The Fontaine

DeWalt moved to Portland in March 2012 to recover from a heart attack and be closer to family. (DeWalt Decl. ¶ 2; First DeWalt Dep. 14:5-7, 21:14-22:11.) Shortly after moving to the area, DeWalt became aware the City did not have many restaurants or bars catering to African-Americans. (First DeWalt Dep. 22:4-15.) Interested in opening such a venue, DeWalt found a suitable location on the corner

---

[7] The "Marchetti Dep." is filed as Exhibit 3 of the Manlove declaration (ECF No. 126-1), Exhibit 4 of the Merrithew declaration (ECF No. 154-4), and Exhibit 55 of the supplemental Manlove declaration (ECF No. 174-1).

[8] The "Jackson Dep." was taken over two days on February 15, 2017 and July 20, 2017. The pages of the deposition transcript are numbered consecutively over the two days and are filed as Exhibit C of the Abrams declaration (ECF No. 120-4), Exhibit 8 of the Manlove declaration (ECF No. 126-1), Exhibits 7 and 35 of the Merrithew declaration (ECF No. 154-7, 154-35), and Exhibit 57 of the supplemental Manlove declaration (ECF No. 174-1).

of NE Broadway and NE Third just off a major street in a commercial area with only few residential buildings nearby (the "Premises"). (First DeWalt Dep. 24:9-25:7.) DeWalt, as President of DPI, signed a lease for the Premises on April 27, 2012 (the "Lease"). (Merrithew Decl. dated January 19, 2018, ECF No. 137 ("First Merrithew Decl."), Ex. E at 11.)

The Lease, which identified the landlord as Oregon Foreclosures, LLC ("Landlord"), provided for an initial five-year term commencing on November 1, 2012, with the option to renew for two additional five-year periods. (First Merrithew Decl. Ex. E at 11.) Rent was due "on or before the first day of each calendar month," and DPI would be deemed in default if such rent was not paid within "the ten (10) day grace period allowed by ORS 91.090." (First Merrithew Decl. Ex. E at 15, 32.) DPI's use of the Premises was limited to "Blues, Jazz, and R&B Martini Bar and related businesses." (First Merrithew Decl. Ex. E at 12.)

DeWalt also signed a liquor license application on behalf of DPI in the name of the "Fontaine Bleau" on April 27, 2012. (Jackson Decl. dated April 3, 2018, ECF No. 172 ("Second Jackson Decl."), Ex. 51.) Tthe OLCC issued an annual liquor license to DPI for the Fontaine on December 21, 2012 (the "License"). (First Jackson Decl. Ex. 20 at 2.)

DPI invested more than $400,000 to build-out the Premises to DeWalt's specifications. (First DeWalt Dep. 25:19-26:9.) This work included installing mechanical, electrical, plumbing, and sprinkler systems, as well as flooring, lighting, and built-in furniture such as the bar, bench seats, and booths. (First DeWalt Dep. 541:7-542:5.)

The Fontaine was the only entertainment venue in the area and, with the exception of a couple of nearby gas stations and a convenience store, also was the only area business open late at night. (Asheim

Decl. dated January 12, 2018, ECF No. 127 ("Asheim Decl."), ¶ 4.) Similar to DeWalt's previous

venues, the Fontaine offered entertainment in the form of music, primarily R&B, blues, and jazz, but also

hosted hip-hop music, salsa music, and a comedy club on different nights. (First DeWalt Dep. 64:4-20,

66:17-67:3.) DeWalt considered the Fontaine to be a predominantly black club with the exception of salsa

night, when the customers were predominantly Latino, but he did not prevent any race from coming into

the Fontaine. (First DeWalt Dep. 68:23-69:2, 69:24-70:13.) At one point, DeWalt promoted

entertainment geared toward lesbians in response to what he described as a constant presence from the

Bureau. (First DeWalt Dep. 51:19-52:11.) However, this change in format lasted only two or three

weeks. (First DeWalt Dep. 52:4-6, 455:21-24.)

DeWalt used only DPSST[9] certified security guards at the Fontaine, and he verified their

certification by checking their identification cards. (First DeWalt Dep. 157:20-25.) He booked security

according to the attendance he expected at the Fontaine. (First DeWalt Dep. 158:6-14.) Thus, on nights

he expected full capacity, he would have four security guards, stationing two at the door to check

identification and wand or pat down the customers for guns, and assign two other to roam the Fontaine's

interior. (First DeWalt Dep. 158:15-25.) Mitchell estimated security at the Fontaine ranged from one

guard at the door on "mellow" nights, no more than three on an average night, and five for a busy night.

(Emergency Suspension Hr'g Tr. dated December 4, 2013 ("Tr.")[10] 244:2-24.) The Fontaine had a dress

---

[9] DPSST stands for Department of Public Safety Standards and Training.

[10] The Hearing Transcript is filed as Exhibit B of the Merrithew declaration (ECF No. 137-2), Exhibit F of the Davis declaration (ECF No. 151-6), Exhibit 1 of the Merrithew declaration (ECF No. 154-1), Exhibit 68 of the supplemental Manlove declaration (ECF No. 174-1), and Exhibit S of the second Abrams declaration (ECF No. 178-7).

code which required customers to be dressed "decently" and prohibited white tee shirts, hats, sagging

pants, and track suits (First DeWalt Dep. 426:8-427:7), although security at the front door did not always

enforce the dress code.  (First DeWalt Dep. 427:8-16.)

III.  City's Interactions and Issues with the Fontaine Prior to October 2013 Meeting

Almost immediately after its opening, various City enforcement agencies took an interest in the

Fontaine.  Specifically, the City responded to noise and disturbance complaints related to the Fontaine,

expressed concern about too many customers in the Fontaine, and observed, questioned, and arrested gang

members frequenting the Fontaine.  Plaintiffs allege these actions were based on DeWalt's race, the race

of the Fontaine's customers, and the type of music, specifically hip-hop, played at the Fontaine.

A.  Noise Complaints

Shortly after the Fontaine opened, a neighbor started complaining about the noise.[11]  The City

documented a complaint made on April 2, 2013:

> A new bar/dance club opened about 3 weeks ago called the Fontaine Bleau.  Every
> Thursday, Friday and Saturday, between 10pm until 3am there is extremely loud music of
> the club, and to make matters worse, the patrons park en mass on 3rd Avenue and stand
> around their cars before and after entering or leaving the club for up to 30 minutes, blaring
> and booming the music from their cars and hollering at each other.  The noise is most
> severe between 2-3am, when the bar closes and up to 35 people exit the bar and continue
> to party on 3rd avenue.

(Van Orden Decl. dated January 10, 2018, ECF No. 129 ("Van Orden Decl."), Ex. 28.)  In a letter dated

April 3, 2013, the City informed the Landlord of the noise complaint, delineated the allowable noise levels

---

[11] In his deposition, Van Orden testified that during the time the Fontaine operated, only one person ever complained about noise. (Van Orden Dep. dated March 21, 2017 ("Van Orden Dep."), 161:11-15.) The "Van Orden Dep." is filed as Exhibit 52 of the supplemental Manlove declaration (ECF No. 174-1) and Exhibit 13 of the Merrithew declaration (ECF No. 154-13).

in decibels for specific time periods, advised the City would be performing a site visit, and listed the possible fines for a violation. (Van Orden Decl. ¶ 7, Ex. 29.) The City also mailed the April 3, 2013 letter to the address of the Fontaine. (Van Orden Decl. Ex. 29.)

Van Orden, the Noise Control Officer for the Office during the relevant period, met with DeWalt at the Fontaine later that month to discuss the noise complaint, as well as the Fontaine's layout and sound system. (Van Orden Decl. ¶¶ 1, 9.) Van Orden regularly met with new nightclub owners to provide advice on how to address potential noise issues. (Van Orden Decl. ¶ 11.) Van Orden noticed the side door of the Fontaine did not seal well when closed and advised DeWalt sound could escape from the nightclub through that door. (Van Orden Decl. ¶ 9.) The conversation was cordial and Van Orden did not take any enforcement action as a result of the April 2, 2013 complaint. (Van Orden Decl. ¶ 10.)

DeWalt bought a decibel meter after this meeting and used it regularly, especially when he hosted a large event. (DeWalt Decl. ¶ 3.) According to DeWalt, sound generated by the Fontaine never exceeded the limits allowed by the City. (DeWalt Decl. ¶ 3.)

Bureau Officer Jimmy Harrison ("Harrison") responded to a noise complaint about the Fontaine just after 11:00 p.m. on June 1, 2013. (Second Merrithew Decl. dated March 2, 2018, ECF No. 154 ("Second Merrithew Decl."), Ex. 58.) Harrison, who had communicated with DeWalt about noise issues on previous occasions, walked the area with DeWalt and was unable to hear music coming from the Fontaine. (Second Merrithew Decl. Ex. 58.) Harrison did notice a lot of foot and vehicle traffic associated with the Fontaine, and also observed a large group standing on the sidewalk in front of the nightclub. (Second Merrithew Decl. Ex. 58.) DeWalt informed Harrison he was working with a noise officer on the noise issues, and DeWalt identified a former disgruntled employee named "Tim" as the likely complainant.

(Second Merrithew Decl. Ex. 58.) About an hour later, Bureau Officer Quency Ho ("Ho") arrived at the Fontaine in response to another noise complaint and reported he could "easily hear loud bass music" a block away from the Fontaine. (First Jackson Decl. Ex. 21.) Ho also observed about twenty-five people "hanging out by the front doors to the club being noisy." (First Jackson Decl. Ex. 21.)

Hornstein responded to a noise complaint from Lisa Ball ("Ball"), a resident of a building located one-to-two blocks from the Fontaine, about very loud patrons at the Fontaine on August 17, 2013. (Manlove Decl. dated January 19, 2018, ECF No. 126 ("First Manlove Decl."), Ex. 11A; Hornstein Decl. dated January 12, 2018, ECF No. 130 ("Hornstein Decl."), ¶ 3, Ex. 31; Second Merrithew Decl. Ex. 53; First DeWalt Dep. 177:17-20.) In her subsequent report, Hornstein noted she could hear extremely loud noise and music coming from the Fontaine, and could feel vibrations from the music in her patrol car a full city block from the nightclub. (Hornstein Decl. Ex. 31.) She observed people in the immediate vicinity playing loud music in their cars and talking extremely loud before they made their way into the Fontaine. (Hornstein Decl. Ex. 31.) She noted: "The loud noise and people coming from Fontaine Bleau is a constant neighborhood problem. Fontaine Bleau affecting the livability for residents due to the noise and is a constant nuisance." (Hornstein Decl. Ex. 31.) Hornstein forwarded her report to Van Orden. (Hornstein Decl. Ex. 31.)

DeWalt now thought Ball, to whom he referred as a "villain," was the party responsible for the majority of the noise complaints regarding the Fontaine. (First DeWalt Dep. 202:17-203:3.) He estimates she initiated nearly fifty noise complaints and thought she was a "pathological liar" who was working with the police to put the Fontaine out of business. (DeWalt Decl. ¶ 4; First DeWalt Dep. 170:13-24.) DeWalt surmised Ball was "exposing her new found powers that she has with the Portland Police of how she can

PAGE 26 - OPINION AND ORDER

call the police and the police is going to show up and harass the Fontaine Bleau." (First DeWalt Dep. 171:10-15.)

On September 20, 2013, Ball received a letter from DeWalt advising her he planned to file a lawsuit against her for harassment if she did not stop calling the Bureau with "false complaints" about the noise coming from the Fontaine. (First DeWalt Dep. 174:23-175:19; First Manlove Decl. Ex. 11A; Second Merrithew Decl. Ex. 19.) DeWalt informed Ball that several police officers had verified the falsity of her noise complaints and written reports to that effect. (First Manlove Decl. Ex. 11A.) He indicated he would seek damages of over $200,000, and concluded with: "You have harassed my business from day one and we both know the reasons why. THIS IS YOUR FINAL NOTICE." (First DeWalt Dep. 175-11-14; First Manlove Decl. Ex. 11A.)

DeWalt sent the letter to Ball when he decided to return to a "hip-hop format" after his foray as a lesbian night club in late August. (First DeWalt Dep. 176:13-21.) Ball had not complained during this period and DeWalt, concerned the Fontaine's return to hip-hop music would revive Ball's concerns, informed Ball he would not "tolerate" her complaints. (First DeWalt Dep. 176:13-177:1.)

A neighbor identified only as "anonymous" in the report complained about loud music at the Fontaine on October 6, 2013. (Second Merrithew Decl. Ex. 54.) The report noted the owner of the Fontaine found out about the neighbor's previous complaints and sent her a letter indicating he would sue her, implying the "anonymous" neighbor was Ball. (Second Merrithew Decl. Ex. 54.) The responding officer heard a slight bass and when advised of this, the management at the Fontaine agreed to turn down the volume. (Second Merrithew Decl. Ex. 54.)

Ball emailed the Office on October 7, 2013, to inform them of the letter she received from DeWalt.

(Second Merrithew Decl. Ex. 51.)  In the email, Ball described the numerous times she been unable to

sleep due to loud, bass music emanating from the Fontaine, which she heard through closed windows.

(Second Merrithew Decl. Ex. 51.)  Ball reported the Fontaine's customers parked on Third Avenue,

blasted their music, and sometimes got into fights that had to be resolved by the Bureau.  (Second

Merrithew Decl. Ex. 51.)  Ball expressed fear, explained she felt threatened and helpless after receiving

the letter, and noted the noise seemed to be getting worse.  (Second Merrithew Decl. Ex. 51.)  Ball also

contacted the OLCC to voice her complaints.  (Second Merrithew Decl. Ex. 51.)

The *Oregonian* reported Kris Bakouros, another individual who lived near the Fontaine

("Bakouros"), repeatedly attempted to contact DeWalt to complain about late-night noise, broken glass,

and vomit outside her door.  (First DeWalt Dep. 183:10-14.)  Bakouros allegedly left messages for

DeWalt in the hope of discussing a solution to her concerns, but never received a return call.  (First DeWalt

Dep. 183:14-18.)  When she attempted to meet with DeWalt in person at the Fontaine during business

hours, security guards would not let her in.  (First DeWalt Dep. 183:17-20.)  When questioned about the

*Oregonian* article, DeWalt stated the report was a "blatant lie."  (First DeWalt Dep. 184:9-11.)

DeWalt claims he walked the neighborhood at least once with police officers, who admitted they

did not hear any noise.  (First DeWalt Dep. 170:24-171:5.)  Additionally, the individual who installed the

sound system in the Fontaine and lived at the same location as Ball told DeWalt he never heard the music.

(First DeWalt Dep. 178:3-13.)  While Van Orden had a portable decibel meter available to him, the City

refused DeWalt's request to install a decibel meter at Ball's residence to substantiate or discount her

complaints.  ( (Tr. 63:4-24, DeWalt Decl. ¶ 4.)

/ / / / /

### B.  Occupancy Issues

Cruser, a City firefighter who served as the public assembly inspector during the relevant period, met DeWalt for the first time in early 2013 while performing the fire inspection of the Fontaine required to obtain a building permit.  (Cruser Decl. dated January 12, 2018, ECF No. 131 ("Cruser Decl."), ¶¶ 1, 6.) At that time, Cruser advised DeWalt the Fontaine had a maximum capacity of 155.  (Cruser Decl. ¶ 6.) DeWalt acknowledged the occupancy limit and admitted it was important have an accurate account of all occupants at any given time.  (First DeWalt Dep.  396:10-397:8; 401:13-15.)

As a part of his duties, Cruser regularly monitored local newspapers and attended police roll calls on the weekends to determine if a promoted event was likely to draw large crowds.  (Cruser Decl. ¶ 4.) He warned bars and nightclubs, especially smaller ones, if he learned of an event that likely would exceed a venue's maximum capacity.  (Cruser Decl. ¶¶ 4, 5.)  He provided this information to DeWalt on occasion, and DeWalt seemed receptive and thankful.  (Cruser Decl. ¶ 9.)  Cruser also performed impromptu inspections of nightclubs on the weekends.  (Cruser Decl. ¶ 4.)

On October 5, 2013, Cruser dropped-in at the Fontaine to discuss capacity issues with DeWalt and remind him he needed to maintain an accurate count of his patrons at all times.  (Cruser Decl. ¶ 11.) Some of DeWalt's employees reported DeWalt had no system in place for tracking the number of customers in the Fontaine at any time.  (Cruser Decl. ¶ 13.) Cruser issued a "violation" to the Fontaine for failure to keep a proper door count.  (Cruser Decl. ¶ 12; First DeWalt Dep. 470:18-25.)  The violation did not assess any fines or place any restrictions on the Fontaine, but merely served to document Cruser's concerns and provide written notice to DeWalt as a warning.  (Cruser Decl. ¶ 12, Ex. 32.)

/  /  /  /  /

## C. Promoted Events and Gang Affiliations

Mark Friedman, a Bureau Sergeant, served as Supervisor of the Street Crimes Unit as well as Special Events Coordinator during the relevant period ("Friedman"). (Friedman Decl. dated January 10, 2018, ECF No. 132 ("Friedman Decl."), ¶¶ 1, 2.) As the Special Events Coordinator, Friedman evaluated events to be held in his jurisdiction, in part by communicating with promoters and hosts, to determine whether extra police support was needed. (Friedman Decl. ¶ 2.) Friedman first contacted DeWalt by phone in April 2013 to discuss a specific promoter's plan to hold events at the Fontaine. (Friedman Decl. ¶ 4.) When DeWalt informed Friedman the Fontaine would not be hosting these events due to lack of ticket sales, Friedman asked DeWalt for a date on which he would be available to meet with City employees. (Friedman Decl. ¶ 4.) DeWalt indicated he would get back to Friedman with possible dates, but never did. (Friedman Decl. ¶ 4, Ex. 38.)

In the spring and summer of 2013, the Fontaine became known among the Bureau as one of the clubs, along with the Conger Club and Magoo's, that gang members frequented. (Tr. 156:3-19.) Gang members routinely showed up at the Fontaine every few weeks and "it appeared they felt comfortable there and they could get away with whatever they were going to get away with." (Tr. 156:19-23.) The Bureau was aware gang members were responsible for more attempted murders and violent assaults in Portland than any other group of individuals. (Tr. 157:3-13.) For example, the Bureau's Gang Enforcement Team investigated approximately one-hundred gang-related murder attempts in 2013, 113 in 2012, and at least 103 in 2011. (Tr. 157:14-20.) As a result, the Bureau engaged in extra patrols of the Fontaine and surrounding area because of its concern about violence or reckless behavior at the venue. (Tr. 156:8-13, 157:25-7.)

On June 23, 2013, Bureau Officer Charles Asheim ("Asheim"), a member of the Bureau's Gang Enforcement Team, became aware of a large party hosted at the Fontaine. (Asheim Decl. ¶ 6.) While driving in the area about 2:00 a.m., Asheim saw an individual he recognized as a gang member, confirmed he had an outstanding warrant, and arrested him. (Asheim Decl. Ex. 16.) During the arrest, the individual pulled out a loaded gun and threw it on the sidewalk, resulting in additional charges related to the possession of the gun. (Asheim Decl. Ex. 16.) The individual explained the party at the Fontaine was a celebration for his birthday. (Asheim Decl. Ex. 16.) Earlier that evening, other Bureau officers patrolling the area around the Fontaine also identified and made contact with other gang associates, and arrested one of them on an outstanding warrant. (Asheim Decl. ¶ 6.)

While riding in a patrol car near the Fontaine on July 27, 2013, Asheim recognized two individuals he knew to be gang members. (Asheim Decl. Ex. 17.) Asheim knew one of them had been released from prison that month and the other was on parole. (Asheim Decl. Ex. 17.) Asheim stopped the individuals as they entered the Fontaine at about 1:00 a.m. and expressed concern they were violating parole by "going to a bar full of gang members." (Asheim Decl. Ex. 17.)

On August 23, 2013, Friedman assisted the Gang Enforcement Team in monitoring an E-40 concert in downtown Portland. (Friedman Decl. ¶ 7.) E-40 was a performer known to attract a "gang affected crowd," and known gang members did attend the concert. (Friedman Decl. ¶¶ 7, 8.) At the end of the concert, Bureau officers followed individuals identified as "gang affiliates" to prevent, or provide support in the event of, violence. (Friedman Decl. ¶ 8.) When the individuals ended up in the vicinity of the Fontaine, Friedman approached the front door of the Fontaine, which appeared quiet at the time, and engaged a security guard in conversation. (Friedman Decl. ¶¶ 9, 10.)

Friedman warned the security guard of the presence of the gang-affiliated individuals and cautioned him to be vigilant in the event they headed toward the Fontaine, the only entertainment venue open in the area at that time. (Friedman Decl. ¶¶ 9, 10.) The security guard thanked Friedman, and confided he and other Fontaine employees were concerned for their safety because of recent incidents and the type of people showing up at the Fontaine. (Friedman Decl. ¶ 11; Friedman Dep. dated March 16, 2017, ("Friedman Dep.")[12] 18:1-25.)

Friedman then approached DeWalt to offer him the same information and recommend vigilance. (Friedman Decl. ¶ 12; Friedman Dep. 21:1-15.) DeWalt denies Friedman told him he had just been at the E-40 concert, or of the City's concern based on a prior incident at an E-40 concert, or that gang members appeared to be on their way to the Fontaine after the concert. (First DeWalt Dep. 365:6-23.) DeWalt testified he would have appreciated this information from Friedman, and said Friedman told DeWalt only that "the City was not going to tolerate these types of events," which DeWalt interpreted to be an after party for an E-40 concert. (First DeWalt Dep. 239:11-25, 363:15-19, 364:6-13, 365:24-366:2.) DeWalt understood this statement to mean that he had to contact or get approval from the City if he planned to host such an event. (First DeWalt Dep. 363:15-22.) DeWalt said Friedman also mentioned the music being played at the Fontaine, which DeWalt described as a wide genre from Al Green to Tupac to E-40. (First DeWalt Dep. 364:14-365:5.) Friedman denies mentioning the Fontaine's choice of music or telling DeWalt "the City of Portland does not like these types of events you are having, it does not like the type of music being played, and the City will not tolerate it." (Friedman Decl. ¶¶ 15, 16.)

---

[12] The "Friedman Dep." is filed as Exhibit B of the Abrams declaration (ECF No. 120-3) and Exhibit 12 of the Merrithew declaration (ECF No. 154-12).

Friedman shared the security guard's concerns with DeWalt at this time, which DeWalt appeared to acknowledge. (Friedman Decl. ¶ 12; Friedman Dep. 21:16-22.:4.) DeWalt denies discussing the security guard's concerns with Friedman, or that he knew his staff was concerned for their safety, but admits he knew of the issues at the Fontaine and had been considering an alternative format in the near future, specifically mentioning to Friedman a lesbian bar. (Friedman Decl. ¶ 13; Friedman Dep. 23:1-10; First DeWalt Dep. 239:11-240:9, 366:3-8, 369:3-20.) Friedman remembers DeWalt commenting being too old to be up until 2:30 a.m. and being frustrated with some of the issues he faced. (Friedman Dep. 22:7-16.) DeWalt agreed he was said he was tired, but he meant he was tired with the City's interactions with the Fontaine, the requirement he control his customers when they leave the Fontaine, and the Bureau's constant harassment, not with the late nights or because of his age. (First DeWalt Dep. 369:21-371:20.)

DeWalt recalled Friedman had ten-to-fifteen people dressed in military gear with him at the time of their conversation. (First DeWalt Dep. 239:22-240:4.) Friedman said there were approximately nine other officers in the general vicinity at that time, and three other officers within a twenty-foot radius of the Fontaine's front, but none standing next to him, and six additional officers parked in the area. (Friedman Decl. ¶ 17.)

D. *Disturbance Complaints*

Bureau Officer David McGuffey ("McGuffey") responded at about 2:00 a.m. on August 24, 2013, to a report of a large group of people fighting at the Fontaine. (Jackson Decl. Ex. 24.) In his report, McGuffey noted the Fontaine "is a problem address here in the precinct and every Friday night it generates a police call." (Jackson Decl. Ex. 24.) When he arrived, McGuffey observed about fifty to seventy black males and females yelling at each other while walking to their cars, some of which were parked in the right-

of-way on Third Street. (Jackson Decl. Ex. 24.) The crowd was not engaged in fighting and disbursed

when McGuffey instructed them to do so. (Jackson Decl. Ex. 24.) DeWalt explained he had just closed

the Fontaine, and he described the group as young people just having fun. (First DeWalt Dep. 240:10-23.)

McGuffey subsequently entered the Fontaine, which was occupied only by employees cleaning up

after closing, and was "taken aback at the overwhelming odor of Marijuana." (Jackson Decl. Ex. 24.) The

OLCC contacted DeWalt upon learning of the marijuana odor, and cautioned him to look out for smokers

in the future. (First DeWalt Dep. 37:9-38:13.) DeWalt denied the accusation, stating the Fontaine never

smelled of marijuana. (First DeWalt Dep. 38:1-19.)

## IV. DeWalt and City Officials Meet to Discuss the Fontaine

The License Team arranged to meet with DeWalt on October 10, 2013, to discuss the City's

concerns about the Fontaine (the "Meeting"). (Van Orden Decl. ¶ 18.) Specifically, the License Team

intended to address these issues: 1) noise complaints; 2) the perceived inability to control customers; 3)

security guards' concern for their safety; 4) gang affiliations among customers; and 5) capacity. (Oden-Orr

Dep. dated July 20, 2017, ("Oden-Orr Dep.")[13] 20:8-23; First Marchetti Decl. ¶ 5.)

### A. The License Team

The License Team consists of various representatives from the City, including members of the

Office and the Bureau's Drug and Vice Division. (Kruger Dep. 14:22-15:14.) Marchetti, Jackson, Cruser,

and Van Orden, as well as other City or Bureau representatives, were members of the License Team in

---

[13] The "Oden-Orr Dep." is filed as Exhibit 2A of the Manlove declaration (ECF No. 126-1), Exhibit 36 of the Merrithew declaration (ECF No. 154-36), and Exhibit 59 of the supplemental Manlove declaration (ECF No. 174-1).

2013.  (First Jackson Decl. ¶ 2.)

The License Team is responsible for reviewing complaints and issues related to liquor licenses, deciding if an action should be taken, and, if so, the appropriate action.  (Kruger Dep. 15:6- 11.)  During the relevant period, the License Team met at least monthly to discuss basic livability issues, such as noise, crime, gang activity, and over-service of alcohol.  (First Jackson Decl. ¶ 2; First Marchetti Decl. ¶ 3.) When a licensee's activity generated multiple complaints, the License Team arranged a meeting with the licensee to discuss the issues and possible solutions.  (First Jackson Decl. ¶ 3; First Marchetti Decl. ¶ 4.) Marchetti viewed these meetings as problem-solving endeavors that provided the licensee with suggestions about best business practices intended to mitigate identified issues.  (First Marchetti Decl. ¶ 4.)  Marchetti attended hundreds of these meetings between 2008 and 2014.  ( First Marchetti Decl. ¶ 4.)

If the License Team determined a sanction should be imposed upon a licensee, it reported the decision and recommended sanction to the Drug and Vice Division in a letter.  (Kruger Dep. 15:8-14; Kruger Decl. ¶ 3.)  During the relevant period, Bureau Sergeant Kevin Hogan ("Hogan"), reviewed the License Team's sanctions recommendations before forwarding them to Kruger.  (Kruger Dep. 18:1-8; Kruger Decl. ¶ 3.)  Kruger then considered whether the recommended sanction met the applicable statutory requirements before allowing it to move forward.  (Kruger Decl. ¶ 3.)  Kruger did not agree with all recommendations and had rejected proposed actions in the past.  (Kruger Dep. 20:14-21:1; Kruger Decl. ¶ 3.)

/ / / / /

/ / / / /

/ / / / /

*B. The Meeting*

DeWalt attended the meeting with his attorney, Melvin Oden-Orr ("Oden-Orr").[14] (Jackson Dep. 31:12-19.) Marchetti, Jackson, Van Orden, and Cruser, among others, attended the meeting on behalf of the City. (First Jackson Decl. Ex. 19; Jackson Dep. 34:8-18.) Cruser specifically requested the opportunity to attend the Meeting, informing Marchetti he had previous dealings DeWalt, whom he described as "defensive." (Second Merrithew Decl. Ex. 10.) Cruser also stated the Fontaine's primary promoter had a following of Blood gang members, and that DeWalt told him he intended to convert the Fontaine to a lesbian club. (Second Merrithew Decl. Ex. 10.) The meeting was Jackson's first interaction with DeWalt, although he likely gathered and reviewed some police reports relating to the Fontaine prior to the meeting. (Jackson Dep. 31:4-11, 164:5-20; First Jackson Decl. ¶ 4.) In accordance with standard practice, Jackson prepared a police report summarizing the meeting. (Marchetti Dep. 143:10-19.)

1. Noise Complaints

The parties generally discussed the numerous noise complaints made by Fontaine's neighbors. (First Marchetti Decl. ¶ 6.) Additionally, Van Orden gave DeWalt a copy of the only noise citation issued against the Fontaine. (Van Orden Decl. ¶ 22.) The noise citation, dated October 9, 2013, assessed a $300 fine based on the information contained in Hornstein's August 17, 2013 report (the "Citation"). (Van Orden Decl. ¶ 15, Ex. 30.) DeWalt was surprised to receive the Citation because he was not aware anyone had performed tests to determine the Fontaine was over the allowable decibel standard. (First DeWalt Dep. 458:1-9.) However, neither DeWalt nor Oden-Orr objected to the Citation or sought to

---

[14] Oden-Orr was appointed a Multnomah Count Circuit Court judge in 2017.

address any concerns about the Citation. (Van Orden Decl. ¶ 22.) DeWalt considered Van Orden's failure to put a decibel meter in Ball's residence or to visit the Fontaine to investigate the complaints evidence Van Orden did not like hip-hop or rap music. (Second DeWalt Dep. 75:4-76:16.)

The License Team informed DeWalt he was responsible for the behavior and noise level of his customers when they left the Fontaine, and suggested DeWalt use unarmed security guards to monitor customer behavior in the surrounding area after closing. (First Jackson Decl. Ex. 19 at 1; First Marchetti Decl. ¶ 6.) Jackson explained that the definition of "premises," or "immediate vicinity," included the sidewalks and streets in front of and around a licensed establishment. (First Jackson Decl. ¶ 9.) Marchetti agreed with Jackson's definition, and also was cognizant of a licensee's obligation under OR. REV. STAT. 471.315 to control noise, disturbances, or unlawful activities related to the sale and service of alcohol within the immediate vicinity of the licensed venue. (First Marchetti Decl. ¶ 6.) DeWalt, on the other hand, considered "premises" to include only the parking lot, the perimeter of the building, and the sidewalk adjacent to the Fontaine. (First DeWalt Dep. 407:19-23; Second DeWalt Dep. 97:17-98:7.)

DeWalt acknowledged his responsibility for customers while at the Fontaine, but denied any responsibility for the conduct of unintoxicated customers who left the "premises" and engaged in inappropriate or unlawful conduct elsewhere. (First DeWalt Dep. 203:4-18, 407:7-408:5.) DeWalt attributed the noise issues primarily to Ball's complaints, and he declined to send his security members, not all of whom are armed, two blocks away to deal with disorderly individuals, as the License Team suggested. (First DeWalt Dep. 414:24-416:12; Marchetti Dep. 138:18-139:12.) Specifically, he "admitted that some of his clientele could cause problems and he would not expose his security to that type

of risk, and he prefers to request 'extra-patrol' from the Portland Police" to address these issues.[15] (First Jackson Decl. Ex. 19 at 1; First DeWalt Dep. 415:4-24.)

DeWalt believed Jackson disliked black people based on Jackson's attempt to hold DeWalt accountable for the conduct of Fontaine's customers after they left the nightclub. (First DeWalt Dep. 195:7-196:2; Second DeWalt Dep. 91:14-92:1.) DeWalt assumed but had no evidence that Jackson did not require the owners of white clubs to control their customers after they left a venue. (Second DeWalt Dep. 91:2-17.)

    2.   Occupancy Issues

Cruser raised concerns about the Fontaine's occupancy limit. (First Jackson Decl. ¶ 8; First DeWalt Dep. 417:2-8; Cruser Decl. ¶ 16.) DeWalt contended his occupant load was much higher than 155, but Cruser subsequently confirmed this number with DeWalt's architect and informed DeWalt the number was accurate. (Cruser Decl. ¶¶ 6, 16, 19, Exs. 33, 34; Second Merrithew Decl. Ex. 9, Se.) Cruser provided DeWalt with information and forms needed to request an increase of the occupancy limit but, after talking with his architect, DeWalt decided not to pursue an increase. (First DeWalt Dep. 417:8-15; Cruser Decl. ¶ 16.) DeWalt based this decision on the cost of installing another toilet and his impression the Fontaine would not "be around" much longer. (First DeWalt Dep. 417:16-418:11.)

    3.  Promoted Events and Gang Affiliations

The License Team informed DeWalt the Fontaine had become a "hangout for known gang members and their affiliates," and explained several people had been arrested with firearms upon arriving

---

[15] It was not uncommon for the entertainment detail to provide extra patrols for bars that request it and extra patrols were, on occasion, provided to the Fontaine. (Jackson Dep. 130:15-131:23.)

at or leaving the Fontaine. (First Jackson Decl. Ex. 19 at 1; First DeWalt Dep. 437:10-21.) DeWalt explained he used three security guards on busy nights, and that the guards "pat down" and "wand" all customers when entering the Fontaine. (First Jackson Decl. Ex. 19 at 1.)

The License Team expressed concern about the promoters with whom DeWalt was doing business, specifically Brotha Luv. (First Jackson Decl. ¶ 6; First DeWalt Dep. 465:15-466:12.[16]) Jackson, who knew DeWalt was an experienced bar owner, recommended DeWalt engage in routine due diligence when deciding which promoters he would host in the Fontaine, primarily by checking with other venues and licensees who have hosted, or refused to host, the promoter, in an effort to avoid involvement with promoters who attract gang members or have a track record of violence or other issues at their events. (First Jackson Decl. ¶¶ 6, 7; Jackson Dep. 175:21-176:5, 178:3-179:7.) Jackson regularly provided the same advice to other bar owners. (First Jackson Decl. ¶ 7.) The License Team did not direct DeWalt to not host a specific promoter, however. (Oden-Orr Dep. 39:4-12.)

DeWalt appreciated the information related to gang issues but was frustrated when the Bureau did not respond to his requests for documentation on, or a list of, gang members and related promoters, or information on how to identify them. (First DeWalt Dep. 463:7-464:22.) The Bureau does not provide the public with lists of, or intelligence on, gang members and did not have a list of problem promoters. (Asheim Dep. dated July 19, 2017, ("Asheim Dep.")[17] 35:12-36:21; Jackson Dep. 111:24-112:2, 178:3-14.)

---

[16] DeWalt had hosted at least two events with Brotha Luv, but did not know of his gang following until the Meeting. (First DeWalt Dep. 156:12-157:19.)

[17] The "Asheim Dep." is filed as Exhibit 32 of the Merrithew declaration (ECF No. 154-32), and Exhibit 62 of the supplemental Manlove declaration (ECF No. 174-1).

4. Format Change

According to DeWalt, Marchetti raised the issue of DeWalt's decision to return to its original format after experimenting with alternative formats, such as a lesbian nightclub. (First DeWalt Dep. 430:10-23.) Because of the Fontaine's continuing issues with the City, DeWalt altered the Fontaine's format to cater to lesbians in late August 2013. (First DeWalt Dep. 51:19-52:2.) When the Fontaine failed to make a profit as a lesbian club, DeWalt returned to his original format and clientele after only a few weeks. (First DeWalt Dep. 52:1-6, 248:2-10, 455:21-24.) DeWalt explained he felt the "ladies" he was working with to promote the lesbian events did not have nightclub experience and he did not know how to promote anything other than an African-American club. (First DeWalt Dep. 247:20-248:2, 430:23-431:5.) When Marchetti suggested DeWalt consider changing the music he was playing, DeWalt responded he did not find anything offensive about his music, stating he did not play anything "vulgar and cursing," only "good . . . decent music" that would not offend an older crowd. (First DeWalt Dep. 431:6-14.) DeWalt inferred Marchetti's suggestion really referred to hip-hop music or rap, but does not remember her specifically mentioning this type of music. (First DeWalt Dep. 431:15-23.)

C. Conclusion

At the end of the Meeting, the License Team cautioned DeWalt that if incidents continued to occur at the Fontaine, a time, place, and manner violation could be issued. (First Jackson Decl. Ex. 19 at 2.) Marchetti acknowledged the incidents at the Fontaine did not rise to a level sufficient to warrant the initiation of the formal time, place, and manner process or issuance of a sanction. (Marchetti Dep. 80:17-81:9.)

According to DeWalt, Marchetti told him to maintain a list of gang members, ask his customers if

they were on parole or probation, require his customers to dress in a certain manner, and play a different type of music. (First DeWalt Dep. 419:22-420:5-23.) During the meeting, someone (DeWalt believes Marchetti) said DeWalt should prevent his customers from standing in front of the Fontaine because they looked "lewd, vulgar, and filthy", and that he could be charged with loitering if he failed to do so. (First DeWalt Dep. 190:2-22; 420:23-421:1.) Finally, Marchetti or Jackson suggested DeWalt require his security guards to monitor and control noise in a two-block radius, and prevent customers from speaking, laughing or playing loud music when they left the Fontaine. (First DeWalt Dep. 190:18-22, 420:7-11, 421:1-6.) DeWalt acknowledged that Marchetti did not use a racial epithet or slurs when listing these directives. (Second DeWalt Dep. 84:8-20.)

Marchetti states that during the meeting she did not refer, and did not hear anyone refer, to the Fontaine's hip-hop music or that DeWalt should maintain a list of gang members who patronized the Fontaine, or that DeWalt should ask patrons if they were on parole, or that the Fontaine should ban saggy pants. (First Marchetti Decl. ¶¶ 10, 11.) Rather, Marchetti testified she was unaware of the Fontaine's musical format or primary customer base. (First Marchetti Decl. ¶ 21.) Oden-Orr does not recall any reference to hip-hop music or hear anyone tell DeWalt his customers should not be allowed to stand out in front of the Fontaine because they looked lewd, vulgar, or filthy; he does remember, however, someone suggesting DeWalt impose a dress code prohibiting hats and saggy pants. (Oden-Orr Dep. 46:2-7, 49:4-22, 50:2-20.) Cruser remembers DeWalt stating he felt he was being targeted because of his race. (Cruser Decl. ¶ 18.)

Jackson thought DeWalt seemed argumentative with the License Team about its concerns and dismissive of its recommendations, particularly with regard to due diligence. (First Jackson Decl. ¶ 10.)

Marchetti testified DeWalt made clear he did not feel responsible for noise and livability issues created by the Fontaine, and opined noise control was the City's responsibility. (First Marchetti Decl. ¶ 9.) Marchetti also felt DeWalt's response to the recommendations made at the Meeting suggested he did not intend pursue any of them. (Marchetti 30(b)(6) Dep. dated December 5, 2017 ("Marchetti 30(b)(6) Dep."),[18] 45:22-46:6.) DeWalt did not have any conversations with any City official after the Meeting to discuss what actions he intended to take, or already had put in place, to remedy the License Team's concerns. (Second DeWalt Dep. 51:20-24.)

V. City's Interactions and Issues with the Fontaine After October 2013 Meeting

After the Meeting, DeWalt met with staff members to share his impression of the City's expectations for operating the Fontaine. (First DeWalt Dep. 468:5-19.) DeWalt felt the License Team wanted him to prevent his customers from making any noise, even talking, as they left the Fontaine. (First DeWalt Dep. 441:1-19.) DeWalt told Mitchell the City wanted him to patrol a two-block radius, in response to which Mitchell refused, saying he had never had to do that with any other employer. (First DeWalt Dep. 468:19-24.) DeWalt testified that he nonetheless hired an extra security person to stand on the corner and monitor the music, and Mitchell stated he implemented a routine of walking around the block every thirty minutes to check the sound level and make necessary adjustments, such a turning the speakers down or encouraging a driver to move on or turn down his music. (First DeWalt Dep. 468:25-469:5; Mitchell Decl. ¶¶ 35-37.)

---

[18] The "Marchetti 30(b)(6) Dep." was taken over two days on December 5, 2017, and December 14, 2017. The pages of the deposition transcript are numbered consecutively over the two days and are filed as Exhibit 4 of the Manlove declaration (ECF No. 126-1) and Exhibit 56 of the supplemental Manlove declaration (174-1).

In response to Cruser's concerns, Mitchell purchased two hand-held counters to record the number of people entering and exiting the Fontaine and to ensure they maintained a maximum capacity of 125 to 150, depending on the event. (Mitchell Decl. ¶ 38.) DeWalt and Mitchell also created and enforced a very strict dress code, barring tennis shoes, t-shirts, ball caps, and similar items of attire, as well as imposing a minimum age of twenty-five and increased it to thirty, when necessary. (Tr. 261:24-262:18.) Mitchell thought these restrictions would eliminate the "club killers," which he described as wild young folk with something to prove and who were prone to fighting. (Tr. 262:19-263:8.)

DeWalt was "somewhat" receptive to these changes but did not want to make a lot of changes immediately because of the Fontaine financial struggles (Tr. 263:9-20), but he did take some steps to address the License Team's concerns. He informed his manager they needed to "watch out for each and every promoter." (First DeWalt Dep. 468:24-25.) He asked the manager of another nightclub how to identify gang members and deal with banned promoters. (First DeWalt Dep. 469:5-12.) And DeWalt "got rid" of Brotha Luv. (First DeWalt Dep. 469:18-21.) DeWalt hand-delivered a letter dated October 11, 2013, to Joseph Blake, whom DeWalt identified as Brotha Luv ("Blake"), advising him the City suggested the Fontaine no longer host his events and should bar him from the Fontaine. (First DeWalt Dep. 211:3-25; Second Merrithew Decl. Ex. 25.) DeWalt explained to Blake the City informed him of Brotha Luv's (i.e., Blake's) gang affiliation and that his events had prompted gang violence, including two murders. (Second Merrithew Decl. Ex. 25.) DeWalt acknowledged such action would be a hardship on Brotha Luv, and stated "my company will also be placed in a hardship position due to the City of Portland and the Portland Police Department heavy handed demands." (Second Merrithew Decl. Ex. 25.) Despite DeWalt's attempts at remedial actions, however the City's issues with the Fontaine continued.

A. *Excessive Noise*

1. Citizen Complaints

The night of the Meeting, Ball complained again of loud bass at the Fontaine and stated she was working on the issue with a noise officer. (Second Merrithew Decl. Ex. 55.) The responding officer, who notified DeWalt of the complaint, found the music barely audible from Ball's address. (Second Merrithew Decl. Ex. 55.) On October 18, 2013, Ball again complained about loud bass from the Fontaine and vehicles, reiterating her wish to remain anonymous because of DeWalt's previous contacts with her. (Second Merrithew Decl. Ex. 56.) The responding officer determined the noise originated from a vehicle that had left the location. (Second Merrithew Decl. Ex. 56.)

On October 31, 2013, a second "anonymous" caller complained about loud noise from the Fontaine, and asked that the responding officer contact her by telephone so she could provide the information to the noise officer with whom she was working. (Second Merrithew Decl. Ex. 57.) The responding officer heard no loud noise, but encouraged the complainant to call back if necessary. (Second Merrithew Decl. Ex. 57.)

2. Appeal of the Noise Citation

In a letter dated October 18, 2013, DeWalt appealed the Citation and identified DPI as the responsible party. (Archer Decl. dated January 9, 2018, ECF No. 133, ("Archer Decl."), Ex. 39.) On October 28, 2013, the Landlord also identified DPI as the responsible party, asserted DPI had standing to contest the Citation, and stated DPI should be given the opportunity to appeal the Citation. (Archer Decl. Ex. 41.) Under City policy, property owners are responsible for their tenants' actions and noise citations therefore are issued to the owner and not the tenant, allowing the City to file a lien against the

PAGE 44 - OPINION AND ORDER

property if a fine is not paid. (Van Orden Decl. ¶ 17; Archer Decl. ¶ 7.) Consequently, a tenant that

wishes to appeal a citation must obtain written authorization from the landlord. (Archer Decl. ¶ 8.)

Amy Archer, the Operations and Livability Program Manager for the Office responsible for

enforcement of the City's noise code ("Archer"), informed both DeWalt and the Landlord of this policy

and asked the Landlord to verify DPI's authority to contest the Citation. (Archer Decl. ¶ 2, Ex. 40.) The

Landlord refused DeWalt's request, however, explaining it preferred its lawyer to handled the matter.

(Second DeWalt Dep. 35:1-12.) The Landlord expressly informed Archer that neither DPI nor DeWalt

were its agents or had the authority to represent the Landlord. (Archer Decl. Ex. 41.) On November 5,

2013, Archer sent letters to both DPI[19] and the Landlord explaining that without written authorization only

the Landlord could formally appeal the Citation, listing acoustical engineers who could evaluate the noise

issues at the Fontaine, and providing recommendations for controlling the noise. (Archer Decl. Exs. 42,

43.)

In the letter addressed to the Landlord, Archer explained she had given the Citation a courtesy

review and found sufficient evidence in the August 17, 2013 report to support the Citation. (Archer Decl.

Ex. 43.) Archer allowed the Landlord until November 11, 2013, to appeal the Citation and cautioned that

if no appeal was filed and the fine was not paid by November 20, 2013, the $300 fine would double.

(Archer Decl. Ex. 43.) The Landlord paid the fine, which it eventually recovered from DeWalt (First

DeWalt Dep. 527:23-528:10), and Archer had no further contact with DeWalt. (Archer Decl. ¶ 14.)

---

[19]DeWalt does not remember receiving the November 5, 2013 letter addressed to him at the address for the Fontaine, and explained he did not generally receive mail at the Fontaine. (Second DeWalt Dep. 40:13-20.)

Archer never had a direct conversation with DeWalt and, until after DeWalt filed this lawsuit, did not know his race, the race of the Fontaine's clientele, or the Fontaine's music format. (Archer Decl. ¶ 3.)

B. *Capacity Issues*

The Bureau continued to receive reports of large crowds at the Fontaine, which prompted Cruser to drive by the Fontaine the evening of October 13, 2013, and park a block away to determine whether a drop-in inspection was warranted. (Cruser Decl. ¶ 22.) The Fontaine did not appear busy and Cruser decided to remain in his car. (Cruser Decl. ¶ 22.) After about ten minutes, DeWalt approached Cruser's car, complained about the warning issued on October 5, 2013, and asserted Cruser and the Bureau were ruining his business. (Cruser Decl. ¶ 23, Ex. 35.) DeWalt said one of his promoters no longer would hold events at the Fontaine because of the strong police and fire presence. (Cruser Decl. Ex. 35.) DeWalt also questioned his obligation to keep an accurate customer count, and Cruser agreed to provide the relevant provisions of the City's fire and building code, which he emailed to DeWalt on October 18, 2013. (Cruser Decl. ¶ 24, Ex. 36.)

VI. The Annual Scorpio Bash

A. *The Arrangements*

On Tuesday, November 5, 2013, "Willy," a promoter with whom DeWalt had previously worked without any problems, contacted DeWalt. (First DeWalt Dep. 149:13-24, 150:6-7.) Willy explained a friend was looking for a place to hold an annual event that Friday, known as the Annual Scorpio Bash, which he described as a formal event for individuals twenty-five years or older (the "Bash"), and asked if the Fontaine would be available. (First DeWalt Dep. 149:3-12; 212:11-20.) New to Portland, DeWalt had no knowledge of the Bash. (First DeWalt Dep. 212:7-10.)

Willy provided DeWalt with the friend's name (referred to herein as "Max"), and DeWalt asked his manager and Mitchell if they knew of Max and whether he had gang ties or was a trouble maker. (First DeWalt Dep. 150:6-23.) After being assured Max would not create problems, DeWalt contacted Max to arrange a meeting to discuss the details of the Bash. (First DeWalt Dep. 150:22-25.)

Max explained that the last-minute location search occurred because the original venue's owner cancelled; he was unwilling to host an event that would draw a predominantly black customer base. (First DeWalt Dep. 151:4-10.) DeWalt did not consider it unusual for a promoter to be looking for a venue just three days before an event. (First DeWalt Dep. 151:1-4.) DeWalt, aware of what he considered racial issues in Portland, did not find the last-minute cancellation surprising. (First DeWalt Dep. 151:11-16.)

The Melody Ballroom originally agreed to host the Bash. (Kaad Decl. dated February 18, 2018, ECF No. 156 ("Kaad Decl."), ¶ 4.) Kathleen Kaad ("Kadd"), The Melody Ballroom's owner, had researched Max and found nothing that set off "alarm bells;" she considered him to be "legitimate" and contracted to host the Bash, which had been described to her as a "birthday party." (Kaad Decl. ¶ 4.) During her ownership, The Melody Ballroom hosted primarily private events from music concerts, corporate events, weddings, proms, charity events, and theme parties and "was open to all types of people including Black and African-American events." (Kaad Decl. ¶ 2.) Just days before the date of the Bash, a Portland Spirit employee who had been present during a recent party Max had promoted and which ended in a shooting, contacted Kaad to recommend she not host the Bash. (Kaad Decl. ¶ 5.) Bureau Officer Jay Gahan ("Gahan") also contacted someone at the Melody Ballroom to warn of the risk in hosting

the Bash.  (Gahan 30(b)(6) Dep. dated December 14, 2017, ("Gahan Dep.")[20] 8:20-9:5.)  Kaad's bar manager then obtained additional information and a from a lawyer and his recommendation to not host the Bash, and coupled with the promoter's failure to respond to Kaad's communications or pay the deposit to secure the venue, she cancelled the Bash and left a message on the promoter's voice mail informing him of her decision.  (Kaad Decl. ¶ 6.)[21]  Concerned that Bash attendees still would arrive at The Melody Ballroom the night of the event, Kaad called the Bureau to advise them of the cancelled event, express her concerns, and request extra patrols near The Melody Ballroom that night.  (Kaad Decl. ¶ 6.)

Max and two other individuals met with DeWalt at the Fontaine on Wednesday, November 6, 2013.  (First DeWalt Dep. 150:22-15, 151:14-18.)  DeWalt informed Max he would require six security guards to work the Bash, with the cost split between DPI and Max. (First DeWalt Dep. 153:3-11.) DeWalt told Max that the artist[22] scheduled to appear at the Bash must be at the venue by 10:00 p.m., and that Max must cover the cost of the deejay.  (First DeWalt Dep. 153:6-12.)

DeWalt asked Max if he had any gang affiliations or relations.  (First DeWalt Dep. 148:10-17.) DeWalt did not know, and Max did not reveal, that Max was appearing on behalf of a promoter known as "Yea Dat Entertainment" ("Yea Dat").  (First DeWalt Dep. 147:14-148:22.)  Yea Dat is known as a promoter who could "cause real problems for any club." (Tr. 261:5-15; Asheim Decl. ¶ 11.)  Mitchell had

---

[20] The "Gahan Dep." is filed as Exhibit 42 of the Merrithew declaration (ECF No. 154-42), and Exhibit 61 of the supplemental Manlove declaration (ECF No. 174-1).

[21] Gahan testified at deposition the Trio Club also had agreed to host the Bash, but canceled the engagement after Gahan talked to its owner about the event.  (Gahan Dep. 10:8-16.)

[22] "Kimbella," an MTV veejay know to DeWalt, likely was the entertainer.  In fact, DeWalt had previously hosted "hundreds of those types of events."  (First DeWalt Dep. 152:4-12.)

worked events promoted by Yea Dat in the past, one of which ended in an all-out brawl, and did not want to work with him again. (Tr. 260:9-261:1.)

DeWalt believed Yea Dat purposely sent Max to meet with DeWalt to disguise the true Bash promoter's identity, and he denies knowing of Max's association with "Yea Dat" until after he saw a police report. (First DeWalt Dep. 147:14-148:6, 155:20-24.) Moreover, the security guards did not know of Yea Dat's involvement until it was too late, because none of the advertising or promotional material identified him as the promoter. (Tr. 261:5-12.) Thus, although DeWalt was generally attentive to security issues, he could not inform his security guards that Yea Dea was promoting the Bash. (Tr. 260:23-261:12.)

The Bureau received an anonymous tip about a party at the Fontaine on Friday evening. (Asheim Dep. 91:9-22; Asheim Decl. ¶ 11.) Additionally, anonymous 911 callers informed the Bureau that a member of the Bloods gang was hosting the Bash and that many gang members would be in attendance. (Tr. 39:12-40:9; 139:10-22.) Some Bureau officers knew the Bash had been moved twice because of concerns about gang violence, and although they speculated that the Fontaine's party could be the Bash, the Bureau initially did not know that to be the case and, consequently, it did not know to warn DeWalt of the risk of hosting the event. (Asheim Decl. ¶ 11; Asheim Dep. 91:18-22; 102:16-103:13; Gahan Dep. 11:16-12:11.) If he had received a tip, Mitchell believes he would have cancelled the Bash after discussing the warning with DeWalt and other security members. (Mitchell Dec. ¶ 64.)

B. *The Event*

Customers began arriving about 8:00 p.m. and paid a $25.00 cover fee at the door. (First DeWalt Dep. 154:6-17.) Six security guards worked the Bash: Mitchell, Joe Thomas ("Thomas"), and "Carlos"

hired by DeWalt, and Kenan Powell ("Powell") and two other guards hired by Yea Dat. (Tr. 278:4-20.) The Fontaine had the largest security presence that night that Mitchell had ever seen at the venue. (Mitchell Decl. ¶ 55.)

Carlos and Powell initially worked the front door, with Carlos "wanding" for weapons and Powell checking identification. (Tr. 279:2-16.) Additionally, because of DeWalt's concern about exceeding occupancy after Cruser's visits, the front door security guards used two counters, one count customers entering and one to count customers leaving. (Tr. 254:21-255:4, 274:6-14.) Most customers' attire complied with the Fontaine's dress code, though security admitted some customers who wore white tee shirts and hats. (First DeWalt Dep. 212:11-18, 427:15- 22.) A Yea Dat employee collected money, and Mitchell stood at the second door telling customers that they would not be readmitted if they left. (Tr. 279:7-19, 273:23-274:5.) Mitchell assigned Thomas to monitor the side door. (Tr. 274:21-25.)

When the entertainer did not arrive by 10:00 p.m., DeWalt unsuccessfully attempted to reach by phone Max and the other individuals who had attended the Wednesday meeting. (First DeWalt Dep. 154:4-155:3.) DeWalt told one of his security guards he was concerned Max had "bamboozled" him. (First DeWalt Dep. 154:16-21.) DeWalt never saw the entertainer that evening. (First DeWalt Dep. 155:18-19.)

Asheim visited the Fontaine about 11:45 p.m. and confirmed with Powell, who had previously assisted the Bureau with issues related to the Fontaine, both Yea Dat as the promoter of the Bash and the presence of many gang members. (Asheim Decl. Ex. 18 at 2; Tr. 139:23-140:3.) Powell explained he was enforcing a strict dress code and age limit, performing pat-downs of entering customers, and going through bags at the front door, but expressed concern that Yea Dat was letting his own people in through a side

door without similar security measures. (Asheim Decl. Ex. 18 at 2; Tr. 140:9-20.) Powell stated when he agreed to work security for the Bash he had not been informed the promoter would be Yea Dat, and he had strong concerns gang violence would erupt. (Asheim Decl. Ex. 18 at 2.) Powell asked Asheim to return later in the evening, specifically when the Bash concluded, to help prevent problems in the street. (Tr. 140:3-5.)

Based on previous experience, Asheim knew Yea Dat's events attracted large group of gang members, and he also knew of the shooting of three gang members at a Yea Dat event on the Portland Spirit three months earlier in August 2013. (Asheim Decl. ¶ 11.) Asheim gave Powell his cell phone number and asked him to call to if any issues arose. (Asheim Decl. Ex. 18 at 2; Tr. 140:5-8.) Asheim notified the night district officer of the Bash, who promised to get the word out, and Asheim asked another officer to check on the Fontaine when he was free. (Asheim Decl. Ex. 18 at 2; Tr. 140:21-141:1.)

VI. The Shooting

Just after midnight on November 9, 2013, a customer and suspected gang member, identified as "Quan," jumped on the Fontaine stage and started a large fight. (Asheim Decl. Ex. 18 at 3; Tr. 147:3-17.) Mitchell remembers it began when the customer sprayed the crowd with champagne. (Tr. 254:6-13.) The attitude of the customers, numbering about 150, changed, so Mitchell directed that no one else be allowed to enter. (Tr. 254:12-18.) At the time this occurred, the "counters" showed 207 people had entered and 57 had left through the front door. (Tr. 274:15-20.)

As the fight progressed, people started throwing barstools and bottles. (Asheim Decl. Ex. 18 at 3; Tr. 147:17-20.) When Powell attempted to remove Quan from the stage, about twenty of Quan's fellow

"gang members" rushed at Quan and Powell, and they told Powell they would be able to control Quan.[23] (Asheim Decl. Ex. 18 at 3; Tr. 147:20-23, 148:7-15.)  Yea Dat personnel recommended Powell allow Quan's people to take care of him, and they cautioned that there likely would be a shooting if Powell forced Quan outside.  (Asheim Decl. Ex. 18 at 3.)  The "gang members," which included Durieul Harris ("Harris"), pushed Quan into the bathroom in the back hall.  (Asheim Decl. Ex. 18 at 3.)  Powell, who waited outside in the hall, could hear fighting in the bathroom, which dissipated but then seemed to reignite.  (Asheim Decl. Ex. 18 at 3.)

DeWalt was aware of the argument in the bathroom, which he thought concerned money.  (First DeWalt Dep. 214:23-215:4.)  He attempted to separate the antagonists before it got physical, but then another customer threw a beer bottle against the wall.  (First DeWalt Dep. 214:19-216:11.)  Max, or one of his associates, asked DeWalt to not intercede, explaining he knew the people involved in the altercation and worried what might happen if everyone ended up outside.  (First DeWalt Dep. 216:19-271:3.)  DeWalt exited the bathroom, asked Mitchell to take care of things, and said it was time to close the Fontaine.  (First DeWalt Dep. 216:12-18.)  Mitchell saw eight men who appeared to be arguing, and he expressed concern to DeWalt that things were getting really tense and they might not make it through the night.  (Tr. 255:25-256:20.)

Eventually, Harris stumbled out the bathroom door, apparently pushed, into the main part of the Fontaine.  (Asheim Decl. Ex. 18 at 4; Tr. 148:23-149:2.)  The group in the bathroom forced the individual

---

[23] Mitchell does not believe Powell was "rushed" by twenty "gang members" that night, because such an occurrence likely would have shut down the Fontaine.  (Tr. 266:14-22.)

suspected of punching Harris out of the bathroom, and Powell then pushed him out the Fontaine's side door. (Asheim Decl. Ex. 18 at 3-4; Tr. 149:3-9.) Mitchell told Powell he thought he was going to close the party down, and asked him to call the police to do a walkthrough. (Tr. 257:18-24.)

The fight reignited on the Fontaine's dance floor at about 12:30 a.m., and Mitchell instructed the DJ to stop playing music, turned on the lights, and began active efforts to end the party and clear the Fontaine. (Asheim Decl. Ex. 18 at 4; Tr. 263:21-264:9; Tr. 152:12-22.) A barstool apparently thrown by Quan hit Mitchell's head. (First DeWalt Dep. 219:12-18, 321:12-14; Tr. 264:18-23.)

Powell went out the side door and called Asheim to report that a large fight had broken out in the Fontaine and police were needed immediately. (Asheim Decl. Ex. 18 at 2, 4; Tr. 141:11-142:2, 152:22-153:5.) At the same time, the police dispatcher was directing officers to respond to multiple 911 calls reporting a "riot" at the Fontaine. (Tr. 141:23-142:6.) While en route to the Fontaine, Asheim heard officers on the scene report a shooting that injured at least one person (the "Shooting"), a "riot" in the streets, and additional shots fired in the crowd. (Asheim Decl. Ex. 18 at 2-3; Tr. 142:7-23.)

When Asheim arrived he saw over one hundred people in the street, noticed numerous officers taking cover behind their cars with guns drawn, witnessed people actively fighting in the street, and heard bottles breaking. (Asheim Decl. Ex. 18 at 3, Tr. 142:24-143:4.) Shortly thereafter, Asheim's supervisor called for a "citywide Code 3 cover," a call for all available officers to immediately respond to the Fontaine with lights and sirens activated. (Tr. 143:4-8.) In his eight years on the force, Asheim had heard of a "citywide Code 3 cover" only once, during an officer- involved shootout with a suspect. (Tr. 143:9-15.) Asheim described the scene at the Fontaine as "extremely chaotic" and "very unsafe." (Asheim Decl. Ex. 18 at 3.) Chase Bryson, another responding officer, similarly noted the "scene was very chaotic and there

were people running around in the streets yelling." (Jackson Decl. Ex. 27.)

Harris, a known gang member, lay motionless within twenty feet of the Fontaine's front door. (Asheim Decl. Ex. 18 at 3; First DeWalt Dep. 228:8-18; Tr. 143:16-23.) Asheim believed Harris had been the intended target because the killing was "very up close and personal," and numerous bullet casings lay near the body. (Tr. 145:19-24.) The Bureau believe the shooter to be the person who earlier had punched Harris in the bathroom. (Tr. 183:10-20, 189:17-190:4.)

Officers carried Harris to the next intersection for medical treatment, but he died at the scene. (Asheim Decl. Ex. 18 at 3.) Asheim overheard Eric Harris and Runisha Harris, Harris's relatives who were both identified as gang members, say "this would start a war," "it's fucking on now," and "I can't stop it," when they learned of Harris's death. (Asheim Decl. Ex. 18 at 3.) Bureau officers found additional bullet casings from two or more guns in various locations in the two-to-three block radius surrounding the Fontaine, as well as loaded handguns in two cars left near the Fontaine. (Asheim Decl. Ex. 18 at 3, Tr. 146:17-25, 184:2-186:7.)

Shortly after the Shooting, members of the Bureau found DeWalt in his office and asked to see surveillance videos. (First DeWalt Dep. 226:4-8, 227:2-16.) A video from a camera in the hallway outside the bathroom confirmed the individual who punched Harris had been pushed out of the bathroom, and then two security guards – likely Powell and Mitchell – pushed Harris out the side door. (Tr. 154:19-155:1, 182:1-19.) Asheim recognized as gang members seven or eight individuals leaving the bathroom. (Tr. 155:2-6.)

DeWalt admitted to having a "gap" in security that evening and that customers had entered the Fontaine through the back door. (First DeWalt Dep. 159:18-160:17.) Specifically, he thought Quan and

another Yea Dat associate, known as "Baldwin," snuck into the Fontaine through the back door. (First DeWalt Dep. 219:15-18.) Mitchell acknowledged Quan, who had previously been banned from the Fontaine and was denied access at the front door that evening, in fact had been present at the Bash, and Mitchell surmised he been let in through a side door. (Tr. 258:24-260:8.) However, Mitchell understood security had identified Quan within ten minutes of his arrival and had escorted him out of the Fontaine. (Tr. 275:5-276:11.) Quan apparently found a way to reenter the Fontaine; many there identified him as the individual who started the fight.

DeWalt was unhappy that one of his security guards was roaming around and talking with police, and planned to fire him. (First DeWalt Dep. 160:1-7.) He indicated he pulled Mitchell off the front door to discuss the head count and Thomas, whom he had stationed by the bathroom, left that post and went elsewhere. (First DeWalt Dep. 160:1-17.) DeWalt acknowledged both the shooter and the victim were in the Fontaine that evening. (First DeWalt Dep. 167:11-13.) DeWalt believed that after the Shooting, Powell acted as an informant for the Bureau. (Second DeWalt. Dep. 182:22-24.)

DeWalt did not leave the Fontaine until about 6:00 a.m. the morning of the Shooting. (First DeWalt Dep. 230:24-231:1.) At that point, a Bureau detective investigating the Shooting asked DeWalt for the key to the Fontaine, explaining Bureau officers would be there for some time. (First DeWalt Dep. 233:10-16.) DeWalt was extremely hesitant to give the detective the key out of concern for his property and the detective did not have a search warrant. (First DeWalt Dep. 233:17-21.) Late that afternoon, a Bureau officer called DeWalt to tell him he could pick-up his key, and its location. (First DeWalt Dep. 234:13-21, 506:13-16.) DeWalt picked-up the key, met his manager at the Fontaine, cleaned up the nightclub, and left. (First DeWalt Dep. 506:13-18.)

DeWalt reports the Bureau damaged the video camera during its investigation. (Second DeWalt Dep. 182:5-12.) Additionally, the two logbooks he used to record every incident and every visit from City employees, as well as his bookings and sales, had gone missing – because, he claims, Bureau members took them during their investigation. (Second DeWalt Dep. 181:13-25, 182:5-12; 213:11-214:6.) Bureau members present in DeWalt's office during the investigation represent they did not take, and not see any other Bureau members take, any financial records or papers. (Balcomb Decl. dated April 4, 2018, ECF No. 170 ("Balcomb Decl."), ¶ 4; Billard Decl. dated April 3, 2018, ECF No. 171 ("Billard Decl."), ¶ 9.)

VIII.  The City's Request for Immediate Suspension of the License

The City had established a process for requesting the immediate suspension of a liquor license from the OLCC in 2010 (the "Process"). (Marchetti 30(b)(6) Dep. 5:14-6:18.) The Process required the City, through the Police Chief or designee, to make a written request within twenty-four hours of an incident involving a licensed location whose activities prompted the request, and to present evidence that: (1) the City has a history of problem-solving efforts with the licensed location that establishes the license holder was generally uncooperative and unwilling to engage in actions likely to remedy the identified problems; (2) the incident prompting the request was related to the previously identified problems and the licensed location; and (3) allowing the license holder to continue to serve alcohol posed an imminent public safety risk. (Marchetti 30(b)(6) Dep. 6:15-8:9, 15:9-17.) Kruger considered past incidents of violence, patrons blocking traffic, disorderly conduct, shootings, reports from security about concerns for safety, arrests of intoxicated patrons, and community complaints about noise as relevant to a determination a request for immediate suspension of the license is warranted. (Kruger Dep. 88:20-89:16.) The City would request an immediate suspension when these three factors existed and the City could timely submit such request.

(Marchetti 30(b)(6) Dep. 8:15-9:3, 9:13-18.)

*A. The License Team*

Jackson learned of the Shooting within hours, and was directed to start gathering reports and information with regard to the history of the Fontaine. (First Jackson Decl. ¶¶ 11, 12; Jackson Dep. 45:4-12, 46:4-14, 71:9-72:3.) He also obtained as much information as he could from the officers investigating the Shooting. (Jackson Dep. 55:11-56:2.) Jackson communicated with Marchetti and Friedman regarding the Shooting, the Fontaine's history, and the possibility of requesting an immediate suspension of the License pursuant to the Process. (First Jackson Decl. ¶ 11; Jackson Dep. 49:10-50:17, 51:19-24, 72:3-11; First Marchetti Decl. ¶ 12.) The parties also discussed the likelihood Dewalt planned to reopen the Fontaine that night, which likelihood arose at least in part from information from the Bureau that DeWalt had asked for the Fontaine's keys because he wanted to be open for business that night. (Jackson Dep. 37:24-38:8, 39:11-18 ; Marchetti Dep. 18:9-19:13.) In fact, the Fontaine had booked a large event for that evening, which it had promoted for at least the previous thirty days. (First DeWalt Dep. 494:25-496:3.)

Marchetti noted Fontaine security members reported DeWalt had limited their ability to handle customers at the door. (Marchetti Dep. 42:5-16.) The security members were not empowered to queue incoming customers at the door, which prevented them from adequately assessing entering customers for intoxication or suspicious behavior. (Marchetti Dep. 43:17-44:5.) Similarly, at closing time security members were to move customers out to the street and close the door, preventing security members from reminding customers of the residential area and to avoid disturbing sleeping residents. (Marchetti Dep. 44:7-21.) Marchetti shared this information with Stover, Hales's liaison on the License Team. (Marchetti

PAGE 57 - OPINION AND ORDER

Dep. 28:12-29:8; Hales Perpetuation Dep. dated December 9, 2016 ("Hales Perp. Dep."),[24] 19:24-20:2.)

Based on the information obtained by and the resulting recommendation from the License Team for an emergency suspension of the License, Hogan directed Jackson to write a letter on behalf of Kruger addressed to John Eckhart, Enforcement Director of the OLCC during the relevant period ("Eckhart"), requesting the immediate suspension of the License (the "Request"). (Marchetti Dep. 29:12-30:8; Jackson Dep. 43:3-21, 44:18-45:12, 75:12-23.) The suspension of a liquor license in Oregon is governed by OR. REV. STAT. 471.315. In the Request November 9, 2013 request, Jackson relied on and quoted the following provisions of OR. REV. STAT. 471.315:

> ORS 471.315 ground for cancellation or suspension of license:
>
> (1) The Oregon Liquor Control Commission may cancel or suspend any liquor license issued under the chapter, or impose a civil penalty in lieu of or in addition to suspension as provided by ORS 471.322, if it finds or has reasonable grounds to believe any of the following to be true:
>
>> (c) That there is a history of serious and persistent problems involving disturbances, lewd or unlawful activities or noise either in the premises or involving patrons of the establishment in the immediate vicinity of the premises if the activities in the immediate vicinity are related to the sale or service of alcohol under the exercise of the license privilege. Behavior which is grounds for cancellation or suspension of a license under the this section, where so related to the sale or service of alcohol, includes, but is not limited to obtrusive or excessive noise, music or sound vibrations; public drunkenness; fights; altercations; harassment or unlawful drug sales; alcohol or related litter; trespassing on private property; and public urination. Mitigating factors including a showing by the licensee that the problems are not serious or persistent or that licensee has demonstrated a willingness and ability to control adequately the licensed premises which is related to the licensee's sale or service of alcohol under the licensee's exercise of the license privileges.

---

[24] The "Hales Perp. Dep." is filed as Exhibit 11 of the Manlove declaration (ECF No. 126-1) and Exhibit 3 of the Merrithew declaration (ECF No. 154-3).

*and/or*

> (d) That there is any other reason which, in the opinion of the commission, based on public convenience or necessity, warrants cancelling or suspending such license.

(First Jackson Decl. Ex. 20 at 1-2.)[25]

The Request noted the increase in both the number and severity of incidents involving Fontaine customers since the License's issue on December 21, 2012, the City's efforts to reduce the incidents, and DeWalt's failure to mitigate the activity. (First Jackson Decl. Ex. 20 at 2.) The Request specifically mentioned the June 2, 2013 noise complaint; the reports on gang-affiliated patrons dated June 23 and July 27, 2013; the conversations regarding the E-40 after party and Fontaine's security guards reported concern for their safety on August 23, 2013; the disturbance call four hours later on August 24, 2013; ongoing issues and conversations regarding capacity issues; the License Team's meeting with DeWalt; DeWalt's opinion he was not responsible, and his refusal to provide oversight for his patron's actions once they left the Fontaine; and the Shooting. (First Jackson Decl. Ex. 20 at 2-3.) The Request concluded with: "[t]he City of Portland believes the lack of willingness or ability to control the location will [culminate] in further acts of violence . . . [and] feels that the emergency suspension will allow licensee an opportunity to meet with representatives from Portland Police, Portland Fire and OLCC to discuss how to implement an effective plan to safely operate the venue." (First Jackson Decl. Ex. 20 at 3-4.)

According to Jackson, the factors unique to the Fontaine which justified the request for immediate suspension were DeWalt's lack of control over the Fontaine, as evidenced by previous incidents; multiple entry and exit points, and lack of security at each of these points; DeWalt's apparent failure to take any

---

[25] These provisions currently are found in OR. REV. STAT. 471.315(1)(J)(c) and (d).

action to remedy earlier problems;[26] a homicide involving patrons of the Fontaine; and DeWalt's desire to

reopen the Fontaine that evening. (Jackson Dep. 54:13-55:10; 216:5-25.) The request relied only on

those incidents directly related to the sale, service, or consumption of alcohol at the Fontaine. (Jackson

Dep. 80:25-81:12.) Jackson forwarded the Request to Kruger's office in accordance with the Process.

In the event the OLCC denied the immediate suspension request, the License Team recommended

the Fontaine receive a a time, place, and manner violation. (Marchetti 30(b)(6) Dep. 123:3-4, 123:23-

124:6, 125:4-24; Jackson Dep. 76:25-77:15.) The License Team believed that without a suspension, or

upon expiration of a short-term suspension, DeWalt would reopen the Fontaine and no mandatory

restrictions or operational changes would be in place; thus, it wanted the violation in place to minimize the

risk to public safety. ((Marchetti 30(b)(6) Dep. 124:22-125:9.) Nonetheless, because of believed DeWalt

previously had refused to cooperate with the Bureau or the License Team to resolve existing issues, the

License Team remained unconvinced DeWalt would act in good faith or voluntarily cooperate in an

abatement process. (Marchetti 30(b)(6) Dep. 126:10-18.)[27]

*B. Kruger*

Hogan reviewed the Request before giving it to Kruger. (Kruger Dep. 17:20-18:8.) Kruger

---

[26] Jackson faulted DeWalt for agreeing to host the Bash after the event had been cancelled at another venue, without sufficient time to research the event or its sponsors, and considered DeWalt's failure to properly vet the promoter of the Bash evidence of DeWalt's failure to take remedial actions. (Jackson Dep. 153:1-18.)

[27] Relatedly, in a November 19, 2013 email Archer sent to Jackson and Stover, Archer said the Office considered cancellation of the License to be the best approach. (Archer Decl. Ex. 44.) Alternatively, she recommended severe restrictions be placed on the Fontaine, including no operations past 10 p.m., a one-drink limit per customer, reduction of the maximum occupancy to 75, and a minimum of three certified security guards at all times. (Archer Decl. Ex. 44.)

concluded from the Request's summary of events that the Shooting clearly was related to the Fontaine. (Kruger Decl. ¶ 5.) He was not convinced DeWalt had the ability to control his customers' conduct and believed that without an emergency temporary suspension of the License, a serious risk of more violence at the Fontaine existed. (Kruger Decl. ¶ 5.) Kruger approved the Request in accordance with OR. REV. STAT. 471.315(1)(I)(c) and (d), to allow DeWalt to get the Fontaine in order after the Shooting, and forwarded the Request to the OLCC mid-afternoon on November 9, 2013. (Marks Dep. dated May 11, 2017 ("Marks Dep."),[28] 34:2-9; Kruger Dep. 94:8-20; Kruger Decl. ¶ 5.) At the time he reviewed the Request, Kruger had not heard of DeWalt or the Fontaine, did not know DeWalt and the Fontaine's clientele were African-American, and did not know the style of music the Fontaine played. (Kruger Dep. 10:17-24, 51:22-24, 55:23-56:5; Kruger Decl. ¶ 6.) Kruger stated he first learned of DeWalt's race and of the Fontaine's music style after this lawsuit was filed. (Kruger Dep. 49:6-25.)[29]

Once Kruger reviewed, approved, signed, and forwarded the Request to the OLCC, his

---

[28] The "Marks Dep." is filed as Exhibit G of the Abrams declaration (ECF No. 120-8), Exhibit 6 of the Manlove declaration (ECF No. 126-1), Exhibit A of the Merrithew declaration (ECF No. 137-1), Exhibit 23 of the Merrithew declaration (ECF No. 154-23), Exhibit G of the Merrithew declaration (ECF No. 168-1), Exhibit 66 of the supplemental Abrams declaration (ECF No. 174-1), and Exhibit P of the second Abrams declaration (ECF No. 178-4.)

[29] DeWalt points out that Kruger is a "military buff" and collects German, British, and American military outfits, including equipment and uniforms from the Nazi era. (Kruger Dep. 126:1-12.) In 2009, the Bureau suspended Kruger for having placed a plaque bearing the name of five German soldiers on a tree in Rocky Butte in the late 1990s. (Kruger Dep. 126:18-23, 127:22-128:6.) Following his suspension, Kruger attended two "Tools for Tolerance" seminars at the Holocaust Museum in Los Angeles, through a federal grant. (Kruger Dep. 130:4-24.) In an affidavit filed in another lawsuit against Kruger, an individual represented that as teenagers more than thirty-five years ago, he and Kruger drove around town listening to Hitler speeches and yelling racial and homophobic slurs out the car window. (Kruger Dep. 134:16-135:9.) Kruger denies the allegations. (Kruger Dep. 134:16-135:9.)

involvement in the suspension of the License ended. (Kruger Dep. 53:6-9.) He believes the Mayor's office was deeply involved in the suspension fairly early in the process, which eliminated the Drug and Vice Division's further participation. (Kruger Dep. 53:10-22.) Stover copied members of the Drug and Vice Division and the License Team on emails related to the License suspension, and the emails may have been forwarded to Kruger. (Kruger Dep. 61:5-18, 63:13-18.) Other than confirming that during a chance meeting on November 11, 2013, the Drug and Vice Division authored the Request, Kruger had no discussion with the Mayor or his office about the Plaintiffs or the License. (Kruger Dep. 59:13-24.)

   *C. Hales*

   Hales long believed that any license, whether it be a liquor license or a driver's license, is a privilege not a right, and that any crime committed related to such license justified revocation of the license out of public safety concerns. (Hales Dep. 16:18-17:10; Hales Perp. Dep. 35:3-25.) He struggled with the OLCC's obligation to honor the City's concerns about noise and other serious interference with neighborhood livability, as well as serious public safety impacts related to liquor licenses. (Hales Dep. 17:11-23; Hales Perp. Dep. 24:12-25:1) For example, he was concerned with liquor licensees on Hayden Island's "Lottery Row." (Hales Perp. Dep. 25:2-6.) The licensees created issues with the neighborhood because of late-night noise, which caused frequent calls to the Bureau and general friction between the residents and the bar owners. (Hales Perp. Dep. 25:2-13.) Hales also cited "Last Thursday," a monthly "artwalk" that evolved into a giant, unorganized street festival with bars placing tables on the sidewalk, vendors selling art or food, and musicians performing on the street. (Hales Perp. Dep. 26:22-27:8.)

   Hales had been frustrated by the OLCC's failure to properly monitor or control alcohol sales to visibly intoxicated customers, who then entered surrounding neighborhoods to make noise and urinate on

PAGE 62 - OPINION AND ORDER

lawns or operate motor vehicles, placing the public at risk. (Hales Perp. Dep. 28:3-29:13.) He believed

the City's density exacerbated the effects to residents of noise from a licensed establishment, and he felt

the OLCC did not properly respond to the community's needs. (Hales Perp. Dep. 25:14-26:7.) Hales

regularly communicated his concerns to the OLCC, and by 2013 he believed the OLCC was beginning

to hear, understand, and genuinely appreciate his concerns. (Hales Perp. Dep. 36:14-37:4, 37:24-39:15.)

Hales learned of the Shooting when Stover called to tell him of a murder, riot, and general mayhem

at the Fontaine the morning of November 9, 2013, and learned the Bureau would request an emergency

suspension of the License. (Hales Dep. 12:24-13:6, 15:8-18; Hales Perp. Dep. 15-25.) Stover and other

members of the License Team described to Hales the history of DeWalt's unwillingness to remedy potential

public safety issues at the Fontaine, as well as the possibility DeWalt intended to reopen the Fontaine that

evening. (Hales Dep. 29:12-22; 34:5-21, 43:16-44:7, 99:2-16.) Not surprisingly because of his general

view of liquor licenses, Hales approved of the recommendation to immediately suspend the License. (Hales

Cep. 12:11-14.) Hales thought the Shooting, the serious crowd management challenge resulting from the

Shooting, and DeWalt's lack of cooperation with the Bureau and License Team to remedy previously

identified problems at the Fontaine, made the Request reasonable. (Hales Dep. 17:24-18:17, 32:22-

33:11.) He considered significant DeWalt's intent to reopen the Fontaine that evening. (Hales Perp. Dep.

54:9-20.)

Hales viewed the Shooting served as a clear example of the City's concerns about public safety,

which finally resulted in the OLCC's recognition of the problem and willingness to cooperate. (Hales Dep.

18:12-21.) He did not review the Request and did not consider taking, nor was he presented with,

alternative actions that might allow the Fontaine to remain in business. (Hales Dep. 14:4-6, 44:13-23.)

Hales also thought permanent cancellation of the License was appropriate. (Hales Perp. Dep. 44:2-23.)

He does not recall talking with Kruger about the Fontaine but did offer his opinion to Marks at some point.

(Hales Dep. 56:24-57:10; 54:12-24.)

Hales did not know DeWalt was African-American or that the Fontaine catered to a largely African-American clientele and played hip-hop music until after DeWalt filed this lawsuit. (Hales Dep. 36:19-37:4, 102:18-23, 113:23-114:2; Hales Perp. Dep. 48:18-50:12.) Stover testified he and Hales at some point discussed the possible ramifications of closing down the Fontaine, which had been described as "a club that primarily caters to a black audience," but later gave contradictory testimony, stating such conversations were not specifically related to the Fontaine. (Stover Dep. 106:16-24, 130:25-131:14, 132:21-133:6.) Hales never reached an agreement or understanding with Marks, any OLCC representative, or any City employee that regulatory action should be initiated against the Fontaine because DeWalt is an African-American, the Fontaine catered to African-Americans, or the Fontaine played hip-hop music. (Hales Perp. Dep. 51:4-52:25.) Hales had no issues with hip-hop music being played in Portland clubs; he noted City Hall sponsored two hip-hop festivals during his tenure as Mayor. (Hales Dep. 38:19-24.)

IV.  The OLCC's Emergency Suspension of the License

Jesse Sweet, Public Safety Director for the OLCC ("Sweet"), learned of the Shooting from a report in the Saturday morning newspaper. (Sweet Dep. dated May 10, 2017, ("Sweet Dep.")[30] 17:7-13.)

---

[30] The "Sweet Dep." is filed as Exhibit D of the Abrams declaration (ECF No. 120-5), Exhibit 5 of the Manlove declaration (ECF No. 126-1), Exhibit 22 of the Merrithew declaration (ECF No. 154-22) and Exhibit 60 of the supplemental Manlove declaration (ECF No. 174-1).

Shortly thereafter, Sweet discussed the Shooting with Eckhart by phone, and confirmed the OLCC had contacted the Bureau and obtaining information. (Sweet Dep. 17:15-16; 18:11-19:3.)

Rob Patridge, Chair of the OLCC ("Patridge"), forwarded a copy of the news report on the Shooting to Marks by text the morning of November 9, 2013. (Marks Dep. 20:1-9; Hales Perp. Dep. 54:21-22.) Just before noon, Patridge called Marks to convey Hales's concern about the Shooting, express Hales's desire that something be done, and inquire how the OLCC intended to respond. (Marks Dep. 20:10-23, 21:18-22:4.)

During a mid-day conference call, Sweet, Eckhart, Merle Lindsey ("Lindsey"), and Marks discussed the Shooting, the potential danger to the public if the Fontaine was allowed to reopen that evening, and the general standard and process applicable to emergency suspensions. (Sweet Dep. 17:16-17, 21:2-10, 22:6-15, 23:16-22.) Their primary concern was the murder that occurred within fifteen feet of the Fontaine's front door, but they also discussed DeWalt's record, which suggested his unwillingness or inability to control the Fontaine's patrons, as well as the possibility DeWalt intended to reopen the Fontaine that evening. (Sweet Dep. 23:16-22, 28:21-29:10; Marks Dep. 29:5-12.) Sweet also considered relevant DeWalt's failure to have adequate security on hand the night of the Shooting and his failure to call the police when the fight broke. (Sweet Dep. 143:21-144:3.) The group agreed Sweet would look into the Shooting and if information supported the License's immediate suspension, Marks would authorize an emergency suspension order. (Marks Dep. 25:5-16, 29:23-30:2)

David Luster, an OLCC employee ("Luster"), contacted Jackson to confirm the details of the Shooting, and to obtain police reports and other information about the Fontaine. (Luster Dep. dated May

9, 2017, ("Luster Dep.")[31] 66:17-67:1; 67:14-21.) After receiving this information, Luster prepared a formal report addressing whether the Shooting supported an emergency suspension. (Luster Dep. 35:19-36:7.) Luster accompanied his report to Sweet with the information he obtained from the Bureau. (Sweet Dep. 34:9-14.) Members of the OLCC field staff attempted to contact DeWalt to discuss the Shooting and his plans for that evening, but could not locate or contact him. (Sweet Dep. 24:5-11, 25:16-23.)

The information obtained and report prepared by Luster, as well as the Request, reflected DeWalt's unwillingness to accept responsibility for, and inability to control, customers once they left the Fontaine, which Sweet believed strengthened the case for an emergency suspension. (Sweet Dep. 35:15-36:3.) The information also established violence in the Fontaine preceded the Shooting and that DeWalt had not properly dealt with the situation, as well as other incidents of fighting and disorderly conduct. (Sweet Dep. 41:14-42:10; 52:10-23.)

The completed investigation convinced Marks that the Shooting directly related to the sales or service of alcohol at, or management of, the Fontaine. (Marks Dep. 60:14-61:8.) Marks distinguished the Shooting from a shooting in which an individual entered a bar to shoot his domestic partner, noting the bar had no relationship to the violence or shooting, thus not warranting suspension. (Marks Dep. 119:10-120:7.) Marks felt an immediate suspension of the License could prevent retaliatory actions, which made the Shooting unique from every other fatal shooting he had addressed. (Marks Dep. 120:8-11.) He wanted to issue the emergency suspension order as early as possible to avoid the any retaliatory actions

---

[31] The "Luster Dep." is filed as Exhibit H of the Abrams declaration (ECF No. 120-9), Exhibit 7 of the Manlove declaration (ECF No. 126-1), Exhibit F of the Merrithew declaration (ECF No. 137-6), and Exhibit 21 of the Merrithew declaration (ECF No. 154-21).

or disruption caused by closing the Fontaine if it was allowed to open that evening. (Marks Dep. 43:9-25.)

Marks also found troubling DeWalt's reported persistent history of failing to control Fontaine customers or events held at the Fontaine, and specifically his failure to adequately control customers when a fight broke out the night of the Shooting. (Marks Dep. 115:6-116:10.) But his desire to protect public safety and prevent retaliatory action at the Fontaine primarily drove his decision. (Marks Dep. 117:7-11.) Marks ultimately did not believe the privilege of a liquor license outweighed the risk to the public from allowing the Fontaine to reopen. (Marks Dep. 35:15-24.)

### A. The First Suspension Order

Marks coordinated the preparation of an "Order of Immediate License Suspension and Note of Opportunity for Hearing," dated November 9, 2013, and addressed it to DPI at the Fontaine's address (the "First Order"). (First Manlove Dec. Ex. 12.) The First Order advised DeWalt the License's immediate suspension based on a finding that continued operation of the Fontaine represented a serious danger to public health and safety pursuant to OR. REV. STAT. 183.430(2). (First Manlove Dec. Ex. 12 at 1.) OR. REV. STAT. 183.430(2) provides, in pertinent part:

> In any case where the agency finds a serious danger to the public health or safety and sets forth specific reasons for such findings, the agency may suspend or refuse to renew a license without hearing, but if the licensee demands a hearing within 90 days after the date of notice to the licensee of such suspension or refusal to renew, then a hearing must be granted to the licensee as soon as practicable after such demand, and the agency shall issue an order pursuant to such hearing as required by this chapter confirming, altering, or revoking its earlier order.

OR. REV. STAT. 183.430(2)(2018). The suspension was based on alleged violations of OR. REV. STAT. 471.315(1)(c) and OR. ADMIN. R. 845-006-0347(2)(b). (First Manlove Dec. Ex. 12 at 1.)

The First Order noted that the "history of serious and persistent problems involving disturbances,

lewd[32] or unlawful activities or noise either in the premises or involving patrons of the establishment in the immediate vicinity of the premises" violated OR. REV. STAT. 471.315(1)(c), and identified the June 2 noise complaint; the June 23 incident involving a gang member; the August 24 report of a loud crowd and marijuana odor; and the Shooting, all of which were detailed in the Request as evidence of the Fontaine's serious and persistent problems. (First Manlove Dec. Ex. 12 at 1-2.) The First Order also referred to a July 20, 2013 incident in which Bureau "officers responded to a disturbance call at the licensed premises and arrested a patron for Trespassing II." (First Manlove Dec. Ex. 12 at 2.) The First Order reported the "patron had pushed and kicked other patrons and thrown chairs before being detained by security personnel." (First Manlove Dec. Ex. 12 at 2.)

The First Order also characterized the Shooting as a "disorderly activity on the licensed premises or in areas Licensee controls that are adjacent to or outside the premises" which "resulted in a death and a serious physical injury and involved the use of a deadly weapon against another person," in violation of OR. ADMIN. R. 845-006-0347(1)(c) and (2)(b). (First Manlove Dec. Ex. 12 at 2.) The relevant administrative regulations provide "[n]o licensee or permittee will permit noise or disorderly activities on the licensed premises or in areas the licensee controls that are adjacent to or outside the premises," and "[v]iolation of this section that results in death or serious physical injury to a person or that involves unlawful use or attempted use of a deadline weapon against another person is a Category I violation." OR. ADMIN. R. 845-006-0347(2)(a) and (b) (2013). The regulations define "disorderly activities" as "those that harass,

_____

[32] DeWalt objected to the regular use of the work "lewd" to refer to his customers during the Meeting and in the police reports, the Request, and the First Order. (Second DeWalt Dep. 85:7-17.)

threaten or physically harm another person." OR. ADMIN. R. 845-006-0347(1)(c) (2013).

The First Order explained that despite the City's efforts to assist, "the licensee has failed to take appropriate steps to abate dangerous activity at the licensed premises." (First Manlove Dec. Ex. 12 at 3.) The First Order listed Cruser's numerous discussions with DeWalt regarding capacity issues; Friedman's conversation with DeWalt on August 23, 2013; and the Meeting as evidence of the City's attempts to inform and educate DeWalt about issues regarding the Fontaine. (First Manlove Dec. Ex. 12 at 3.)

The First Order referenced the Request and the OLCC's authority under OR. REV. STAT. 183.430(2) to "immediately suspend a license if it finds a serious danger to the public heath or safety." (First Manlove Dec. Ex. 12 at 3.) The First Order concluded:

> The number and severity of violent incidents at this premises and in the immediate vicinity show that the licensee is not able to control the serious problems which have occurred in and around the premises. These incidents have created a serious danger to the public health and safety. Because the licensee has failed to take immediate and effective action to prevent this danger to the public heath and safety, the Commission must impose this immediate suspension to keep the public from further harm.

(First Manlove Decl. Ex. 12 at 3.) The First Order, signed by Lindsey[33] on behalf of Marks, informed DeWalt of his right to request a hearing within ninety days of the date of the First Order. (First Manlove Decl. Ex. 12 at 4.)

At the time he issued the First Order, Marks did not know DeWalt was African-American. (Marks Dep. 55:3-8; Marks Decl. ¶ 10.) He learned of this about a week later. (Marks Dep. 55:9-14; Marks Decl. ¶ 10.) Marks also did not know the Fontaine was a "hip-hop" club until after DeWalt filed this lawsuit. (Marks Decl. ¶ 10.)

---

[33] Marks authorized Lindsey to sign the First Order on his behalf. (Marks Dep. 46:18-23.)

Luster "served" the First Order on Plaintiffs by either pushing a copy under the Fontaine's main door and posting it on the door. (First Merrithew Decl. Ex. D at 2; Sweet Dep. 55:18-21; Luster Dep. 78:5-10; First DeWalt Dep. 242:16-243:7.) Luster also delivered a copy of the First Order to DeWalt's last known address when he was unable to locate DeWalt. (First Merrithew Decl. Ex. D at 2; Voelkel Dep. dated May 9, 2017, ("Voelkel Dep.")[34] 42:7-21; Luster Dep. 78:5-10.) Luster returned to the Fontaine later that evening and noticed a second sign posted on the door indicating the birthday party scheduled at the Fontaine that evening had been moved to the Elks Lodge. (Luster Dep. 94:1-15.) DeWalt received the First Order the following day; he acknowledged it had been posted at the Fontaine in two different places. (First DeWalt Dep. 235:12-21.) Prior to the issuance of the First Order, Fontaine and DeWalt had no interaction with the OLCC and had never been cited for any issues. (First DeWalt Dep. 39:24-40:10.)

After issuing the First Order, Sweet prepared memo listing conditions the OLCC previously had imposed as part of a settlement to address licensees with documented compliance problems. (Sweet Dep. 91:3-92:15; Marks Dep. 70:2-18.) Marks considered imposing significant restrictions or conditions to resolve the Fontaine situation, but never had the opportunity to formally address this option because the administrative process was interrupted. (Marks Dep. 70:19-71:22.) In any event, in light of the serious nature of the Fontaine's violations and the existing management issues, Marks opined he would not have offered to resolve the matter with restrictions. (Marks Dep. 71:23-72:5.) Additionally, Marks knew Hales believed suspension the appropriate action, based on the danger posed by the Fontaine. (Marks Dep.

---

[34] The "Voelkel Dep." is filed as Exhibit J of the Abrams declaration (ECF No. 120-11).

72:18-73:25.)[35]

A few days after the Shooting and the issuance of the First Order, DeWalt went to the OLCC to update his address and pay for the renewal of the License, which had been issued for one year and was due to expire. (First DeWalt Dep. 253:1-11.) DeWalt claims he someone at the OLCC said he would never get another license, so he left the OLCC offices. (First DeWalt Dep. 253:15-254:6.) On November 13, 2013, DeWalt's attorney faxed his request for hearing to the OLCC. (Second Merrithew Dep. Ex. 44.) DeWalt also personally delivered his request for a hearing on the First Order to the OLCC. (Sweet Dep. 62:14-19.)

The Hearing was scheduled for December 4, 2013. Stover advised Hale of the date of the Hearing, the OLCC's intent to suspend the License permanently, and Marks's hope the administrative law judge would affirm the suspension to prevent the Fontaine from being in business during the six-month process needed to permanently suspend the License. (Second Merrithew Decl. Ex. 38.) Marks had assured Stover the "OLCC is going to try their best to implement [Hales's] recommendations for a permanent suspension." (Second Merrithew Decl. Ex. 38.) Hales expressed a desire to personally testify or have a staff member testify at the Hearing. (Sweet Dep. 84:2-15.)

Webster, the Administrative Law Judge who handled the Hearing, limited the issue before her to the validity of OLCC's assertion that the continued operation of the Fontaine posed a serious danger to

---

[35] Marks met with members of the Bureau the Monday following the Shooting, expecting a debriefing on the Shooting, and was surprised when they did not talk about it. (Marks Dep. 76:25-78:7.) Marks speculated the Bureau was not at liberty to discuss the particulars of an ongoing investigation. (Marks Dep. 78:7-12.)

the public health and safety. (Webster Dep. dated March 24, 2017, ("Webster Dep.")[36] 7:20-8:1, 10:3-6; Tr. 9:3-20.) Becky Voelkel presented the OLCC's case at the Hearing. (Voelkel Decl. dated January 18, 2018, ECF No. 118 ("First Voelkel Decl."), ¶ 2; (Voelkel Decl. dated March 2, 2018, ECF No. 152 ("Second Voelkel Decl."), ¶ 2.) Webster received documentary evidence and heard testimony from Johnson, Asheim, Luster, Paul Rosenow, an OLCC inspector, and Mitchell on December 4, 2013. (Second Voelkel Decl. ¶ 2; Tr. 3-7, 224:3-14.) During telephonic closing arguments, which occurred on December 5, 2013, Plaintiffs' counsel asserted for the first time that the First Order had not been properly served. (Second Voelkel Decl. ¶ 3; Sweet Dep. 66:11-16.)

Sweet informed Marks of Plaintiffs' challenge to the First Order's service. (Marks Dep. 86:16-87:10.) Acting on advice from the Department of Justice and communications with other OLCC employees, Marks authorized the reinstatement and resuspension of the License to remedy the service errors Plaintiffs had identified. (Marks Dep. 87:12-22; First Merrithew Decl. Ex. D at 2; Sweet Dep. 67:17-22.) Consequently, in an order dated December 11, 2013, the OLCC rescinded the First Order (the "Rescission Order"). (First Manlove Dec. Ex. 12A.) The cover letter accompanying a copy of the Rescission Order addressed to the Fontaine advised:

> Because the Commission is rescinding the Order of Immediate License Suspension that was issued to Dewalt Productions, Inc. on November 9, 2013, there is no longer a basis for a hearing and the Commission therefore withdraws the case from the Office of Administrative Hearings.

(Second Merrithew Decl. Ex. 29 at 2.)

---

[36] The "Webster Dep." is filed as Exhibit I of the Abrams declaration (ECF No. 120-10), Exhibit D of the Davis declaration (ECF No. 151-4), and Exhibit O of the second Abrams declaration (ECF No. 178-3).

The Rescission Order relieved Webster of jurisdiction and the need to issue a proposed order.[37] (Voelkel Dep. 12:12-23; Webster Dep. 28:20-29:1.) Webster acknowledges an ALJ does not issue a ruling after a hearing when the parties settle or when the agency withdraws its referral before the ruling is issued. (Webster Dep. 13:11-19.)

*B. The Second Emergency Suspension Order*

The OLCC then issued another "Order of Immediate License Suspension and Notice of Opportunity for Hearing" dated December 11, 2013 (the "Second Order"). (First Manlove Dec. Ex. 12B.) The Second Order was virtually identical to the First Order. (First Manlove Dec. Ex. 12B.) Marks considered the Second Order an extension of the First Order's process, not an independent or unrelated proceeding, and he wanted to to resolve the issues raised in the First and Second Orders in an expeditious manner. (Marks Dep. 88:11-89:1; 105:4-22.) Marks fixed his attention on continuing the administrative process for the emergency suspension and had not given much thought to whether emergent circumstances still existed. (Marks Dep. 89:6-15.) In his opinion, the Second Order allowed the OLCC to complete the administrative process related to the emergency created by the Shooting. (Marks Dep. 89:1-5.) Furthermore, because of the common issues raised in both the First and Second Orders, the majority of the record from the first hearing could be used if DeWalt appealed the Second Order. (Voelkel Decl. ¶ 4.)

Sweet felt DeWalt's failure to seek assistance or advice from the OLCC about how to operate as a compliant licensee supported the OLCC's determination that an emergent situation still existed. (Sweet

---

[37]The OLCC did not delegate to Webster the authority to issue a final order, only a proposed order. (Voelkel Decl. ¶ 3.)

Dep. 74:9-24.) Voelkel believed the Fontaine's history of serious and persistent problems, including death and injuries, and DeWalt's unwillingness to close the Fontaine for a "cooling off period," established a continuing danger to public health and safety. (Voelkel Dep. 33:21-34:10.)

DeWalt decided to not reopen the Fontaine when the OLCC reinstated and then immediately resuspended the License and, thus, he did not request a hearing on the Second Order. (First DeWalt Dep. 534:1-25.) While acknowledging many liquor licensees generate most of their income from liquor sales, Marks believed the License suspension did not prevent DeWalt from keeping the Fontaine open as an entertainment venue, and he pointed to Stars in Salem as an example of a business that continued to operate after its liquor license was suspended. (Marks Dep. 90:21-91:11.) DeWalt acknowledged he needed the License only if he intended to serve alcohol and could have operated an entertainment venue without a license if he did not serve alcohol. (First DeWalt Dep. 31:21-32:5.)

Plaintiffs concede Marks had discretion to reinstate the License after the hearing and to withdraw the case from ALJ to divest her of jurisdiction. (Davis Decl. dated March 2, 2018, ECF No. 151 ("Davis Decl."), Ex. G at 3.) DeWalt also does not claim the Hearing was unfair. (First DeWalt Dep. 610:1-6.) Rather, he asserts the OLCC acted unfairly by preventing the ALJ from ruling on the First Order, as the rules required, and by immediately issuing another emergency suspension order. (First DeWalt Dep. 608:11-21.) On April 2, 2014, Marks signed a Final Order by Default, finding the License had been properly suspended on December 11, 2013, by the Second Order pursuant to OR. REV. STAT. 471.315(1)(c) and OR. ADMIN. R. 845-006-00347(2)(a). (First Manlove Decl. Ex. 14.)

### C. Cancellation/Nonrenewal of License

In a December 16, 2013 letter entitled "Notice of Proposed License Cancellation," Marks notified

DeWalt the OLCC had initiated proceedings to permanently cancel the License based on violations of OR. REV. STAT. § 471.315(1)(c) (the "Notice"). (First Manlove Dec. Ex. 13.) Hales favored cancellation, based on the combination of loss of life and mayhem the morning of the Shooting and DeWalt's failure to cooperate and unwillingness to shoulder the responsibilities of the License, and he expressed this sentiment to Marks. (Hales Perp. Dep. 44:2-23, 45:6-24, 53:8-24.) Hales made this decision in his capacity as Mayor of the City, and on behalf and for the benefit of residents of the City. (Hales Perp. Dep. 47:17-48:15.)

The Notice identified more than forty noise complaints and incident reports relating to the Fontaine received between February 22, 2013, and November 9, 2013, most of which were not included in the First Order or the Second Order. (First Manlove Dec. Ex. 13.) Originally, DeWalt requested a license renewal hearing but eventually cancelled the hearing by a February 18, 2014 email, because the Lease had been terminated and DeWalt knew the Fontaine would no longer be in operation. (First DeWalt Dep. 533:6-8, 15-25; Davis Decl. Ex. A at 36.)

X.  Cancellation of the Lease

In mid-December 2013, DeWalt tendered his December rent payment to the Landlord pursuant to the Lease's terms. (First DeWalt Dep. 547:20-24.) DeWalt testified at deposition the Landlord refused to accept payment, and agreed to let DeWalt out of the Lease and personal guaranty because "We know they don't want you there." (First DeWalt Dep. 535:11-22, 547:20-25.) DeWalt believed the Landlord originally wanted the suspension resolved, but changed its mind when it became evident the December 4, 2013 hearing would not resolve the issue. (First DeWalt Dep. 540:15-24.) At that time, DeWalt understood the Landlord would to agree to terminate the Lease and release DeWalt from the guaranty, in

exchange for return of the Premises and all improvements. (First DeWalt Dep. 540:25-541:6.)

In a December 16, 2013 email to the Landlord's representative, however, DeWalt expressed surprise his December rent check had been returned because he understood the Landlord had given him time to decide whether to keep the space or move out. (Davis Decl. Ex. A at 37.) In the same email, DeWalt explained he intended to sublease the Premises to a third-party. (Davis Decl. Ex. A at 37.) In fact, DeWalt sent a "30 day Notice to Sublet or Assign Lease" on December 16, 2013, pursuant to previous discussions with a third-party. (First DeWalt Dep. 536:8-21; (Abrams Decl. dated January 18, 2018, ECF No. 120 ("First Abrams Decl."), Ex. A at 184.)

In a responsive email dated December 18, 2013, the Landlord's representative stated:

Mr. DeWalt:

I made it very clear to you on Thursday that you were in default. I told you we would entertain a proposal regarding your relinquishing possession of the premises in exchange for us allowing you to walk away from your guaranty. I did not say you could have until Monday to pay your rent. Your rent was late on December 11 and thus you were in default on December 11.

Let me know if you are still interested in relinquishing possession of the premises in exchange for terminating your guaranty. We will not entertain such an offer however if you remove anything from the premises. If you are unwilling to relinquish possession we will evict you, mitigate, and then file a lawsuit again[st] your personally to collect unpaid rent.

(Davis Decl. Ex. A at 37.)

The same day, the Landlord returned a second check for the December rent payment from Salesmen Inc. and forwarded by DeWalt. (First Abrams Decl. Ex. L at 4.) The second check apparently came from the prospective sublessor; a letter accompanying the check recommended the Landlord contact DeWalt's attorney if the check does not "fulfill the necessary requirements for the '30 day notice to Sublet

or Assign Lease.'"  (First Abrams Decl. Ex. L at 2.)  In a letter addressed to DeWalt, the Landlord advised:

> We are not under any obligation to accept your rent payment after the 10th day of the month.  You attempted to tender rent on December 16, 2013 which we rejected as late.  We hereby reject your second attempt at paying rent late.
>
> Please do not again attempt to tender rent.  We will not accept it.  Your tenancy has terminated.

(First Abrams Decl. Ex. L at 1.)

In a letter dated December 31, 2013, for the Landlord's lawyer informed Plaintiffs of the Lease's termination for failure to pay rent and other charges in a timely manner, as well as for violations of other sections of the Lease, specifically:

> Section 10(a) and (b) - Use of Premises.  You have failed to conform to applicable laws and regulations affecting the Premises.  You have also allowed activities and conduct on the Premises which is offensive to Landlord, the other tenants in the building, and the neighbors, and which has created a nuisance and has been detrimental to and potentially damaged the reputation of the Premises.  New articles related to the activities that have taken place at the Premises are enclosed and describe noise complaints, arrests, disturbance calls, fights and a triple shooting that resulted in a death at the Premises or in connection with your business at the Premises.
>
> Section 24(c) - Abandonment.  Your liquor license has been suspended by the OLCC which has resulted in your failing to operate in the Premises for the designated purposes in the Lease for more than five day[s].

(First Merrithew Decl. Ex. E at 6-7.)  The letter directed Plaintiffs to "vacate the Premises and relinquish all keys and rights to possession to my client on or before January 7, 2014."  (First Merrithew Decl. Ex. E at 7.)

## XI.  Effect of Fontaine's Closure on DeWalt

Prior to moving to Portland and while managing the Fontaine, DeWalt operated a venue in

Oklahoma City known as the Purple Martini. (First DeWalt Dep. 22:16-22.) After the Fontaine closed, the Purple Martini remained open until January 2016, when the lease for the premises ended. (First DeWalt Dep. 22:20-23:2.) At the time of his June 2017 deposition, DeWalt was involved in a restaurant bar in Overland Park, Kansas, which offered R&B, Blues, Jazz, and comedy, similar to the businesses DeWalt had operated for the last thirty-five years. (First DeWalt Dep. 14:19-15:11.)

After the cancellation of the License and closure of the Fontaine, DeWalt participated in one counseling session. (Second DeWalt Dep. 15:18-16:5.) He does not currently take and never has taken medication for mental health issues, such as depression or anxiety. (Second DeWalt Dep. 18:20-19:4.) DeWalt asserts Defendants' actions caused stress which resulted in a diabetes diagnosis, and contributed to another heart surgery in March 2015. (Second DeWalt Dep. 16:20-25, 18:1-19.)

The Fontaine did not return a profit in 2013. (First DeWalt Dep. 27:10-11, 624:4-6; First Abrams Decl. Ex. A at 242.)

<u>XII. Defendants' Interactions with other Entertainment Venues</u>

Plaintiffs allege Defendants' actions discriminated against them based on DeWalt's race, the race of the Fontaine's customers, and the Fontaine's choice of music. In support of these claims, Plaintiffs argue Defendants treated them differently than similarly-situated entertainment venues owned or frequented by Caucasians that featured other styles of music. Plaintiffs also allege the City has a pattern or practice of treating entertainment venues owned by African-Americans catering to African-American customers differently from entertainment venues owned by Caucasians catering to Caucasian customers. Accordingly the record of Defendants' interactions with other entertainment venues is relevant to Plaintiffs' claims.

*A. City's Requests for Emergency Suspension of a Liquor License*[38]

1. Club 915

The City first used the Process in early January 2011, in response to a incident at Club 915. (Marchetti 30(b)(6) Dep. 19:25-20:17, 21:2-17; First Marchetti Decl. ¶ 15, Ex. 45.) The Bureau issued a letter requesting an emergency suspension of Club 915's liquor license based, in part, on over twenty police reports related to Club 915 during the previous year, including the over-serving of customers, assault, theft, shots fired resulting in property damage and physical injury, gang affiliations among customers, and the death of a customer from exposure. (First Marchetti Decl. Ex. 45.) The request responded to the shooting death of a Club 915 employee on January 1, 2011, which occurred during the club's attempt to close for the night because of fights occurring inside the venue. (First Marchetti Decl. Ex. 45.) During the previous year, the City communicated with the owner of Club 915, who had reported issues with gang activity and said he feared his customers because they carried guns. (First Marchetti Decl. Ex. 45.) The City reviewed and made recommendations regarding Club 915's security control plan, determined the owner was unwilling or unable to follow the plan, and had flagged the venue for mandatory reports in early December 2010. (First Marchetti Decl. Ex. 45.) The OLCC suspended Club 915's liquor license seven days later. (Marchetti 30(b)(6) Dep. 14:21-15:3.) Club 915 played Top 40 music and was owned by an Asian-American. (Marchetti 30(b)(6) Dep. 169:17-22, 183:3-5; First Marchetti Decl. ¶ 17.) Mitchell identified Club 915 as a "Black or African-American club," which he defined as a club that "regularly

---

[38] These three venues, as well as the Grand Cafe and the Fontaine, all held an "F" license, or a liquor license that allowed a premises to serve beer, wine, and alcohol, which is the category of license granting the broadest privilege for serving alcohol. (Marchetti 30(b)(6) Dep. 175:20-22, 176:7-177:2.)

catered to a predominantly Black or African audience or regularly hosted predominantly Black and African-American cultural events." (Mitchell Decl. ¶ 19)

> 2. Seeznin's

On June 28, 2011, the City requested an emergency suspension of the license issued to Seeznin's Bar and Lounge ("Seeznin's"). (First Marchetti Decl. Ex. 46.) Samuel Thompson, an African-American ("Thompson"), filed a liquor license application for Seeznin's in October 2010. (Thompson Decl. dated February 13, 2018, ECF No. 155 ("Thompson Decl."), ¶¶ 3, 9.) His "dream was to open a bar that would bring Portland's Black community together and be a positive force for change in the Black and African-American community." (Thompson Decl. ¶ 8.) As of December 2010, the application remained under review because of the OLCC's investigation of a "driving fine." (Thompson Decl. ¶ 9.) Anxious to get his restaurant open, Thompson applied for a temporary server license limited to the weekends. (Thompson Decl. ¶ 9.) The OLCC issued Seeznin's a temporary license in December 2010, ultimately granting him an annual liquor license on March 9, 2011. (First Marchetti Decl. Ex. 46; Thompson Decl. ¶ 9.) Thompson believes the OLCC processed his liquor applications differently because of his race and the race of his expected customers. (Thompson Decl. ¶ 10.)

Thompson is also of the opinion the Bureau and the City focused more attention on Seeznin's because it was owned and frequented by African-Americans. (Thompson Decl. ¶ 10.) For example, on the night of Seeznin's grand opening, a few Bureau officers parked their police cars in front of Seeznin's and turned on their overhead lights. (Thompson Decl. ¶ 10.) When Thompson asked the officers to turn the lights off because they scared away his customers, they told Thompson he could not tell them what to do. (Thompson Decl. ¶ 10.) This activity repeated every weekend night for about a month. (Thompson

Decl. ¶ 10.)  The Bureau also "hounded" Thompson about painting Seeznin's blue, which Thompson understood to mean he selected it because it was a "gang color."  (Thompson Decl. ¶ 11.)

The City documented Seeznin's issues with gang-affiliated customers, fights, over-serving, property damage of a police vehicle, and an April 2011 fatal shooting of a gang member within four blocks of Seeznin's, which occurred shortly after the gang member was denied admittance to the venue and Thompson had called the Bureau to report the presence of underage gang members in the area. (Thompson Decl. ¶ 11; First Marchetti Decl. Ex. 46.)  The City also documented Thompson's alleged interference with an officer's attempt to locate his nephew, a known gang member believed to be carrying a gun inside Seeznin's.   (First Marchetti Decl. Ex. 46.)  Thompson also disclosed that his partner, or "money backer" for Seeznin's, was a convicted felon which, if true, would disqualify Seeznin's from holding a liquor license. (First Marchetti Decl. Ex. 46.)  Thompson, however, denied any such "partnership" and stated he merely leased space from the individual, who owned the building.  (First Marchetti Decl. Ex. 46.)

City officials met with Thompson on at least one occasion to discuss problems resulting from the presence of gang members at Seeznin's. (First Marchetti Decl. Ex. 46.)  Thompson explained he was devoted to preventing gang violence, had family involved in gangs, would have difficulty excluding gang members from Seeznin's, and wanted to provide a safe place for gang members to relax.  (Thompson Decl. ¶ 6; First Marchetti Decl. Ex. 46.)  Thompson contends that when he asked the City for help excluding or identifying gang members, or a list of gang members and other individuals Thompson should keep out of Seeznin's, however, the City refused to help.  (Thompson Decl. ¶ 13.)  Thompson stated he considered Seeznin's a family restaurant until 6:00 p.m., during which time he rewarded elementary and middle school students who had earned good grades by providing them a free meal at the venue. (Thompson Decl. ¶ 13;

First Marchetti Decl. Ex. 46.)  At least one City official mentioned it was not safe to expose children to

known gang members.  (First Marchetti Decl. Ex. 46.)  After the meeting, Thompson painted the exterior

of the building beige, implementing the only suggestion for improving safety the City, the Bureau, and the

OLCC had offered at the meeting.  (Thompson Decl. ¶ 13.)

In the early morning hours of June 26, 2011, officers responded to reports of a shooting with

multiple victims at Seeznin's.  (First Marchetti Decl. Ex. 46.)  Upon arrival, officers learned their were two

victims; one present at the scene but deceased, and a second who apparently had been taken to a hospital.

(First Marchetti Decl. Ex. 46.)  Numerous gang members were present at Seeznin's at the time.  (First

Marchetti Decl. Ex. 46.)  Thompson states he was hosting a Benson High School reunion at the time, which

was attended by a Bureau officer, and the shooting actually happened across the street from Seeznin's.

(Thompson Decl. ¶ 16.)

On June 28, 2011, the City asked for the suspension of Seezin's license, citing the history of serious

and persistent problems, presence of documented gang members, two fatal shootings in the previous ninety

days, and the possible involvement of a convicted felon as a "silent partner."  (First Marchetti Decl. Ex. 46.)

Thompson claims the Bureau "had built a trumped up case against me by creating a paper trial of falsities

with the result of depriving yet another Black man the dignity of running a business in Portland without

undue harassment by the City of Portland, the Portland Police and the OLCC."  (Thompson Decl. ¶ 17.)

The OLCC, however, did not suspend Seeznin's license but rather imposed its own additional restrictions

on Seeznin's.  (First Marchetti Decl. ¶ 18.)

Seeznin's hosted high school reunions, youth employment fairs, retreats, birthday parties, and

"music and comedy events showcasing Black and African-American cultures and artists."  (Thompson

Decl. ¶ 16; Mitchell ¶ 19.)  The City knew Thompson was African-American and that the majority of

Seeznin's customers were African-American.  (Marchetti 30(b)(6) Dep. 169:5-10, 184:18-185:3; First

Marchetti Decl. ¶ 17.)  The record contains no evidence that the City also was aware of the type of music

played at Seeznin's.  (Marchetti 30(b)(6) Dep. 183:6-8, 14-25.)

### 3.  Don's Dugout

The next request for an emergency suspension of a license was made on September 13, 2013, for

Don's Dugout, because of a history of failed attempts of problem-solving, a high number of gang affiliations

with customers, multiple issues related to public safety, and gunfire.  (Marchetti 30(b)(6) Dep. 15:23-16:5;

First Marchetti Decl. Ex. 47.)  The letter specifically mentioned numerous fights, noise complaints, and

gunshots from December 31, 2011, to May 1, 2012.  (First Marchetti Decl. Ex. 47.)  The City met with

Don and Janice Douglas, the owners of Don's Dugout, in June 2012 to discuss the increase in incidents

at the venue, security issues, and other areas of concern.  (First Marchetti Decl. Ex. 47.)  The owners

attributed the problems to four bad employees and informed the City the employees had been terminated.

(First Marchetti Decl. Ex. 47.)  The owners planned to change the format to a private club to provide a

safe place for members only, and had purchased equipment to run background checks on prospective

members. (First Marchetti Decl. Ex. 47.)  About a week later, Marchetti received a letter from the owners

describing the meeting as "confusing," and explaining the owners had been unaware of the issues raised at

the meeting and were unprepared to respond to the City's complaints.  (First Marchetti Decl. Ex. 47.)  Still,

the owners' letter confirmed the firing of the four employees, actions taken to convert the venue to private

membership, and an intent to abide by the policies of the Bureau and the OLCC.  (First Marchetti Decl.

Ex. 47.)  The issues, however, were not resolved.

Over the next three months, the City responded to reports of a robbery, the displaying of a gun, gun fire, and noise complaints. (First Marchetti Decl. Ex. 47.) On September 2, 2012, Bureau officers arrived at Don's Dugout to find a large crowd in the parking lot, an injured male laying on the ground, and an injured intoxicated female nearby. (First Marchetti Decl. Ex. 47.) Several police officers entered the bar to find a large crowd, only one bartender, and no security personnel inside. (First Marchetti Decl. Ex. 47.) A second bartender had refused to come to work that evening due to a shooting that occurred the night before. (First Marchetti Decl. Ex. 47.) The police closed the bar down and the owner, who arrived a few minutes later, denied any knowledge of the previous night's shooting. (First Marchetti Decl. Ex. 47.) Ten days later, various fights involving knives and bottles occurred at Don's Dugout, with a least one victim suffering a serious wound to his hand with resulting tendon damage. (First Marchetti Decl. Ex. 47.) The City's letter requesting the suspension detailed these incidents and expressed the opinion that the serious and persistent problems related to the venue, specifically the assaults and shootings, warranted a suspension. (First Marchetti Decl. Ex. 47.)

Before the OLCC suspended the liquor license, the Oregon Lottery required removal of the video poker machines, which eventually resulted in closure of the bar. (Marchetti 30(b)(6) Dep. 16:6-18; First Marchetti Decl. ¶ 18.) The owners of Don's Dugout were Caucasian and music was not played at the premises. (Marchetti 30(b)(6) Dep. 170:12-17; 184:7-8; First Marchetti Decl. ¶ 17.)

*B. City's Request for Imposition of Emergency Restrictions on a Liquor Licensee*

In late 2012, the City utilized the Process to request immediate restrictions on the liquor license issued to the Grand Cafe in the hopes of preventing a serious incident at the location. (Marchetti 30(b)(6) Dep. 36:1-15; First Marchetti Decl. Ex. 48.) The venue had an increase in public safety issues over a one-

year period beginning in late 2011. (First Marchetti Decl. Ex. 48.) The incidents included assaults, thefts, fights, shots fired, and gang affiliations among the customers. (First Marchetti Decl. Ex. 48.) The issues related, in part, to the lack of qualified security guards, lack of screening at the door, and failure to enforce a dress code. (First Marchetti Decl. Ex. 48.)

The City initially communicated with the owner of the Grand Cafe via the License Team in February 2012 to identify public safety issues and possible solutions. (First Marchetti Decl. Ex. 48.) The owner offered a plan to mitigate the issues but never followed through with the plan. (First Marchetti Decl. Ex. 48.) On March 1, 2012, the License Team issued a time, place, and manner violation to the Grand Cafe. (First Marchetti Decl. Ex. 48.) The owner of the Grand Cafe submitted another mitigation plan in response, which was incorporated into a formal abatement plan on April 10, 2012. (First Marchetti Decl. Ex. 48.) However, when the term of the abatement plan expired on July 13, 2012, the Grand Cafe no longer implemented the strategies of the mitigation plan. (First Marchetti Decl. Ex. 48.) On November 29, 2012, the owners of the Grand Cafe met with the License Team to seek advice on steps to take to insure safety at the venue. (First Marchetti Decl. Ex. 48.) The License Team recommended the owners again follow the strategies set forth in the previous mitigation plan. (First Marchetti Decl. Ex. 48.)

In a letter dated December 4, 2012, the City requested emergency restrictions on Grand Cafe's liquor license based on the documented gang activity, multiple assaults, and lack of willingness or ability to control the location. (First Marchetti Decl. Ex. 48.) The City suggested the OLCC require the licensee to provide additional security to monitor alcohol consumption and safety at the premises; be closed from 11:00 p.m. to 7:00 a.m. every day; impose mandatory identification checks the door; implement a no re-entry policy; and eliminate DJ entertainment, alcohol shots, and possession of more than one drink at a time.

(Marchetti 30(b)(6) Dep. 47:14-48:11; First Marchetti Decl. Ex. 48.)

The OLCC noted that a request for restrictions required a history of serious and persistent problems, and found some that restrictions would be reasonably expected to reduce the problematic behavior. (Marchetti 30(b)(6) Dep. 36:16-37:4.) The OLCC did not adopt the restrictions suggested by the City but proposed its own instead. (First Marchetti Decl. ¶ 18.) The owner of the Grand Cafe was Caucasian and the club played a variety of music. (Marchetti 30(b)(6) Dep. 170:21-171:1; 184:9-13; First Marchetti Decl. ¶ 17.) The Grand Cafe eventually changed ownership. (First Marchetti Decl. ¶ 18.)

*C. Defendants' Failures to Request/Impose Emergency Suspension After a Shooting*

1. 720 Club

The City did not request an emergency suspension after the April 17, 2009 shots-fired incident at the 720 Club because it could not identify the shooter, thus making it impossible to determine if the 720 Club or its customers were involved. (Marchetti 30(b)(6) Dep. 51:12-52:5.) Combined with the absence of injuries from the incident, it was not considered serious and thus not investigated by the License Team. (Marchetti 30(b)(6) Dep. 52:6-11.) Moreover, the Process had not been created and the City assumed the OLCC would engage in their own investigative process. (Marchetti 30(b)(6) Dep. 52:11-17.) Mitchell did not consider the 720 Club to be a "Black and African-American club." (Mitchell Decl. ¶ 21.)

2. Good Call Sports Bar

The City did not learn of an October 23, 2010 shooting at the Good Call Sports Bar for nearly three months after it occurred; consequently, the City did not request an immediate suspension. (Marchetti 30(b)(6) Dep. 55:1-14.) The licensee contacted Marchetti shortly before the 100-day anniversary of shooting after receiving information that a retaliatory shooting was likely. (Marchetti 30(b)(6) Dep. 55:10-

PAGE 86 - OPINION AND ORDER

18.)  The License Team contacted the relevant police precinct and initiated problem-solving measures. (Marchetti 30(b)(6) Dep. 55:19-24.)

### 3.  JD's Bar and Grill

The City also did not respond to the shooting at JD's Bar and Grill on January 24, 2011. (Marchetti 30(b)(6) Dep. 55:25-56:3.)  The License Team was not informed of the shooting, and the local precinct worked directly with the OLCC on problem-solving efforts addressing chronic nuisance issues at the venue.  (Marchetti 30(b)(6) Dep. 56:4-7, 56:22-57:8)

### 4.  New Copper Penny

The February 12, 2012 shooting at the New Copper Penny was not reported to the License Team in time to initiate a suspension request within twenty-four hours of the incident.  (Marchetti 30(b)(6) Dep. 58:15-23.)  Moreover, the venue did not have a history of problem-solving efforts.  (Marchetti 30(b)(6) Dep. 58:23-25.)  However, once the License Team became aware of the shooting, they investigated the New Copper Penny and pursued a time, place, and manner violation.  (Marchetti 30(b)(6) Dep. 60:1-15.) Additionally, the City did not request an emergency suspension after a subsequent shooting originated across the street from the New Copper Penny on March 26, 2014.  (Marchetti 30(b)(6) Dep. 69:18-70:1.) Investigation revealed the shooting appeared to be a drive-by shooting directed at customers waiting to get into the New Copper Penny and did not arise out of the sale of alcohol at the venue.  (Marchetti 30(b)(6) Dep. 70:1-71:9.)  The License Team worked with the New Copper Penny to reduce such incidents, which effort resulted in queuing the line inside the venue, rather than outside on the street. (Marchetti 30(b)(6) Dep. 71:9-16.)  The OLCC issued a Verbal Instruction ("VI") which stated the incident was related to, but not caused by, the licensee.  (Abrams Decl. dated April 6, 2018, ECF No. 178

("Second Abrams Decl."), Ex. M at 19.)

DeWalt visited the New Copper Penny at least once to check out the "competition." (Second DeWalt Dep. 151:18-22.) He considered the New Copper Penny to be competition because it had a hip-hop nightclub and catered to many of the same customers as the Fontaine. (Second DeWalt Dep. 151:23-152:9.) Mitchell acknowledged the New Copper Penny played hip-hop music, but he did not consider it to be a "Black and African-American club." (Mitchell Decl. ¶¶ 21, 46.)

### 5. Grand Central Restaurant and Bowling Lounge

The City did not consider issuing a request for an immediate suspension after a February 19, 2012 shooting at the Grand Central Restaurant and Bowling Lounge, because the venue had no documented history of problems or City involvement. (Marchetti 30(b)(6) Dep. 61:19-62:2.) Based on his experience in the industry, Feldman believed the Grand Central Restaurant and Bowling Lounge catered to a white audience. (Feldman Decl. ¶ 10.)

### 6. Mystic Club

A July 2012 shooting at the Mystic Club did not warrant a emergency suspension request because the Bureau determined the shooting to be unrelated to the venue or the service of alcohol. (Marchetti 30(b)(6) Dep. 62:18-24.) The Bureau determined the shooting was an execution-style shooting and did not involve patrons of the Mystic Club. (Marchetti 30(b)(6) Dep. 62:24-63:21.)

The License Team investigated a subsequent shooting at the Mystic Club on January 11, 2014, which resulted a security guard's death. (Marchetti 30(b)(6) Dep. 67:15-68:8; Second Abrams Decl. Ex. M at 2-3.) The investigation revealed a prospective customer of the club shot the security guard when the guard denied the customer entry to the club. (Marchetti 30(b)(6) Dep. 68:3-6.) Because the shooting was

unrelated to the sale or service of alcohol at Mystic Club, the City did not request an emergency suspension. (Marchetti 30(b)(6) Dep. 68:6-69:13.) Mitchell did not consider the Mystic Club to be a "Black and African-American club." (Mitchell Decl. ¶ 21.)

### 7. Club Skinn

A shooting that occurred at Club Skinn on May 8, 2013, did not involve patrons of the bar and was not related to service or sale of alcohol at the venue. (Marchetti 30(b)(6) Dep. 65:22-66:4.) Consequently, the City did not consider requesting an emergency suspension at that time. (Marchetti 30(b)(6) Dep. 65:22-25.) Mitchell did not consider Club Skinn to be a "Black and African-American club." (Mitchell Decl. ¶ 21.)

### 8. Magoo's Bar and Grill

The April 16, 2014 shooting at Magoo's Bar and Grill resulted in the issuance of a time, place, and manner violation but not a request for immediate suspension. (Marchetti 30(b)(6) Dep. 72:6-17, 73:1-74:12.) The shooting occurred on a Friday or Saturday night but the License Team did not learn of it until the following Monday or Tuesday, when the liquor license investigator and coordinator returned to work. (Marchetti 30(b)(6) Dep. 72:18-24.) The OLCC issued a VI to Magoo's Bar and Grill after this incident. (Sweet Decl. dated April 6, 2018, ECF No. 177 ("Second Sweet Decl."), ¶ 4.)

### 9. East China Lounge

The City did not request an immediate suspension as a result of a June 8, 2014 shooting at the East China Lounge, because the investigating detective would not discuss the the shooting for fear of compromising the investigation. This effectively eliminated the City's ability to determine the immediacy of public risk, and prevented the License Team from making a request within twenty-four hours. (Marchetti

30(b)(6) Dep.74:13-76:4.)  Once the License Team finally received the information, however, they did

consider issuing a time, place, and manner violation. (Marchetti 30(b)(6) Dep. 76:5-12, 76:24-77:4.)  The

OLCC issued a Restriction Violation (Notice of Proposed License Suspension/Civil Penalty) and Notice

of Proposed License Cancellation against the East China Lounge on August 6, 2014, which was resolved

when the licensee admitted the violation and agreed to pay a fine of $8,415.00 by November 17, 2014,

or serve a fifty-one-day suspension of the venue's liquor license.  (Second Abrams Decl. Ex. M at 19, 28-

36.)  Based on his experience in the industry, Feldman believes the East China Lounge caters to a white

audience.  (Feldman Decl. ¶ 10.)

> 10.  Soobies Bar and Grill

The July 5, 2014 shooting at S o o b i e s  B a r  and Grill did not warrant a request for immediate

suspension because the liquor license previously had been cancelled, and the venue was operating as a juice

bar at the time the shooting occurred.  (Marchetti 30(b)(6) Dep. 77:18-25; 78:1-2.)

> 11.  Shady Lady Tavern

The License Team did not have knowledge of the shooting at Shady Lady Tavern on August 10,

2014, within twenty-four hours of its occurrence, and thus could not timely request an immediate

suspension.  (Marchetti 30(b)(6) Dep. 78:14-22.)  Moreover, no history of problem-solving existed for

the venue.  (Marchetti 30(b)(6) Dep. 79:11-14.)  The License Team later decided to pursue a time, place

and manner violation (Marchetti 30(b)(6) Dep. 79:2-7) and the OLCC issued a VI.  (Second Abrams

Decl. Ex. M at 9.)  Mitchell did not consider the Shady Lady Tavern to be a "Black and African-American

club."  (Mitchell Decl. ¶ 21.)

### 12. Boss Hawq's Bar and Grill

Similarly, in the absence of timely knowledge of the February 2, 2015 shooting at Boss Hawq's Bar and Grill, the City could not request an immediate suspension. (Marchetti 30(b)(6) Dep. 92:23-93:4.) Additionally, there was no history of problem-solving or prior issues. (Marchetti 30(b)(6) 93:5-6.) The License Team did address the shooting through the time, place, and manner ordinance. (Marchetti 30(b)(6) Dep. 93:6-9.) The OLCC investigated the shooting, found the bartender properly attempted to alleviate the situation, appropriately protected the customers when shots were fired, and immediately called 911, and issued a VI based on the totality of the circumstances. (Second Abrams Decl. Ex. M at 37-38.)

### 13. Shimmers

The License Team again lacked immediate knowledge of the shooting at Shimmers on February 24, 2015, and the City was unable to request an immediate suspension. (Marchetti 30(b)(6) Dep. 91:24-92:6.) Had the License Team been informed of the shooting promptly, it likely would have requested an immediate suspension because the shooting, which resulted in a death, was gang-related, and the Bureau had engaged in problem-solving efforts with the venue prior to the shooting. (Marchetti 30(b)(6) Dep. 80:1-14; 92:2-11.) The License Team ultimately issued a time, place, and manner violation in an attempt to address some of the issues and the OLCC issued a VI. (Marchetti 30(b)(6) Dep. 92:12-14; Second Abrams Decl. Ex. M at 10.)

### 14. Hourglass Club

The absence of any previous issues or history of problem-solving prevented the City from requesting an immediate suspension of the Hourglass Club's license after a shooting on October 2, 2015, that was timely reported. (Marchetti 30(b)(6) Dep. 93:13-19, 94:11-18.) The License Team issued a

PAGE 91 - OPINION AND ORDER

time, place, and manner violation on October 7, 2015, with a resulting abatement plan. (Marchetti 30(b)(6) Dep. 93:19-20, 94:5-10.) The OLCC investigated, found the venue to be in good standing, determined the shooting was an isolated incident, and issued a VI on November 10, 2015. (Second Abrams Decl. Ex. M at 39-40.) Mitchell did not consider the Hourglass Club to be a "Black and African-American club." (Mitchell Decl. ¶ 21.)

15. Palace/Pallas Club

The City did not consider requesting an immediate suspension for an October 3, 2015 shooting at the Palace Club because the License Team was not notified within of the shooting within twenty-four hours and there was no problem-solving history with the club. (Marchetti 30(b)(6) Dep. 99:13-22.) As with the Hourglass Club, the License Team issued a time, place, and manner violation on October 7, 2015, and the issues identified were addressed in an abatement plan. (Marchetti 30(b)(6) Dep. 99:22-23.) The OLCC issued a VI on October 29, 2015. (Second Abrams Decl. Ex. M at 13.) Mitchell did not consider the Hourglass Club to be a "Black and African-American club." (Mitchell Decl. ¶ 21.)

16. Heat Gentlemen's Club

In light of OLCC's general policy against immediate suspensions for non-life threatening shootings and because of the absence of any life-threatening injuries, the City did not request an immediate suspension for the November 13, 2015 shooting at Heat Gentlemen's Club. (Marchetti 30(b)(6) Dep. 107:2-16.) Rather, the License Team issued a time, place, and manner violation on November 30, 2015. (Marchetti 30(b)(6) Dep. 107:20-24.) The OLCC issued a VI on December 1, 2015, and included the incident in a Notice of Proposed License Cancellation/History of Serious and Persistent Problems issued on May 31, 2017. (Second Abrams Decl. Ex. M at 20, 41-49.)

17.  Triple Nickel

The shots-fired incident near the Triple Nickel on August 4, 2016, did not warrant an immediate suspension request because it was determined the incident was unrelated to the licensee. (Marchetti 30(b)(6) Dep. 107:25-108:19.)  A fight in the venue that same night did result in a time, place, and manner warning for disorderly conduct and the issuance of a VI by the OLCC. (Marchetti 30(b)(6) Dep. 108:14-17, 109:9-14; Second Abrams Decl. Ex. M at 11.)  Triple Nickle also promptly barred the individuals involved in the altercation. (Second Abrams Decl. Ex. M at 11.) Based on his experience in the industry, Feldman believes the Triple Nickel caters to a white audience. (Feldman Decl. ¶ 10.)

18.  Lucky Corner Bar and Grill

The License Team learned of a shooting resulting in death at the Lucky Corner Bar and Grill on September 5, 2016, but did not have sufficient information within the first twenty-four hours to consider whether emergency suspension was warranted. (Marchetti 30(b)(6) Dep. 110:12-20.)  Eventually, it became evident the shooting occurred in a parking lot, did not involve customers of the bar, and was not related to the sale and service of alcohol. (Marchetti 30(b)(6) Dep. 110:23-111:2, 111:7-15.) The OLCC issued a VI on November 16, 2016. (Second Abrams Decl. Ex. M at 12.)

19.  Maddy's

The September 23, 2016 shooting in a parking lot shared by Maddy's and Bi-Mart occurred closer to Bi-Mart and was determined by the Bureau to be unrelated to the licensee. (Marchetti 30(b)(6) Dep. 111:16-112:2.)  The City did not take any action, and the License Team might not have considered the event. (Marchetti 30(b)(6) Dep. 113:6-10.)

20. Roseland Theater

In the absence of a liquor license investigator and coordinator, the shooting at the Roseland Theater on October 6, 2016, was handled by the Bureau's gang enforcement team and not the License Team. (Marchetti 30(b)(6) Dep. 113:16-114:2.) In fact, the License Team was not made aware of the shooting. (Marchetti 30(b)(6) Dep. 114:2-3.)[39] In July 2017, the OLCC issued a compliance plan to Roseland Theater imposing increased security measures, limiting the number of drinks a patron may possess, and requiring the use of a measuring tool for alcohol. (Second Abrams Decl. Ex. M at 57-58.) Mitchell did not consider the "Roseland" to be a "Black and African-American club." (Mitchell Decl. ¶ 21.) Based on his experience in the industry, Feldman believes the Roseland Theater catered to a white audience. (Feldman Decl. ¶ 10.)

21. Club Paypen and Whispers

A shooting occurred on October 20, 2016, in the parking lot shared by Club Playpen and Whispers. (Marchetti 30(b)(6) Dep. 135:24-136:5.) The License Team investigated but was unable determine if the shooting was related to either establishment and, consequently, the City did not request an emergency suspension. (Marchetti 30(b)(6) Dep. 136:5-14.) The OLCC issued a VI on November 9, 2016. (Second Abrams Decl. Ex. M at 14.)

---

[39] At oral argument, Plaintiffs' counsel noted the court heard oral argument on Defendants' motions to dismiss on October 7, 2016, and mentioned the October 6, 2016 shooting at the Roseland Theater, raising doubts Marchetti or the License Team were not aware of this shooting. However, the record shows that at the time there was neither a liquor license investigator and coordinator, or that the License Team handled the incident, and that the Bureau's Gang Enforcement Team investigated the shooting. Thus, it is only speculation that Marchetti or the License Team knew of the Roseland Theater shooting.

22. Club SinRock

The City did not consider a request for immediate suspension after a shots-fired incident in the parking lot of Club SinRock on January 26, 2017. (Marchetti 30(b)(6) Dep.138:2-8.) The licensee did not have the history of problem-solving required to make a request. (Marchetti 30(b)(6) Dep.138:8-10.) The incident was not considered serious and the License Team issued only a time, place, and manner warning. (Marchetti 30(b)(6) Dep. 138:10-12.)

23. Crystal Ballroom

The shooting at the Crystal Ballroom on August 12, 2017, was not reported to the License Team within twenty-four hours, preventing timely consideration of a request for immediate suspension.[40] (Marchetti 30(b)(6) Dep. 138:22-139:3.) Additionally, the Crytsal Ballroom did not have a history of problem-solving efforts which would have justified such consideration. (Marchetti 30(b)(6) Dep. 139:4-6.) The OLCC issued a VI to the Crystal Ballroom after this incident. (Second Sweet Decl. ¶ 4; Second Abrams Decl. Ex. M at 67-69.) Mitchell did not consider the Crystal Ballroom to be a "Black and African-American club." (Mitchell Decl. ¶ 21.) Based on his experience in the industry, Feldman believed the Crystal Ballroom catered to a white audience. (Feldman Decl. ¶ 10.)

D. *OLCC's Relationship with Venues Owned by an African-American*

Clyde's Prime Rib and Restaurant has never received any citation from the OLCC. (Sweet Decl. dated January 18, 2018, ECF No. 119 ("First Sweet Decl."), ¶ 6.) Until 2016, Clyde's Prime Rib and

---

[40] Plaintiffs' counsel also questioned Marchetti's representation the License Team was not advised of the August 12, 2017 shooting at the Crystal Ballroom. It is unclear why Plaintiffs have issues with this deposition testimony; they failed to present contrary evidence or address this issue in their opposition brief.

Restaurant was owned by an African-American. (First Abrams Decl. ¶ 15.)

The only OLCC citation issued to Olive and Twist occurred in 2008 for allowing an employee to serve without a valid service permit. (First Sweet Decl. ¶ 7.) Olive and Twist is owned by an African-American. (First Abrams Decl. ¶ 15.)

The liquor license issued to Solae's Lounge was suspended for twelve days and the OLCC issued a citation to Solae's Lounge in 2016 for having an employee without a valid service permit. (First Sweet Decl. ¶ 8.) Solae's Lounge is owned by an African-American. (First Abrams Decl. ¶ 15.) Mitchell considers "Solae's" a "Black and African-American club." (Mitchell Decl. ¶ 19.)

XII. Testimony from Others Involved in Portland Nightclubs

*A. Roger Mitchell*

Based on his experience as a club security professional and as a black man living in Portland, Mitchell believes "a business catering to a Black and African-American audience will not survive because OLCC, Portland Police, and the City of Portland will work together and target that business for heavy-handed enforcement instead of engaging in problem solving with Black and African-American clubs" and that the OLCC, Bureau, and City will engage in troubleshooting and problem-solving with other clubs, such as the New Copper Penny. (Mitchell Decl. ¶¶ 40, 42.) This was also true for the Fontaine. (Mitchell Decl. ¶ 49, 72, 73.) Mitchell cited as an example an occasion on which he witnessed five or more Bureau officers entering the Fontaine for no reason, leading the customers to believe the Fontaine was not safe, while Bureau officers regularly pulled in front of the New Copper Penny at closing in what Mitchell described as a "helpful police presence." (Mitchell Decl. ¶¶ 44, 45.) Additionally, in Spring of 2013, a Bureau officer parked outside the Fontaine after closing made the comment: "I bet you a cup of coffee

there will be a shooting here by July." (Mitchell Decl. ¶ 43.) Mitchell believes the Shooting provided

Defendants what they needed to close the Fontaine. (Mitchell Decl. ¶¶ 72, 73.)

### B. Kenny Scott

Scott believes the "City, OLCC and the Portland Police have a particular problem with Black and

African-American people congregating to listen to hip-hop music," and has experienced increased

"harassment and regulatory scrutiny" from Defendants when promoting such events. (Scott Decl. ¶¶ 7, 8.)

Scott claims this "differential treatment has led to the systematic elimination of Black and African-American

nightclubs and events in Portland." (Scott Decl. ¶ 8.) Scott gave as an example the Bureau's presence

and imposition of fines for random infractions at the City Nightclub, at which Scott promoted a

"predominantly Black and African-American hip-hop night," which forced the closure of the venue, with

the minimal harassment at the Barrel Room and the Crown Room on the evenings those venues played hip-

hop music for a "non-Black" or "white" crowd. (Scott Decl. ¶¶ 10, 11, 12.)

### C. Bradley Macomber

The OLCC, the Bureau, and the Office regularly imposed restrictions on the Crown Room, such

as not allowing the Crown Room to serve alcohol "shots" and requiring the lights be bright enough to read

a newspaper, and then aggressively enforced the restrictions. (Macomber Dep. 47:12-48:12, 49:12-50:4.)

Macomber thought the City was concerned about gang-related gun violence and wanted to limit the number

of "black kids coming into downtown and shooting people up." (Macomber Dep. 46:6-15.) Macomber

also received numerous time, place, and manner violations and was placed on a few abatement plans during

the final three years the Crown Room was in business. (Macomber Dep. 56:5-24, 61:17-24.) Macomber

testified the Crown Room eventually lost its liquor license when it failed to have food to fill orders from the

menu on two consecutive nights and a security guard "tased" an individual outside the club. (Macomber Dep. 50:10-51:16.) Sweet represented the Crown Room surrendered its liquor license in May 2013 after being charged with a history of serious and persistent problems. (Second Sweet Decl. ¶ 2.) The Crown Room did not have any interactions with the OLCC from 2007 to 2011. (Macomber Dep. 101:8-14.)

However, Macomber opined that "the only type of show that attracted heavy handed and intimidating regulation was hip-hop" and the "only thing that ultimately stopped the harassment by the City of Portland, the OLCC and the Portland Police was when we stopped playing hip-hop music." (Macomber Decl. ¶¶ 10. 15.) While Macomber mentioned that another club had instituted a limit on the number of African-Americans allowed in the club to avoid scrutiny by Defendants, he did not speak to the racial make-up of the crowd at the Crown Room on the nights Defendants harassed the club. (Macomber Decl. ¶ 16.) In his subsequent deposition, Macomber testified the Crown Room was the only club "regulated because it had too many African-Americans in it." (Macomber Dep. 24:18-25.)

Macomber does not remember having any interaction with Jackson, Kruger, Hales, or Marks. (Macomber Dep. 86:19-87:4, 95:3-11.) He did not have a good relationship with, or opinion of, Marchetti. (Macomber Dep. 86:2-14.)

D.  *Leigh Feldman*

Feldman, the promoter of most of the hip-hop events at the Crown Room, noticed that the presence of more African-Americans in the club resulted in more attention from the Bureau and the OLCC, and the hip-hop events received more attention than any other event even though those events did not, in Feldman's opinion, create any more issues or problems. (Feldman Decl. ¶¶ 5, 6; Feldman Dep. dated

August 14, 2018, ("Feldman Dep.")[41] 60:7-61:6.) This "presence" consisted of four officers wearing bulletproof vests on the outside of their clothing appearing at the venue at least four times a night. (Feldman Dep. 66:7-67:18.)

Based on actions and sentiments voiced by at least one Bureau officer and OLCC member, Feldman considered the primary issue to be a "non-white crowd" at his events. (Feldman Decl. ¶¶ 8, 9.) Feldman believed the Crown Room catered primarily to a white audience but estimated that from 2010 to 2012, one-third to one-half of the crowd for the hip-hop events were people of color, with most of them being black. (Feldman Decl. ¶ 10; Feldman Dep. 39:8-25, 41:4-22.) Feldman thought the Bureau was targeting the Crown Room, because officers would not show up when he promoted hip-hop shows at other venues. (Feldman Dep. 79:8-18.) Hip-hop shows and concerts still occur regularly in Portland. (Feldman Dep. 167:3-13.)

*E. David Harmsen*

In 1997, Harmsen, a white man, purchased Helena's, a restaurant and bar frequented by African-Americans and located in a historically "Black part of Portland." (Harmsen Decl. dated March 1, 2018, ECF No. 161 ("Harmsen Decl."), ¶¶ 2, 7, 8.) Harmsen believed the OLCC and the Bureau focused inordinate attention on Helena's due to its African-American customers. (Harmsen Decl. ¶¶ 9, 10.) During a meeting with Harmsen, the OLCC and the Bureau, Bureau officer John Law ("Law") suggested Harmsen get rid of "those people" and stop serving Hennesey if he wanted to continue in business. (Harmsen Decl. ¶¶ 11, 12.) Law never identified who he was characterizing as "those people." (Harmsen Decl. ¶ 12.)

---

[41] The "Feldman Dep." is filed as Exhibit 70 of the Simon declaration (ECF No. 186-1)

Very little, if any, hip-hop or rap music was played at Helena's. (Harmsen Dep. dated August 28, 2018, ("Harmsen Dep.")[42] 17:20-18:2.) Helena's liquor license was cancelled in 2004. (Second Sweet Decl. ¶ 3.)

XIII. Plaintiffs' Claims

In the First Amended Complaint filed on November 11, 2015 (the "Complaint"), Plaintiffs asserted eleven claims against various defendants, hinging primarily on actions taken with the intent to discriminate against Plaintiffs based on the race and music preferences of DeWalt, DPI, and the Fontaine's customers. Specifically, they allege:

First Claim for Relief: Defendants deprived them of their right to make and enforce contracts based on their race in violation of 42 U.S.C. § 1981.

Second and Third Claims for Relief: Defendants violated their procedural process rights regarding DeWalt's liberty interest in his chosen occupation and Plaintiffs' property interests with regard to the Fontaine.

Fourth Claim for Relief: Defendants violated their right to equal protection by disparate treatment based on Plaintiffs' race and the race of the Fontaine's customers, specifically, that Defendants "acted with intent or purpose to racially discriminate against Plaintiffs by depriving Plaintiffs of their right to equal protection by unlawfully treating Plaintiffs differently than similarly situated clubs that are not owned by or do not cater to a black clientele." (First Am. Compl., ECF No. 42 ("Compl."), ¶ 142.)

Fifth and Sixth Claims for Relief: Defendants violated their First Amendment rights to free expression, based on the hip-hop music played at the Fontaine, and free association, based on the Fontaine's African-American customer base.

Seventh and Eighth Claims for Relief: Defendants conspired to deprive Plaintiffs of various constitutional rights based on their race, in violation of 42 U.S.C. § 1985(3) and 1986.

Ninth Claim for Relief: the City violated Title VI by disparate treatment of Plaintiffs, based on their

---

[42] The "Harmsen Dep." is filed as Exhibit 69 of the Simon declaration (ECF No. 186-1).

race and the hip-hop music played at the Fontaine.

Tenth and Eleventh Claims for Relief: the City Defendants (with the exception of the City itself) and Marks (collectively the "Individual Defendants") violated state common law that makes actionable conduct constituting intentional interference with economic relations and intentional infliction of emotional distress.

In support of their discrimination claims, Plaintiffs generally allege the City Defendants created fraudulent reports and charges against the Fontaine, and failed to meaningfully inform them of "known dangers and failed to take action to ensure public safety and prevent these dangers." (Compl. ¶¶ 31, 48.) Plaintiffs allege a history of racial discrimination in the State of Oregon predating the 1920s and cite the City's alleged actions against black-owned nightclubs and restaurants from 1920 to the present day, including "an inordinate amount of regulatory attention" from the City, the Bureau, the City Fire Department, the OLCC, and the Office, and the City's failure to assist black-owned nightclubs and restaurants with criminal activity, which ultimately resulted in the closure of the Fontaine. (Compl. ¶¶ 22-30.)

In support of their due process claims, Plaintiffs cite the denial of their right to appeal the Citation, the improper service of the First Order, and the issuance of an proposed order after the Hearing as deliberately indifferent actions intended to deprive them of their procedural due process rights.

Plaintiffs seek economic damages in the amount of $2,500,000; non-economic damages in the amount of $5,000,000; and punitive damages in the amount of $15,000,000; and payment of their attorney fees and costs. (Compl. at 36.)

XIV. Summary of Prior Opinion

Defendants filed motions to dismiss attacking various claims alleged in the Complaint. In the

Opinion and Order resolving Defendants' various motions to dismiss (the "Opinion"), the court denied

Marks's request for Eleventh Amendment immunity, finding the OLCC waived the immunity by removing

this lawsuit from state to federal court. *DeWalt Productions, Inc. v. City of Portland*, Case No. 3:14-

cv-1017-AC, 2016 WL 6089718, at *18 (D. Or. Oct. 17, 2016). It also denied Marks's request for

prosecutorial immunity with regard to the reinstatement of the License and issuance of the Second Order,

based on allegations such actions were taken in response to Webster's plan to issue a proposed order in

Plaintiffs' favor, with the sole purpose of depriving Plaintiffs of a favorable result, and in violation of

applicable regulations. *Id*. at *23-*24. Finally, the court denied the Individual Defendants' request for

qualified immunity. *Id*. at *25.

The court granted Defendants's motions to dismiss Plaintiffs' Sixth Claim for Relief based on a First

Amendment right to associate, finding the First Amendment does not protect a bar owner's right to

associate with African-American patrons of his establishment or "to engage in expressive associations by

playing hip-hop music and sponsoring hip-hop events attended primarily by the black community and

patrons who enjoy hip-hop music." *Id*. at *15. With regard to the First Claim for Relief for violation of

42 U.S.C. § 1981, the court dismissed DeWalt's claim based on the suspension of the License, because

DPI held the License, but allowed DeWalt to assert a claim for termination of the Lease based on

allegations DeWalt was the tenant under the Lease. *Id*. at *8.

In the absence of allegations establishing that City Defendants contributed to or participated in the

reinstatement of the License and issuance of the Second Order, the court granted the City Defendants'

motion to dismiss the due process claims alleged in Plaintiffs' First and Second Claims for Relief. *Id*. at

*14. The court recognized DPI's property interest in the License and DeWalt's liberty interest in his

chosen profession, and allowed Plaintiffs to assert due process claims against Marks based on these interests. The court dismissed Plaintiffs' claims of pre-deprivation process, finding the "OLCC's interest in protecting public safety and welfare, viewed in conjunction with the statutory provision of a prompt administrative proceeding intended to result in an order addressing the relevant issues, eliminates the requirement of pre-deprivation process." *Id*. at \*10, \*12. The court also dismissed Plaintiffs' post-deprivation due process claims based on the appeal of the Citation and defective service, explaining that Marks did not rely on the Citation when issuing either of the emergency suspension orders, and noting that Plaintiffs received sufficient notice of the First Order. *Id*. at \*12. As a result, Plaintiffs could pursue their procedural due process claims only against Marks for depriving them of adequate post-deprivation process with regard to actions taken after the Hearing. *Id.* at \*14.

The court denied the Individual Defendants' motions to dismiss Plaintiffs' conspiracy claims alleged in their Seventh and Eight Claims for Relief, finding Plaintiffs alleged the requisite discriminatory intent to deprive them of their livelihood based on race. *Id*. at \*17. It also denied Marks's motion to dismiss Plaintiffs' claim for intentional interference with economic relations based on Plaintiffs' incorporation of allegations relating to communications and cooperation between the Individual Defendants, including Marks, for the purpose of forcing the Fontaine to close. *Id*. at \*18. Finally, the court granted Marks's motion to strike Plaintiffs' claim for punitive damages with regard to Plaintiffs' Eleventh Claim for Relief for intentional infliction of emotional distress. *Id*. at \*19.[43]

---

[43] The court also considered the sufficiency of allegations specific to each defendant with regard to Plaintiffs' conspiracy allegations. *Id*. at \*19-\*22. These rulings have limited value here, because the evidence presented is not necessarily limited to or consistent with the allegations of the Complaint.

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2018). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

Deference to the nonmoving party has limits, however. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c)

(2018). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  Immunity

    *A.  Absolute Immunity*

        1.  Quasi-Prosecutorial Immunity

Marks reasserts his argument that he is entitled to absolute immunity on Plaintiffs' federal claims. In the Opinion, the court afforded Marks quasi-prosecutorial immunity with regard to his decision to issue the First Order, but denied Marks's motion with regard to the rescission of the First Order, reinstatement of the License, and issuance of the Second Order. *DeWalt*, 2016 WL 6089718, at *23. Based on the allegations of the Complaint and the arguments then before the court, the court expressed concern Marks deprived DPI of the ability to effectively challenge the First Order, violated the Oregon Administrative Procedures Act ("Oregon APA") by preventing the issuance of a decision on the First Order within fifteen days of the completion of a hearing, and improperly reinstated the License without seeking leave or approval from Webster, all of which apparently exceeded the general role of a prosecutor. *Id*. at *23-*24. The court now reviews these concerns in light of the evidence and arguments offered by the parties in support of their respective motions for summary judgment.

    Federal law controls the question of immunity in cases where a plaintiff alleges a 42 U.S.C. § 1983

claim. *Martinez v. State of California*, 444 U.S. 277, 284 n.8 (1980). Absolute immunity shields individuals from § 1983 liability if they perform a function that enjoyed absolute immunity at common law. *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003). Only the specific function performed and not the role or title of the official is relevant to the analysis. *Id*. Officials acting in a prosecutorial or judicial role, or performing functions closely associated with the judicial process, are entitled to absolute immunity. *Id*. at 896-98. These functions include "the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id*. at 269. The United States Supreme Court has "been 'quite sparing' in recognizing absolute immunity for state actors." *Id*.

Prosecutorial or quasi-judicial immunity protects prosecutors from liability for conduct in "initiating a prosecution and in presenting the State's case," or when their activities are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)(extending the common law absolute liability to malicious prosecution and false or defamatory statements made by a prosecutor in judicial proceedings to § 1983 actions). The application of absolute prosecutorial immunity depends on the nature of the allegedly unlawful actions. *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003).

> Thus, in deciding whether to accord a prosecutor immunity from a civil suit for damages, a court must first determine whether a prosecutor has performed a quasi-judicial function. If the action was part of the judicial process, the prosecutor is entitled to the protection of absolute immunity whether or not he or she violated the civil plaintiff's constitutional rights.

*Id*. (citing *Imbler*, 424 U.S. at 430). The Supreme Court has extended absolute prosecutorial immunity

to state attorneys and agency officials performing functions similar to those of a prosecutor in initiating and pursuing administrative enforcement proceedings. *Butz v. Economou*, 438 U.S. 478, 515-517 (1978).

The Supreme Court extended prosecutorial immunity to agency officials initiating administrative proceedings based, in part, on the provision of safeguards present in agency adjudications similar to those in the judicial process providing "ample opportunity to challenge the legality of the proceeding." *Id*. at 513, 516. The Court explained:

> An administrator's decision to proceed with a case is subject to scrutiny in the proceeding itself. The respondent may present his evidence to an impartial trier of fact and obtain an independent judgment as to whether the prosecution is justified. His claims that the proceeding is unconstitutional may also be heard by the courts. Indeed, respondent in this case was able to quash the administrative order entered against him by means of judicial review.

*Id*. at 516 (citation omitted). The Court also noted the importance of the parties receiving "finding and conclusions on all of the issues of fact, law, or discretion presented on the record." *Id*. at 513.

Plaintiffs presented evidence and arguments at the Hearing on the First Order. The evidence now before the court reveals Marks, subsequent to the hearing, responded to Plaintiffs' objection to the lack of proper service of the First Order by rescinding it and reinstating the License. After communicating with Oregon Department of Justice lawyers and other OLCC employees, Marks rescinded the First Order to allow the OLCC the opportunity to remedy the deficient service by issuing and properly serving the Second Order. Marks's conduct was not a reaction to Webster's statement that the absence of proper service would result in a ruling favorable to DPI with reinstatement of the License, as the Complaint allegations imply. Rather, the record shows that Marks's decision furthered an informed litigation strategy to ensure the service deficiencies raised by Plaintiffs would be remedied and the issues raised in the First Order

would be resolved on the merits in expeditious manner.

The decision to commence prosecution and the decision not to prosecute are "intimately associated with the judicial phase" of a proceeding and are protected by prosecutorial immunity. *Roe v. City and County of San Francisco*, 109 F.3d 578, 583-84 (9th Cir. 1997). Additionally, challenges and, by implication, responses to an opposing party's legal arguments qualify as "conduct of an advocate and afforded protection." *Grubbs v. University of Delaware Police Dept.*, 174 F. Supp. 3d 839, 856 (D. Del. 2016). Marks's decision to rescind the First Order, reinstate the License, and issue the Second Order in response to Plaintiffs' claim of defective service are acts "inextricably intertwined" with Marks's authority to initiate and prosecute emergency suspensions of liquor licensees and, as such, are entitled to the protection of prosecutorial immunity.[44] *See Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 928 (9th Cir. 2004)(medical boards' expression of intent to deny license reinstatement, decision to deny further hearing, final order denying license reinstatement, and denial of motion for reconsideration all adjudicative functions protected by absolute immunity); *Gambee v. Cornelius*, Civil No. 10-6265-AA, 2011 WL 1311782, *5 (D. Or. April 1, 2011)("use of stipulated orders, the timing and contents of the emergency suspensions, and generally, their power to effect revocations or suspensions – are 'directly to [the Board's] adjudicatory function and the ultimate resolution of the disciplinary dispute at issue.' ").

---

[44] Plaintiffs argue the issuance of the Second Order after the Hearing was a textbook violation of the Double Jeopardy Clause. The Double Jeopardy Clause "serves the function of preventing both 'successive punishments and . . . successive prosecutions." *United States v. Ursery*, 518 U.S. 267, 273 (1996)(quoting *United States v. Dixon*, 509 U.S. 688, 696 (1993)). Even assuming the Double Jeopardy Clause applies to agency actions suspending a license, Plaintiffs were not submitted to successive punishments – the emergency suspension of the License effectively remained in place – or successive prosecutions – the testimony and evidence offered at the Hearing would have applied equally to the Second Order, eliminating the need for a second hearing.

The court previously found Marks not entitled to immunity because his actions, as alleged, appeared to violate the Oregon APA. *DeWalt*, 2016 WL 6089718, at * 23. The court relied on the Supreme Court's guidance that agency officials are entitled to prosecutorial immunity based, at least in part, on the availability of safeguards similar to those in the judicial process. *Id.*, citing *Butz*, 438 U.S. at 516. Thus, on a motion to dismiss where the court assumes as true well-pleaded claims, the court assumed Marks's failure to afford Plaintiffs these safeguards denied Marks the right to assert immunity. However, the Ninth Circuit made clear in *Mishler v. Clift*, 191 F.3d 998, 1006 (9th Cir. 1999), that the critical inquiry is the availability of procedural safeguards, not the manner in which they are exercised in a particular case. Therefore, even if Marks's litigation tactics were committed in error, such error does not alter the determination the acts were prosecutorial in nature. *Id.*

Finally, Plaintiffs' concession that Marks had the discretion to reinstate the License after the Hearing coupled with Webster's testimony that the Rescission Order relieved him of jurisdiction over the First Order, resolves the court's initial concern that Marks's reinstatement of the License without Webster's approval exceeded Marks's authority. Moreover, the Oregon Supreme Court has recognized a state agency's authority to withdraw an order, either completely or for reconsideration, in the absence of statutory authority prohibiting such withdrawal. *State ex rel. Hall v. Riggs*, 319 Or. 282, 293 (1994); *see also Boydstun v. Liberty Nw. Ins. Corp.*, 166 Or. App. 336, 341 (2000)("without some legislative limitation, an agency has plenary authority to decide matters to it" which "encompasses the authority to withdraw and reconsider the substance of a decision after it has been made.").

The decision to rescind the First Order, reinstate the License, and immediately reissue the Second Order on the same grounds previously argued at the Hearing, were all acts inextricably intertwined with the

prosecution of the emergency suspension of the License. Accordingly, the court now finds Marks acted

in the role of a prosecutor when he engaged in this conduct. Marks is entitled to absolute immunity on

Plaintiffs' federal claims with regard to the rescission of the First Order, the reinstatement of the License,

and the issuance of the Second Order.

### 2. Executive Privilege

Kruger and Hales assert their communications and statements about Plaintiffs were made in the

course of their official duties and related to a matter of public concern, and, as such, are protected by

executive privilege. Similarly, they argue Kruger's execution of the Request and his directive to forward

it to the OLCC, and Hales's advocacy in support of the emergency suspension and eventual cancellation

of the License, are equally protected by executive privilege. Kruger and Hales do not ask the court to

grant them immunity against Plaintiffs' federal claims based on their status as City officials. Rather, they

assert such privilege should be considered when determining the objective reasonableness of their conduct

with regard to federal law and the qualified immunity analysis. Plaintiffs assert the privilege is limited to

claims involving defamation or slander, which are not present here, and that it does not protect officials from

federal civil rights claims.

The Oregon Supreme Court has held that an absolute privilege extends to "executive officers of

government who maliciously publish defamatory statements in the course of their official duties." *Shearer*

*v. Lambert*, 274 Or. 449, 452 (1976). This privilege "is available to a defendant only if he publishes the

defamatory matter in the performance of his official duties," which means he must be "required" or

"authorized" to publish the defamatory material. *Id.* at 455. While the privilege question arises most often

in defamation cases, the Oregon courts have held it also applied to the "publication of any matter that is an

invasion of privacy." *Franson v. Radich*, 84 Or. App. 715, 719 (1987)(quoting *Lee v. Nash*, 65 Or. App. 538, 542 (1983)). The absolute privilege applies to city as well as state officials, including sworn city police officers. *Chamberlain v. City of Portland*, 184 Or. App. 487, 499 (2002).

The case law confirms that the executive privilege is a defense for claims involving defamatory or slanderous communications, or the publication of matter resulting in an invasion of privacy. While Plaintiffs allege Kruger and Hales communicated with other City officials for the purpose of closing the Fontaine, there are no allegations that either Kruger or Hales published defamatory or slanderous material. Nor do Kruger and Hales offer precedent for their assertion the state-created executive privilege should be considered when analyzing their right to qualified immunity on Plaintiffs' federal claims. Consequently, the court finds executive privilege is irrelevant to the matters before it.

### C. Qualified Immunity

The Individual Defendants argue they are entitled to qualified immunity for any alleged violations of Plaintiffs' § 1983 rights. The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, public officials are generally immune from civil liability unless their actions violated clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id*. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)(citation and internal quotations omitted). The key inquiry in determining whether an officer has qualified immunity is whether he or she has "fair warning" that the

conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).

To determine whether the doctrine of qualified immunity applies to individual defendants, the court must decide whether a plaintiff has shown a constitutional or statutory right has been violated and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223 236 (2009). The court defers consideration of the Individual Defendants' qualified immunity arguments until after it evaluates Plaintiffs' § 1983 claims and determines whether a constitutional violation occurred.

## II. First Claim for Relief - Race Discrimination under § 1981

In their First Claim for Relief, Plaintiffs allege Defendants deprived them of their right to make and enforce contracts based on their race and status as a night club catering to black customers in violation of 42 U.S.C. § 1981. The conduct on which Plaintiffs base their § 1981 claims are the suspension of the License and the termination of the Lease. *DeWalt*, 2016 WL 6089718, at *8. In the Opinion, the court dismissed DeWalt's § 1981 claim based on the License because DPI, not DeWalt, owned the License. *Id.* ("A shareholder or contracting officer of a corporation has no rights under the corporation's contracts.") However, because DeWalt alleged he was the lessee under the Lease, the court denied the motion to dismiss DeWalt's § 1981 claim based on termination of the Lease. *Id.*

The copy of the Lease filed with the court as part of the summary judgment materials, identifies DPI as the tenant and reveals DeWalt signed the Lease as President of DPI. Consequently, DeWalt has no actionable personal interest in the Lease. Plaintiffs concede "DeWalt as an individual cannot prevail on his

first claim for relief because he was not a party to the lease." (Pls.' Resp. at 65.)  Again, only DPI, which has acquired an imputed racial identity through DeWalt, the sole shareholder of DPI, has standing to bring an action under § 1981 for termination of the Lease.  *Thinket Ink Info. Res. Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1058-59 (9th Cir. 2004).

Section 1981 prohibits race discrimination in the making and enforcement of contracts.  42 U.S.C. § 1981(a) (2018).  "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contacts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (2018).  To establish a viable claim under § 1981, a plaintiff must allege: "(1) [he] is a member of a racial minority; (2) defendant intentionally discriminated against plaintiff because of his or her race; and (3) the discrimination involved the making or enforcing of a contract." *Allen v. U.S. Bancorp,* 264 F. Supp. 2d 945, 948 (D. Or. 2003).  There is no dispute DPI is considered a racial minority for purposes of § 1981.  Consequently, only the latter two factors are at issue.

### A.  Discrimination Concerned Making or Enforcing a Contract

The Ninth Circuit construes the language of § 1981 to include mixed-motive claims, reasoning "[i]f discriminatory intent plays *any* role in a defendant's decision not to contract with a plaintiff, even if it is merely one factor and not the sole cause of the decision, then that plaintiff has not enjoyed the *same right* as a white citizen." *Nat'l Ass'n of African American-Owned Media v. Charter Commc'ns, Inc.*, 915 F.3d 617, 626 (9th Cir. 2019)(emphasis in original).  Consequently a plaintiff need prove only that racial animus contributed to or was one factor in the decision to deprive the plaintiff of rights under a contract.  *Id*.  Plaintiff need not show he would not have been deprived of the benefits of a contract "but for" the

PAGE 113 - OPINION AND ORDER

racially discriminatory conduct. *Id.*

To the extent Defendants participated in the suspension of the License, either by authorizing the Request or issuing the First Order or Second Order, their alleged discriminatory conduct clearly affected DPI's enjoyment of the privileges offered under the License – the privilege of selling liquor to the Fontaine's customers. Consequently, DPI has satisfied this element with regard to the License.

There is no direct evidence Defendants' actions affected DPI's rights under the Lease. Defendants were not actively involved in the decision to terminate the Lease. Rather, DPI appears to argue the suspension of the License resulted in the termination of the Lease; that the suspension indirectly caused the Lease's termination.

Marks argues the suspension of the License did not require the closure of the Fontaine or cause termination of the Lease, and DeWalt concedes he could have continued to operate the Fontaine as a restaurant and entertainment venue after the suspension. Moreover, the initial communications between DeWalt and the Landlord show that the Landlord decided to terminate the Lease when DeWalt failed to make the December 2013 payment in a timely manner, thus supporting Marks's assertion that DeWalt's voluntarily abandonment of the Lease was the sole reason for terminating the Lease. In correspondence dated December 18, 2013, the Landlord advised DeWalt that DPI was in default as of December 11, 2013, because it failed to pay rent, and the Landlord considered DPI's tenancy terminated. But in a second letter dated December 31, 2013, the Landlord also cited the suspension of the License, the Shooting, and offensive activities and conduct at the Fontaine as additional reasons for the termination of the Lease. The Landlord stated "You have failed to conform to applicable laws and regulations affecting the Premises. You have also allowed activities and conduct on the Premises which is offensive to the

Landlord, the other tenants in the building, and the neighbors, and which has created a nuisance and has been detrimental to and potentially damaged the reputation of the Premises" and noted that "[y]our liquor license has been suspended by the OLCC which has resulted in your failing to operate in the Premises for the designated purposes in the Lease for more than five days," when offering alternative reasons for terminating the Lease. (First Merrithew Decl. Ex. E at 6-7.)

Consequently, viewing this evidence in a light most favorable to DPI, Defendants' allegedly discriminatory behavior resulting in the suspension of the License, and reports of offensive activities and conduct related to the Fontaine were factors in the Landlord's decision to terminate the Lease. DPI has met the third element with regard to the Lease as well.

### B. Intent to Discriminate on Basis of Race

A successful § 1981 claim requires proof of discriminatory intent. *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) (§ 1981 was intended to protect persons subjected to "intentional discrimination" based on their race or ethnic identity.) A plaintiff may establish discriminatory intent through either direct evidence or circumstantial evidence. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). Direct evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor" in the alleged discriminatory conduct. *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (emphasis original). "[B]igoted remarks by a member of senior management may tend to show discrimination, even if directed at someone other than the plaintiff." *Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007). A plaintiff must also connect the direct evidence to the alleged discriminatory conduct.

*Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (9th Cir. 2010). "Specifically, any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision." *Id.* "[R]emarks by . . . a decisionmaker tend to show bias, even if several years old." *Metoyer*, 504 F.3d at 937.

"When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir.1998). However the requirements for characterizing evidence as "direct evidence" are strenuous and create a "high hurdle" for plaintiffs. *Anderson*, 621 F.3d at 269. When a party relies on circumstantial evidence or a combination of circumstantial and direct evidence to infer discriminatory intent, the court must make a "sensitive inquiry" into all available and relevant evidence. *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 550 (9th Cir. 1982). "The legal standard to be applied is simply whether the facts proved are are sufficient to permit the court to infer, absent explanation, that the employment was, more likely than not the product of intentional discrimination. *Id*.

In the absence of clear evidence of discriminatory animus, a plaintiff may establish discriminatory intent through evidence of disparate treatment under the Title VII *McDonell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973); *Metoyer v. Chassman*, 504 F.3d 919, 930 (9th Cir. 2007)(claims under § 1981 follow "the same legal principles as those applicable in a Title VII disparate treatment case.") Under this approach, plaintiffs bear the initial burden of establishing a *prima facie* case of intentional discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53; *McDonnell Douglas*, 411 U.S. at 802. Conforming the

*prima facie* elements to Plaintiffs' claims in this case,[45] DPI must show: 1) it belonged to a protected class;

2) it obtained the License; 3) Defendants engaged in conduct resulting in the suspension of the License; and

4) similarly situated venues outside DPI's class received more favorable treatment, or other circumstances

surrounding the suspension of the License "give rise to an inference of discrimination." *Anderson*, 621 F.3d

at 273-74; *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142,1158 (9th Cir.

2013); *Lindsey v. SLT Los Angeles*, 447 F.3d 1138, 1144-45 (9th Cir. 2006). If a plaintiff presents a

*prima facie* case, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for

the discriminatory act. *Burdine*, 450 U.S. at 253. When the defendant does so, the burden shifts back

to the plaintiff to show defendant's reasons are pretextual. *Id.*

"The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment

is minimal and does not even need to rise to the level of a preponderance of the evidence." *Chuang v.*

*Univ. of Calif. Davis, Bd. of Trustees,* 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Wallis v. J.R.*

*Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994)). At the same time, "purely conclusory allegations of

alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment." *Forsberg*

*v. Pac. Northwest Bell Tel. Co.,* 840 F.2d 1409, 1419 (9th Cir. 1988).[46]

/ / / / /

/ / / / /

/ / / / /

---

[45] The Supreme Court expressly acknowledged the prima facie test should be tailored to conform "to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13.

[46] The analysis of direct and circumstantial evidence of discriminatory animus or intent applies equally to all claims based on intentional discriminatory conduct.

### 1. Marks[47]

DPI offers no direct evidence of discriminatory animus with regard to Marks or evidence that Marks treated similarly situated non-African-Americans differently then DPI. Rather, DPI relies solely on circumstances surrounding the suspension of the License to establish the requisite inference of discrimination.[48]

Marks did not know DeWalt was African-American at the time he issued the First Order. (Marks Dep. 55:3-8.) DeWalt offers no evidence to the contrary. In the absence of any knowledge of DeWalt's race or DPI's imputed racial identity, Marks's issuance of the First Order could not be based on an intent to discriminate against DeWalt or DPI because of their race. *See Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) ("An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race.") For this reason alone, DPI's § 1981 claim against Marks based on the issuance of the First Order fails. Additionally, the court granted Marks prosecutorial immunity with regard to his issuance of the First Order, which necessitates a finding in Marks's favor for actions related solely to the First Order. *DeWalt*, 2016 WL 6089718, at * 23.

Marks admits he learned DeWalt was African-American, and consequently of DPI's imputed racial identity, shortly after the issuance of the First Order. Consequently, the court must consider DPI's circumstantial evidence of Marks's discriminatory animus with regard to Marks's conduct in rescinding the

---

[47] Although the court has found Marks is protected by quasi-prosecutorial immunity with regard to Plaintiffs' § 1983 claims, the court will also evaluate these claims on the merits.

[48] DPI generally argues statistical evidence may support a finding of discriminatory animus, but does not specifically argue such evidence with regard to Marks's conduct and its Section 1981 claim. Plaintiffs' other statistical analysis arguments are addressed later in this opinion.

First Order, reinstating the License, and issuing the Second Order.

DPI characterizes Marks's failure to include his "superordinate concern" that the Fontaine would reopen the evening of the Shooting in the First Order and his failure to confirm with DeWalt his intention to reopen that evening as examples of *post hoc* justifications. "Simply because an explanation comes after the beginning of litigation does not make it inherently incredible." *Lindahl v. Air France*, 930 F.3 1434, 1438 (9th Cir. 19991)(quoting *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1436 (9th Cir. 1990)). Here, the record shows that the First Order made clear that Marks considered the likelihood of harm to the public if the License was not immediately suspended, and thus that immediate suspension did not turn on DPI's race.

In the second paragraph of the First Order, Marks states the immediate suspension of the License "is being issued because continued operation of your premises represents a serious danger to the public health and safety." (First Manlove Decl. Ex. 12 at 1.) Later in the First Order, Marks references the Request, which recommends an emergency suspension to allow DPI to discuss with the City and the OLCC the implementation of a effective plan to safely operate the Fontaine, and concludes the "immediate suspension is necessary to keep the public from further harm." (First Manlove Decl. Ex. 12 at 3.) While Marks did not expressly reference Defendants' concern the Fontaine would open again that evening, First Order makes evident the concern that public safety would be jeopardized if the Fontaine was allowed to open without additional safety precautions in place. Moreover, the statute authorizing an emergency suspension did not require a finding of exigent circumstances based on a licensee's intent to reopen immediately after a fatal event.

Finally, Marks's concern the Fontaine would reopen that night relates only to the timing of the First

Order, not the actual suspension of the License, which is at issue in DPI's § 1981 claim. As for DPI's claim Marks did not attempt to contact DeWalt to confirm his plans for the Fontaine that evening, the evidence clearly establishes various OLCC employees attempted to contact DeWalt before Marks issued the First Order.

DPI contends Marks's, or the OLCC's, cooperation with Hales to make sure the Fontaine did not reopen, including by revoking the First Order after the Hearing and issuing the Second Order, is evidence of discriminatory intent. Marks recalls only generally discussing with Hales safety concerns about the Fontaine after the First Order issued. (Marks Decl. ¶ 10.) Marks believed Hales was concerned "that any relief [he] or the OLCC might provide would be detrimental to the safety of the city," and thus Hales wanted to pursue a "full case" against DPI. (Marks Dep. 72:18-73:3.) Marks assured Stover the OLCC would try its best to permanently suspend the License. These conversations, the content of which concerned the handling of a license suspension or its cancellation in accordance with Oregon law, are not evidence of discriminatory animus. This conclusion is supported by Hales's lack of knowledge of DeWalt's race until after DeWalt filed this lawsuit in 2014. Without evidence allowing a reasonable inference of such knowledge, Hales's stated desire to suspend or cancel the License could not be attributed to the imputed racial identity of DPI.

The record shows that revocation of the First Order and issuance of the Second Order were in direct response to DPI's argument after the Hearing that the OLCC failed to properly serve DeWalt with the First Order. DPI questions this explanation by citing an Oregon appellate case which holds a technical defect in the service of an emergency suspension order is not fatal where the licensee participates in the hearing, law of which Marks's attorneys clearly should have been aware. From this, DeWalt argues an

inference is warranted that Marks delayed the License ruling because DeWalt is African-American. Not only is that inference completely speculative, based on this record, but it overlooks that DPI's counsel first raised the issue and thus presumably had the same knowledge of the Oregon appellate case. DPI's failure to raise the service issue prior to the Hearing also deprived DPI of making a record that it presented Marks with the opportunity to fully research and respond to the argument, but failed to do so. Marks's concession that service was inadequate, his attempt to remedy the defective service, and his desire to provide DPI with the notice to which it was entitled, all in response to DPI's belated argument, is not on this record sufficient evidence of Marks's desire to discriminate against DPI based on race.

DPI also contends that discriminatory motive can be inferred from Marks's authorization of the emergency suspension without virtually any information or investigation about the Shooting. The record does not support this contention, but instead clearly establishes Marks directed Sweet to investigate the Shooting and waited to review those results, as well as Luster's report and the Request, before authorizing the suspension. On at least one occasion, Marks followed-up with Sweet because of his concern the investigation was taking so long, and still did not issue the First Order until the investigation was complete. (Marks Dep. 33:16-23.) DPI's argument is not supported by the facts.

DPI has failed to meet its burden to present evidence Marks acted with the intent to discriminate against DPI based on its imputed racial identity. Marks is entitled to summary judgment on Plaintiffs' First Claim for Relief.

/ / / / /

/ / / / /

/ / / / /

2. City Defendants

    a. Direct Evidence

        i. Marchetti and Jackson[49]

DPI argues many of Marchetti and Jackson's comments about DeWalt, his customers, and the Fontaine are consistent with racial stereotypes and, therefore, constitute direct evidence of discriminatory animus. Particularly, DPI cites Marchetti's and Jackson's characterizations of DeWalt as having a "bad attitude" and as "uncooperative"; criticism of the Fontaine's customers as loud, lewd, vulgar, and filthy; insistence that the Fontaine ban saggy pants and hats; requirement the Fontaine not feature hip-hop music nor host promoters that play hip-hop music; and the demand that DPI maintain a list of, and exclude, gang members and customers on probation, wand all customers for weapons, patrol the neighborhood for troublesome customers, and limit the noise generated by customers leaving the Fontaine.

Courts have addressed comments alleged to be discriminatory, including those claimed to be indicative of racial stereotyping. "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the [decisionmaker]." *Dominguez-Curry v. Nevada Transp. Dept*. 424 F.3d 1027, 1038 (9th Cir. 2005). "Stray" remarks, or single, isolated comments, are insufficient to establish discrimination. *Merrick*, 892 F.2d at 1438. Moreover, comments made in an

---

[49] The court previously dismissed Plaintiffs' First Claim, Fifth, and Tenth Claims for Relief against Marchetti and Jackson based on the absence of a causal relationship between the Meeting, including their comments to DeWalt during the Meeting, and the Fontaine's change in music format or the suspension of the License. *DeWalt*, 2016 WL 6089718, at *20. However, the court based that ruling on the allegations of the Complaint, which limited Marchetti and Jackson's involvement to the Citation and the Meeting. The summary judgment materials reveal Marchetti and Jackson's involvement in the Request, which arguably establishes a causal link between Marchetti and Jackson's comments during the Meeting and the First Order. Therefore, the court will consider Marchetti and Jackson's conduct in this context.

ambivalent manner that have no connection with the allegedly discriminatory action do not qualify as direct evidence but are, at best, weak circumstantial evidence of discriminatory animus. *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir.1993). However, comments depicting a racial stereotype may be evidence of racial discrimination, particularly when linked to the objectionable decision. *Lindahl*, 930 F.2d at 1439.

Plaintiff do not offer evidence to establish that, under the controlling standard, the comments they have attributed to Marchetti and Jackson qualify as racial stereotypes. These comments do not equate to the phrase "dumb Mexicans" described by the Ninth Circuit as "an egregious and bigoted insult, one that constitutes strong evidence of discriminatory animus on the basis of national origin." *Cordova v. State Farm Ins Co.*, 124 F.3d 1145, 1149 (9th Cir. 1997). Rather, they are similar to the terms "welfare recipient" and "welfare folks," which this court found did not directly reference a minority group and could not be characterized as "egregious." *Reid v. Evergreen Aviation Gound Logistics Enters. Inc.*, Civil No. 07-1641-AC, 2009 WL 136019, at *9 (D. Or. Jan 20, 2009). Or akin to a reference to "grey hair," which the Ninth Circuit characterized as "at best weak circumstantial evidence of discriminatory animus." *Nesbit*, 994 F.2d at 705. Finally, the comments attributed to Marchetti and Jackson are similar to the phrase "you people," which several courts have determined "is too ambiguous to constitute direct evidence of discrimination when used in isolation." *Anderson*, 621 F.3d at 269.

While Plaintiffs assert Marchetti and Jackson directed DeWalt to stop playing hip-hop music, both DeWalt and his attorney admitted not remembering the term "hip-hop" being used at the Meeting, but instead that they had interpreted Marchetti's and Jackson's statements to mean hip-hop music. Such "inference" is clearly not direct evidence of discriminatory animus. With regard to Brotha Luv, the record makes clear Marchetti's and Jackson's concerns were with the promoter's gang affiliations, not with the

type of music played. Accordingly, the Marchetti and Jackson's statements related to the promoters do not support a finding of discriminatory intent.

Finally, Plaintiffs claim Marchetti's requested restriction of "DJ Entertainment," but no other forms of entertainment, with regard to the Grand Cafe is not direct evidence of discriminatory motive. Plaintiffs have not produced evidence that establishes enjoyment or promotion of "DJ Entertainment" is limited to African-Americans. Thus, Marchetti's requested restriction of such entertainment is not evidence of discriminatory animus.

ii. Kruger

Plaintiffs rely on Kruger's interest in World War II and ownership of German Army uniforms from the Nazi era, his participation in hanging a plaque honoring five Nazi soldiers, and his alleged yelling racial slurs out a car window while listening to Hitler's speeches, as evidence of Kruger's discriminatory motive in executing the Request and forwarding it to the OLCC. Kruger first became aware of DeWalt and the Fontaine at the time he reviewed, approved, and forwarded the Request. Kruger testified he was unaware DeWalt and the Fontaine's customers were African-American, and did not know the type of music played at the Fontaine until after reading information relating to this case.

Plaintiffs question Kruger's knowledge of DeWalt's and his customers' race, but they present no evidence to controvert Kruger's testimony on this point. DeWalt's subjective belief is insufficient to create a genuine issue of material fact on Kruger's knowledge of DeWalt's and the Fountaine's customers' race, or of the type of music played at the Fountaine. In the absence of admissible evidence of such knowledge, Plaintiffs cannot present and the court cannot find a genuine issue of material fact exists that Kruger intentionally discriminated against DPI or DeWalt based on race.

iii. Hales[50]

Plaintiffs claim Hales's concern that the Fontaine interfered with neighborhood livability issues, threatened public safety, and negatively impacted the community, all suggest he believed the Fontaine, which catered to African-Americans, would detrimentally affect the neighborhood. Plaintiffs assert Hales's concerns arose from a stereotype that African-Americans were criminals. Because the First Claim for Relief relies on DPI's status, not the status of the Fontaine's customers, this "direct evidence" is not relevant to DPI's § 1981 claim.

Hales, as did Marks and Kruger, testified he did not know until after Plaintiffs filed this lawsuit that DeWalt was African-American or that the Fontaine catered to African-Americans and played hip-hop music. Without evidence of such knowledge, the record does not support a fact dispute whether Hales's approval of the decision to request an emergency suspension of the License was the result of discriminatory animus. Plaintiffs' proffered evidence to the contrary, that Stover and Hales discussed the ramifications of closing down the Fontaine, described as "club that primarily caters to a black audience," does not identify when that discussion occurred. (Stover Dep. 105:10-106:24.)[51] Without evidence that the discussion occurred before Plaintiffs filed this lawsuit, the statement does not controvert Hales's testimony that he was not aware of the racial identity of the Fontaine's customers and, more specifically, before he

---

[50] The Process did not require Hales to authorize or approve of the Request before it was forwarded to the OLCC. Hales's approval of Kruger's decision to request an emergency suspension is is addressed in more detail below.

[51] The court acknowledges Stover subsequently disavowed this testimony, denying he ever discussed the ramifications of closing the Fontaine because it was owned by an African-American, catered to African-Americans, or played hip-hop music on a regular basis. (Stover Dep. 130:14-21,131:1-13.) However, the contradictory testimony itself creates a factual issue.

approved of the issuance of the Request.

Even assuming Hales was aware DeWalt and the Fontaine's customers were African-American, Hales expressed similar concerns with regard to all holders of a liquor license, regardless of race. He stated that licenses were a privilege, not a right, expressed his frustrations with the OLCC's apparent lack of interest in the City's concerns about noise, raised other neighborhood livability issues, and described serious public safety impacts related to liquor license holders in general, such as with liquor license holders on Hayden Island and in the area hosting Last Thursday. The record shows that Hales's expressed concerns clearly related to liquor license holders in general, not the Fontaine specifically; Plaintiffs have not offered contradictory evidence. Accordingly, these "concerns" are not direct evidence of racial stereotyping or of Hales's intent to discriminate against Plaintiffs.

### iv. The City

Plaintiffs identify City officials' "directive" to the Fontaine to impose a dress code banning saggy pants and hats, and to stop featuring hip-hop, as direct evidence of the City's discriminatory motives. The court already has found that on this record that these facts are insufficient to establish discriminatory motive. Similarly, Plaintiffs' reliance on City officials' alleged characterizations of DeWalt and his customers in support of their decision to issue the Request do not implicate race or racial stereotypes.

Plaintiffs allege that unidentified police officers used a racial slur when talking to DeWalt about managing his venue, but the deposition testimony Plaintiffs offer as evidence of these statements does not identify the individuals who made the statement. DeWalt testified at his deposition:

> I'm not open these nights. And then they would say if you are, you better control those niggers. And then they would turn around and high five and walk off and walk away laughing. I had an incident logbook with names of officers in it in which that came up

missing the night of when police had – had my key.

(DeWalt Dep. 444:1-7.)  DeWalt further explained he worked on paperwork or inventory when the Fontaine was closed, and a group of three to five officers in uniform would knock on the door of the Fontaine and asked DeWalt if the Fontaine was closed.  (DeWalt Dep. 444:8-25.)

Although DeWalt references police officers, he does not identify the police officers or, critically, their connection to any of the City Defendants.  The absence of evidence that establishes such a connection prevents this testimony of serving as direct evidence this officer's or others' discriminatory animus which caused or contributed to the City's decision to recommend an emergency suspension of the License.

Similarly, the comment by a Bureau police officer that a shooting was likely to happen at the Fontaine by July is not evidence of racial animus.  The same is true of DeWalt's testimony that during the discussion of the E-40 after-party, Friedman told DeWalt the City would not tolerate "these type of events" without notice and City approval.  DeWalt believed Friedman was referring to hip-hop events, but DeWalt provided no evidence of specific statements to suggest that connection.

Plaintiffs assert evidence of discriminatory motive is found in the Bureau's decision to warn to two other clubs, but not the Fontaine, about the dangers related to the Bash.  The record confirms Gahan contacted someone at the Melody Ballroom to warn its management of the risk of hosting the Bash, and that the Bureau was aware the Fontaine was hosting a party on November 8, 2013.  Plaintiffs offered no evidence, however, that the Bureau knew the Fontaine party was the relocated Bash.  Without evidence of such knowledge, the Bureau's failure to warn the Fontaine is not support direct evidence of racial animus.

DeWalt also claims the City refused to provide extra patrols to the Fontaine and cites such refusal

as direct evidence of discriminatory intent. However, the record contains no evidence DeWalt requested extra patrols; to the contrary, the record shows the Bureau provided such patrols to the Fontaine on occasion. Specifically, the Bureau provided a police presence at the E-40 after-party – which DeWalt now asserts is evidence of discriminatory motive.

Finally, Plaintiffs offer the testimony of others in the Portland night club industry to establish a practice by City officials of enforcing laws in a discriminatory manner. Both Mitchell and Scott, African-Americans who worked in Portland nightclubs, testified they believed the City targets nightclubs that cater to an African-American audience. First, the court reiterates that the racial identity of DPI, not the racial identity of the Fontaine's customers, is at issue in Plaintiffs' § 1981 claim, making immaterial to Plaintiffs' First Claim for Relief Mitchell's and Scott's testimony. Second, to the extent the testimony is relevant to Plaintiffs' other claims, it does not qualify as direct evidence of discriminatory animus.

An individual's belief based on their experience, without more, does not offer the clearly racist or similarly discriminatory statements generally characterized as direct evidence. In support of his opinion, Mitchell compares the presence of Bureau officers in the Fontaine, which he characterized as a show of force and intimidation, with the helpful police presence in cars at the end of the night at the New Copper Penny. While Mitchell did not consider the New Copper Penny an African-American club, DeWalt testified he considered the New Copper Penny to be competition because it regularly scheduled a hop-hip night and catered to many of the Fontaine's customers. Consequently, Mitchell's example of discriminatory behavior is not supported by the record.[52] Mitchell also indicates the City imposed additional restrictions

---

[52] Mitchell also references the comment by a Bureau officer that a shooting would occur at the Fontaine by July, which the court addressed above.

on venues when hosting hip-hop shows. These restrictions appear unrelated to the race of either the owner or the customers of the venue and thus is not direct evidence of racial animus relevant to DPI's § 1981 claim.

Scott clearly limits his testimony to nightclubs that played hip-hop music that drew African-Americans. He references restrictions imposed on a club hosting African-American hip-hop events as compared to clubs that play hip-hop music and cater to other than African-American customers. Specifically, Scott states:

> Portland nightclubs, such as the Barrel Room are able to play hip hop music but they keep their crowd non-Black which minimizes harassment, police presence, and scrutiny by OLCC and City entities.

> *   *   *

> The Crown Room is another example of a club receiving disparate treatment by City and OLCC based on the type of music it plays and the racial makeup of the crowd that attends those music events. When it first opened, the Crown Room was a hipster, white hip-hop crowd. When Black and African-American people started showing up at the Crown Room after the City Nightclub was forced to close, the Portland Police, OLCC, and City entities pounced.

(Scott Decl. ¶¶ 11, 12.) This evidence, which appears to establish the City does not restrict clubs playing hip-hop music but only clubs catering to African-American customers, is contrary to the evidence offered by Mitchell. Scott's testimony with regard to the City's response to nightclubs catering to African-Americans is not direct evidence to establish discriminatory motive.

Macomber, a white owner of the Crown Room, a Portland nightclub, originally stated in his declaration the City over regulated his venue only when he played hip-hop music, but later testified in

PAGE 129 - OPINION AND ORDER

deposition the Crown Room was the only club regulated because it had too many African-Americans in it. Macomber's testimony, however, is not relevant to Plaintiffs' § 1981 claim to the extent it relates to a venue with a non-minority identity. Again, Macomber's opinion is not direct evidence of racial animus relevant to his § 1981 claims, and he fails to provide the requisite examples of comments, or even actions, taken by the City or its officials to establish discriminatory intent.

Feldman, the Caucasian promoter of most of the hip-hop events at the Crown Room, also opined that more African-Americans in a nightclub resulted in more attention from the City. As an example, he noted a clear trend that "the more black people were in the club, the more attention we got from the Portland Police and the OLCC." (Feldman Decl. ¶ 5.) However, he also thought the City was specifically targeting the Crown Room, as Bureau officers did not show up when he was promoting hip-hop shows at other venues. These opinions are not direct evidence of racial animus. Feldman also describes a Bureau officer making blatantly racist statements to Feldman, "calling African-American patrons animals, using the N word, and calling them stupid." (Feldman Decl. ¶ 7.) Feldman worked as a promoter in Portland from 2007 to 2014. He does not indicate when the clearly racist comments were made, which makes impossible determining any temporal relationship between the comments and the Request. Also, in the absence of the identity of the officer, it is impossible to link the comments to the decision to recommend the emergency suspension of the License. Feldman also remembers Bureau officers commenting "we like these events" with regard to Feldman's promotion of an EDM event drawing a predominantly Caucasian crowd, and statements from a Bureau officer and OLCC member that Feldman's issues would disappear if he stopped promoting hip-hop events or stopped serving Hennessey. Feldman assumed the first comment was intended to express a preference for the promotion of shows to young white people rather than young black

people, but his assumption, without more, is not evidence. Feldman's second statement, in which he denied having any "issues" to begin with, in any event does not directly support his belief that the comment was meant to imply the "issue was the non-white crowd that was beginning to attend events more regularly." (Feldman Decl. ¶ 9.) The testimony Feldman offers is not direct evidence of discriminatory intent by the City.

Finally, Harmsen, a Caucasian owner of a restaurant frequented by African-Americans from 1997 to 2004, believed the Bureau and the OLCC focused excessive attention on his venue due to its African-American customers. He based his belief on suggestions offered by Law to get rid of "those people" and to stop serving Hennesey if he wanted to stay in business. Harmsen's belief is not direct evidence of the City's discriminatory animus. Moreover, the statements were made prior to 2004, and thus have no temporal relation to the City's actions ten years later toward Plaintiffs.

Plaintiffs have not offered direct evidence of the City Defendants' racial animus toward DeWalt, as an African-American, the Fontaine's African-American customers, or a dislike of hip-hop music. The court will now consider the circumstantial evidence of such discriminatory motive offered by Plaintiffs.

b. Circumstantial Evidence

i. Marchetti and Jackson

Plaintiffs offer the similar treatment Marchetti and Jackson gave to DeWalt and Thompson as circumstantial evidence of discriminatory motive. Specifically, the License Team called a meeting to discuss the respective venues issues, and then refused to provide help in identifying gang members for exclusion or provide a list gang members to DeWalt and Thompson. Plaintiffs, however, have not offered any evidence that other nightclub owners requested and received the help or list. Without such evidence, a

fact-finder cannot reasonably infer the License Team's action was related to DeWalt and Thompson's race, or the reace of their respective customer base. Additionally, there is no evidence Seeznin's played hip-hop music or that the Marchetti and Jackson, or any City official, was aware of the type of music played at Seeznin's, which precludes an inference that Marchetti, Jackson, or the City acted with the intent to curb the enjoyment of hip-hop music.

Additionally, Plaintiffs argue the License Team created a false record against DeWalt and Thompson by connecting random neighborhood activity to their respective nightclubs. First, the License Team did not create a record, they relied on and referred to the reports issued by the Bureau and the Citation issued by Van Orden. Thompson does not describe any specific incidents which the Bureau attributed to Seeznin's. Rather, Thompson claims the Bureau tried to link shootings in the area to Seeznin's and used reports of illegal activity allegedly related to Seeznin's against him. The record against DeWalt was based on reports from a neighbor who identified the Fontaine as the source of the noise and on reports from Bureau officers of altercations involving Fontaine customers. DeWalt claims Ball was working with the Bureau, but offers no evidence to support this claim. The Landlord appealed the Citation, which was affirmed, thus establishing the legitmacy of the noise complaints against Fontaine. Furthermore, DeWalt does not contest the content of the officer reports related to Fontaine customers. Consequently, the record does not support Plaintiffs' claim the License Team created a false record against DeWalt and Thompson, or that such record was created with discriminatory motives.

Plaintiffs offer as evidence of discriminatory motive Jackson's admission at the Meeting the License Team did not have sufficient evidence of issues with the Fontaine to support the issuance of a time, place, and manner violation. The License Team's decision to not issue a violation when the Fontaine's history did

not support it is not evidence of discriminatory animus against Plaintiffs; rather, it suggests the opposite inference, that the License Team did not discriminate against Plaintiffs because it did not issue a factually unsupported violation. Nor does Jackson's comment the City code was not in the License Team's favor at that point make this decision circumstantial evidence of discriminatory intent.

Plaintiffs again rely on Marchetti and Jackson's characterization of DeWalt's "bad attitude" and "uncooperativeness" as evidence of discriminatory animus. For the reasons previously explained, this assertion is without support on this record. Marchetti and Jackson's failure to follow up with DeWalt after the Meeting to confirm he implemented their suggestions is also not evidence of discriminatory animus; Plaintiffs offered no evidence the License Team engaged in such practice with other venues or that the License Team's failure had anything to do with race.

Finally, Plaintiffs claim Marchetti's false representation about DeWalt's intent to reopen the Fontaine the night of the Shooting without confirming such intent with DeWalt, and Jackson's failure to include the License's teams concern about the reopening in the Request, is evidence of discriminatory motive. The record shows the License Team and the OLCC both tried to contact DeWalt to discuss the Shooting and his plans for that evening, but were never able to speak with him. DeWalt does not offer contrary evidence. Additionally, the record reveals everyone believed DeWalt intended to reopen that evening, a belief supported by evidence that a large event had been scheduled to occur at the Fontaine that evening. Marchetti's sharing this common and supported belief with others is not evidence of discriminatory animus. As with Marks's actions, the failure to specifically reference in the Request his expectation the Fontaine would be open that evening is not indicative of discriminatory motive; the Request makes clear exigent circumstances existed to warrant the immediate suspension of the License and afford

the City and DeWalt time to discuss an effective plan to safely operate the Fontaine.

        ii. Kruger

Plaintiffs offer as evidence of discriminatory motive Kruger's decision to request an emergency suspension of the License without obtaining information or interviewing DeWalt about his conduct the night of the Shooting, and his failure to discuss the facts of the Shooting with Marks after the issuance of the First Order. First, as noted above, Kruger denied knowing DeWalt's race, the race of the Fontaine's customers, and the type of music played at the Fontaine before Plaintiffs filed this lawsuit. Plaintiffs presented no contrary evidence. Consequently, the record does not support a reasonable inference that Kruger's decision to request the emergency suspension of the License stemmed from discriminatory animus. Second, based on the exigent circumstances and the need for immediate action, the information Jackson obtained and included in the Request provided sufficient support for the Request, which also is not disputed. Finally, Kruger's failure to discuss the Shooting with Marks after the First Order issued is consistent with the Bureau's policy of protecting information necessary to the investigation of incidents such as the Shooting, and is not indicative of racial discrimination or bias.

        iii. Hales

Plaintiffs offer as evidence Hales's approval of the recommendation to immediately suspend the License, which Plaintiffs claim was based solely on his conversations with Stover rather than an investigation; his failure to confirm DeWalt's intent to reopen the Fontaine that evening; his failure to include in the Request his concern about the Fontaine's reopening; and his cooperation with the OLCC to ensure the Fontaine never reopened as circumstantial evidence of discriminatory motive. As noted above, there is no evidence Hales knew the race of DeWalt or the Fontaine's customer base, or the type of music

played at the Fontaine, before he approved of the emergency suspension of the License. In fact, the record shows Hales never read the Request itself before giving his approval. Consequently, there is no reasonable inference of discriminatory intent.

Finally, Hales's approval of the request for an emergency suspension of the License is consistent with his long-held concerns regarding all liquor license holders, irrespective of the race of the license holder or the venue's customers, or the music played at the venue. Hales was told of DeWalt's reluctance to remedy potential public safety issues related to the Fontaine, the general details of the Shooting, and the possibility the Fontaine would reopen that evening. He approved of the recommendation and believed permanent cancellation of the License was appropriate. On this record, Hales's consideration and decision relating to the suspension of the License do not support an inference of discriminatory intent.

### iv. The City

Plaintiffs rely on statistical evidence to provide circumstantial evidence of the City's discriminatory animus. Specifically, Plaintiffs claim that over the last ten years, the City has put half of the nightclubs owned by African-Americans out of business while taking action against only a fraction of all other nightclubs in town.

These allegations, as confirmed by Plaintiffs' briefing, advance a discrimination claim based on disparate treatment: Defendants treated Plaintiffs differently than similarly-situated nightclubs because of DeWalt's race, the race of the Fontaine's customers, or the type of music played by the Fontaine. The disparate treatment theory, which requires proof of an intent to discriminate, is applicable to decisions based on "the exercise of personal judgment or the application of inherently subjective criteria." *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 988 (1988). Reliance solely on statistical evidence in

support of a discrimination claim is generally limited to claims under a disparate impact theory – that a facially neutral practice or rule has a significant discriminatory impact on the group to which the plaintiff belongs. *Connecticut v. Teal,* 457 U.S. 440, 446–447 (1982). To prove disparate impact, a plaintiff must offer statistical evidence sufficient to show the practice or rule at issue detrimentally affected them because of their membership in a protected group. *Watson,* 487 U.S. at 994. Discriminatory intent is not an element of a claim based on the theory of disparate impact. *Id.* at 986-87.

To support a disparate treatment claim, a plaintiff may offer reliable statistical evidence to establish that a defendant acted with discriminatory intent. *Pacific Shores,* 730 F.3d at 1158-59; *Gay,* 694 F.2d at 550. However, statistical evidence, standing alone, is rarely a sufficient basis from which to infer discriminatory animus. *Id.* at 552. "In order to establish a prima facie case of disparate treatment based solely on statistical evidence, the plaintiff must produce statistics showing 'a clear pattern, unexplainable on grounds other than race.' . . . Absent a 'stark' pattern, 'impact' alone is not determinative, and the [c]ourt must look to other evidence." *Id.* (quoting *Village of Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252, 266 (1977). "It must always be remembered that '[r]egardless of how devastating or reliable the statistics may look, the issue remains in [disparate treatment] cases whether a particular isolated historical event was discriminatory.'" *Gay*, 649 F.2d at 552 (quoting *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980)(*per curiam*)).

The City Defendants contend Plaintiffs are pursuing a "selective enforcement" theory – that the City Defendants enforced the OLCC criteria for an emergency suspension in a manner that discriminated against Plaintiffs based on their race. Selective enforcement claims are judged according to equal protection standards, which require a plaintiff to show the alleged selective enforcement had a discriminatory effect

and was motivated by a discriminatory purpose. *Wayte v. United States*, 470 U.S. 598, 608 (1985).

A plaintiff may prove discriminatory purpose with the use of statistical evidence. *Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017). As with discriminatory motive in a disparate treatment case, "the statistics must be so stark that they are 'unexplainable on grounds other than race,' leading to the inescapable conclusion, 'tantamount for all practical purposes to a mathematical demonstration,' of discriminatory intent." *Id.* (quoting *Arlington Heights*, 429 U.S. at 266, *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960)).

The evidence offered reveals the City Defendants used the Process five times, including against the Fontaine, to request emergency measures in response to shootings at Portland nightclubs. Club 915, which played top-40 music and catered to African-Americans, was owned by an Asian American. The City documented numerous incidents related to Club 915 in the year preceding the fatal shooting, as well as meetings and communications with the owner, who failed to cooperate with the City's suggestions to alleviate the identified issues. The City requested an emergency suspension of Seeznin's license, which was owned by an African-American and catered to African-Americans. In support of its request for an emergency suspension, the City identified many issues with Seeznin's, documented a meeting with Thompson during which the issues were discussed, and explained the circumstances surrounding two fatal shootings in a three-month period. In support of its request for an emergency suspension for Don's Dugout, which was owned by a Caucasian couple, the City noted noise complaints, fights, gang affiliations, and multiple issues related to public safety. A meeting between the owners and City officials did not resolve the issues, as evidenced by continued noise complaints, reports of a robbery, a shooting, and an assault with a knife. Don's Dugout did not play music and was not identified as a club that catered to African-

PAGE 137 - OPINION AND ORDER

Americans. Finally, the City requested emergency restrictions be imposed on the Grand Cafe's liquor license, based on documented gang activity, multiple assaults, and the owner's failure to comply with mitigation strategies identified by the City. The owner of the Grand Cafe was Caucasian, the venue played a variety of music, and the customers were not identified as African-American. In summary, two of the five licensees subject to emergency recommendation under the Process were owned by African-Americans and three catered to African-Americans, and only one, the Fontaine, played hip-hop music.

The statistical evidence Plaintiffs offer does not constitute the requisite "stark evidence leading to the inescapable conclusion" that the City Defendants acted with the intent to discriminate against Plaintiffs based on their race. Five instances is an insufficient sample size to support reliable statistical evidence; when considering statistical evidence, the fact finder may take the size of the group into account. *Josephs v. Pacific Bell*, 443 F.3d 1050, 1066 (9th Cir. 2006). "[S]tatistical evidence may not be probative if the data are 'small or incomplete.'" *Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991)(quoting *Watson*, 487 U.S. 977 996-97). "Typical examples" of common weaknesses in statistical evidence "include small or incomplete data sets and inadequate statistical techniques." *Watson*, 487 U.S. at 996-97. Thus, the Ninth Circuit held a group of twenty-eight employees did not provide reliable statistical evidence, noting "the problem with small labor pools is that slight changes in the data can drastically alter appearances." *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1075 (9th Cir. 1986); *see also Shutt*, 994 F.2d at 1433 (characterizing a class of twenty-one former salesman as "exceedingly small" and stating a group of eleven "is so small that it does not alone suffice to establish a statistical pattern that could conclusively be identified as discriminatory."). Similarly, the United States Supreme Court reversed the Third Circuit Court of Appeals and affirmed the district court's finding that

a thirteen-person sample size, without supporting expert evidence, was not a sufficiently reliable basis for statistical evidence to support a discrimination claim. *Mayor of City of Philadelphia v. Educ. Equality League*, 415 U.S. 605, 620-21 (1974) (characterizing as a "flaw in straight percentage comparisons" the smallness of the plaintiffs' statistical sample).

The raw statistical evidence Plaintiffs here present suffers from the same flaws found dispositive in the above-cited cases: an inadequate sample size (five occurrences over a ten-year period), straight and simplistic percentage comparisons, and no supporting expert interpretations. Plaintiffs observe that African-Americans currently represent six percent of the Portland population. The City Defendants represent there were approximately 3,000 liquor licenses in Portland in 2013, and Marks states there are currently three Portland bars owned by African-Americans. From these figures, Plaintiffs argue African-Americans hold approximately .01 percent of the liquor licenses in Portland despite being six percent of the population. Although 3,000 liquor licensees may represent a sufficiently large sample size, Plaintiffs fail to offer the number of African-Americans who applied for liquor licenses, the justification of any denial of a liquor license to an African-American, the number African-American-owned venues closed during a relevant period, or the reason for such closure. Consequently, these statistics do not provide evidence Defendants' actions relating to the suspension of the License were motived by race.

Also before the court is the City Defendants' response to shootings at licensed premises that did not result in a request for emergency measures. The City Defendants offered their justification for not seeking emergency measures for twenty-five shootings over an eight-year period at twenty-three different licensed venues. None of these venues were identified as being owned by an African-American. DeWalt thought one of the venues, the New Copper Penny, catered to a segment of the Fontaine's customers,

while Mitchell and Feldman represented eleven of the venues did not cater to African-Americans. Neither party offered evidence on the race of the customers of the remaining thirteen venues. Both DeWalt and Mitchell acknowledged the New Copper Penny played hip-hop music. This evidence reveals that the City Defendants afforded the New Copper Penny, a venue DeWalt considered a competitor because of the commonality of customers and the type of music played, more favorable treatment than the Fountaine and similar treatment to the eleven venues who catered primarily to non-African-Americans.

The lack of evidence identifying the race of the owners of all the venues, the race of the customers of thirteen of the venues, and the type of music played at all but the New Copper Penny prevents these venues from being viewed as true comparators. Here, valid comparators for a *prima facie* case analysis under a disparate treatment theory are other licensed venues who purportedly received more favorable treatment than Plaintiffs but were similarly situated "in all material respects" to Plaintiffs. *Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Additionally, the differences in the circumstances surrounding the shootings, the history of problems related to the licensed venues, and the interaction between the venue and the City's with regard to such problems eliminate all of the licensed venues, including those which were subject to a request for emergency measures from the City, from consideration as "similarly situated" to the Plaintiffs or the Fountaine in all respects.

### C.  Conclusion

Plaintiffs have identified conduct which detrimentally affected DPI's rights under the License and the Lease. However, viewing Plaintiffs' evidence of discriminatory intent as a whole, the court finds Plaintiffs has not created a reasonable inference that Defendants acted with the intent to discriminate against DPI based on its imputed racial identity as African-American. Consequently, the City Defendants and

Marks are entitled to summary judgment on Plaintiffs First Claim for Relief alleging a violation of § 1981.

III.  Second and Third Claims for Relief - Procedural Due Process

Plaintiffs allege Defendants deprived them of their right to procedural due process for both liberty and property interests.  In the Second Claim for Relief, Plaintiffs allege Defendants conspired to, and did in fact, deprive DeWalt of his "ability to work in his chosen occupation and area of business, damaged his reputation, and grossly interfered with his contractual and business relationships" without requisite procedural due process and with the intent to discriminate against night clubs based on the race or musical preferences of the club owner or customers.  (Compl. ¶¶ 125-127.)  Plaintiffs allege similar intent and conduct with regard to their property interest in the Fontaine and related economic endeavors.  (Compl. ¶¶ 132-136.)  Plaintiffs specifically alleged Defendants violated their procedural due process rights by denying Plaintiffs the right to appeal from the Citation, serving the First Order illegally, and denying them the right to have their appeal from the First Order fully adjudicated.  (Compl. ¶ 133.)

In the Opinion, the court found the allegations in the Complaint, viewed in a light most favorable Plaintiffs, established DPI had "a reasonable expectation, or a legitimate claim of entitlement, to the continuation of the License through the end of its term," and DeWalt had "a protected liberty interest in his right to pursue an occupation of his choice," thereby satisfying the first element.  *DeWalt*, 2016 WL 6089718, at *10.  However, the court determined Plaintiffs received adequate pre-deprivation process, and limited Plaintiffs' due process claims to the adequacy of post-deprivation process relating to the reinstatement and immediate resuspension of the License.  *Id*. at *12-*13.  Finally, the court concluded Plaintiffs failed to allege an adequate causal relationship between the City Defendants' conduct, and the reinstatement of the License and issuance of the Second Order.  *Id.* at *14.  Consequently, Plaintiffs'

procedural due process claims are limited to Marks's decision to rescind the First Order, reinstate the License, and immediately resuspend the License in the Second Order to remedy the deficient service.

Plaintiffs and Marks have filed cross-motions for summary judgment on these claims. Plaintiffs contend the excessive delay of the ruling on the substantive issues raised in the First Order violated their constitutional rights. Marks asserts the evidence establishes Plaintiffs did not have a constitutionally protected property or liberty interest, and, in any event, Plaintiffs were afforded adequate post-deprivation process.

At the outset, the court restates its previous determination that Marks is entitled to prosecutorial immunity with regard to the rescission of the First Order, the reinstatement of the License and the issuance of the Second Order with regard to Plaintiffs' federal claims. As Plaintiffs' due process claims hinge solely only the delay resulting from such actions, Marks's immunity precludes liability for such claims. However, even in the absence of such immunity, Marks's decisions did not violate Plaintiffs' right to equal protection.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "The Due Process Clause forbids the governmental deprivation of substantive rights without constitutionally adequate procedure." *Shanks v. Dressel*, 540 F.3d 1082, 1090-91 (9th Cir. 2008). To prevail on a procedural due process claim plaintiff must establish: (1) a constitutionally protected liberty or property interest; (2) a deprivation of that interest by the government; and (3) the lack of adequate process. *Id*. at 1090. Based on the allegations in the Complaint, the court determined DPI had a constitutionally protected interest in the License and DeWalt had a constitutionally protected interest in pursuing his vocation as a nightclub owner or manager. Marks now reasserts his argument the License was not a constitutionally protected property

interest and also argues his actions did not deprive DeWalt of his ability to pursue his chosen occupation. Both parties offer arguments addressing the lack-of-adequate-process element.

### A. Constitutionally Protected Interest

Marks again challenges DPI's property interest in the License, asserting DPI did not have a legitimate claim of entitlement to the License and is not entitled to any procedural due process protection. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). While the Supreme Court has interpreted the terms "liberty" and "property interest" broadly in the context of the Fourteenth Amendment, it has recognized that "the range of interests protected by procedural due process is not infinite." *Id.* at 570.

A property interest sufficient to support a claim for procedural due process exists when an individual has a reasonable expectation of entitlement deriving from "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Id.* at 576. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. Property interests take many forms, such as an interest in continued receipt of welfare benefits and an interest in continued public employment under the terms of a contract. *Id.* at 576-77.

In the Opinion, the court acknowledged "Oregon statutes provide that a liquor license will '[b]e

valid for the period stated in the license' and may be cancelled or suspended before expiration of this period if the OLCC finds, or has reasonable grounds to believe, the licensee has engaged in listed prohibited actions or activities." *DeWalt*, 2016 WL 6089718, at *10 (quoting OR. REV. STAT. 471.292(1)(b); 471.315 (2015)). The court then found the statutory restrictions on the OLCC's ability to cancel or suspend the License created a reasonable expectation in the continuation of the License through the end of the term. Despite Marks's claim that the now-completed record requires a different decision, Marks cites the same statutes this court considered in the Opinion and he offers evidence supporting the suspension of the License, to contest DPI's legitimate entitlement to the continuation of the License through the end of its stated term.

The question whether a licensee has a protected interest in the license does not hinge on whether the licensing body had sufficient basis to cancel or suspend the license, but rather on the restrictions imposed on the licensing body to effectuate such cancellation or suspension. Marks argues the facts developed during discovery met the statutory requirements necessary to justify an emergency suspension of the License. This argument supports the conclusion Marks did not have unfettered authority to suspend the License, but rather was required to have sufficient cause. It is the existence of the restrictions that determines whether a property interest qualifies for protection under the Fourteenth Amendment, not the facts supporting the suspension or cancellation of the interest.[53]

The terms of the License and the statutes governing the cancellation or suspension of the License

_____

[53] As Plaintiffs' due process claims are based solely on the suspension of the License, the court limits it consideration of property interest to the suspension and does not address the question of whether DPI had a legitimate claim of entitlement to the renewal of the License.

have not changed. Consequently, the court adheres to its prior ruling "DPI had a reasonable expectation, or a legitimate claim of entitlement, to the continuation of the License through the end of its term." *DeWalt*, 2016 WL 6089718, at *10 (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) ("a state operating license that can be revoked only 'for cause' creates a property interest.")).

### B. Deprivation of Interest by Marks

#### 1. Chosen Profession

Marks contends the evidence does not establish he deprived DeWalt of his ability to pursue his chosen occupation of nightclub owner or manager. Based on his own testimony, DeWalt operated another nightclub in Oklahoma City while the Fontaine was in business, and the Oklahoma City venue remained open until January 2016, when the lease expired. Additionally, in June 2017, DeWalt was involved in a restaurant and bar in Overland Park, Kansas, a business substantially similar to the Fontaine's. On this record, it is evident Marks's conduct did not deprive DeWalt of pursuing his chosen occupation, but impeded only his pursuit of this vocation throug the Fontaine.

Plaintiffs now contend DeWalt had a protected interest in his business, or in his ability to continue to operate the Fonatine specifically, rather than the ability to pursue his chosen profession of nightclub owner. For the purpose of due process claims based on a deprivation of a right to pursue a profession, a plaintiff must establish that a defendant' actions deprived the plaintiff not only of his current employment, but also foreclosed his ability to take advantage of other similar opportunities. *Roth*, 408 U.S. at 573-74. "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id*. at 575. Thus, in a case considering facts substantially similar to those presented here, a district court held the closure of a nightclub does not

deprive the owner of a liberty interest in the absence of evidence the owner has been unable to find other work in the industry. *Club Level, Inc. v. City of Wenatchee*, No. CV-12-0088-EFS, 2013 WL 11319110, at *4 (E.D. Wash. Aug. 1, 2013).[54]

Plaintiffs have failed to present evidence DeWalt was unable to find other work in the nightclub industry. To the contrary, the record establishes that DeWalt continued to be involved in his chosen professional through the Oklahoma City nightclub until 2016, and the Overland Park nightclub until mid-2017, even after the Fontaine stopped operating. Plaintiffs fail to state a claim for due process violations based on DeWalt's chosen profession.

2. License

The parties, to some degree, seem to equate DPI's interest in the Lease with its protected interest in the License. They both reference the effect the delay in resolving the issues identified in the First Order had on DPI's interest in the Lease in support of their due process arguments. Evidence such delay caused the Landlord to terminate the Lease, resulting in the closure of the Fontaine, may be relevant to damages resulting from any due process violation or to the harm resulting from the delay of due process. However, it is irrelevant with regard to whether Marks deprived DPI of its right to the License, which has been clearly established. Consequently, the court finds Marks deprived DPI of its right to the License for the remainder

---

[54] Plaintiffs assert these cases are inapposite because they address substantive due process violations rather than procedural due process violations. The court is unaware of, and Plaintiffs have failed to offer, case law establishing the deprivation of a protected liberty interest is analyzed differently depending on the type of due process violation alleged. Rather, as with a procedural due process claim, and plaintiff must show defendants impaired a constitutionally protected interest to prove a substantive due process claim. *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 474 (9th Cir. 1991).

of its term.

*C. Adequate Process*

The court previously determined Marks had the authority to suspend the License without pre-deprivation process. Although Plaintiffs take exception to this ruling, they concede the only issue before the court is whether Marks failed to provide adequate post-deprivation process when it prevented Webster from issuing a ruling on the First Order after the Hearing. In other words, did the delay in issuing a ruling on the First Order deprive Plaintiffs of due process?

The United States Supreme Court has held a "there is a point at which an unjustified delay in completing a post-deprivation proceeding 'would become a constitutional violation.'" *Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242 (1988)(quoting *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 547 (1985)). When evaluating "how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by the delay; the justification offered by the Government for delay; and the likelihood the interim decision may have been mistaken." *Mallen*, 486 U.S. at 242.

The *Mallen* court determined a ninety-day period from the suspension of a bank president to an issuance of an opinion after a hearing was "not so long that it will always violate due process. In many cases, perhaps most, it will be justified by an important government interest coupled with factors minimizing the risk of erroneous deprivation. *Id*. at 243. The Court reasoned the interest in protecting the public from the threat posed by a bank president indicted of conspiracy to commit mail fraud justified a reasoned decision, particularly when the suspension resulting from the indictment was not likely to increase any injury to the president not already caused by the indictment. *Id*. In *Loudermill*, the court acknowledged "[a]

9-month adjudication is not, of course, unconstitutionally lengthy" when considering a claim by a employee dismissed for dishonesty in filling out his employment application. *Loudermill*, 470 U.S. at 547.

1. Private Interest and Harm Resulting from Delay

The parties do not contest the court's previous determination that DPI's interest in the License was substantial; rather, they disagree only on the extent of the harm resulting from the delay. Plaintiffs claim the delay caused the Landlord to terminate the Lease, resulting in the Fontaine's closure. Marks argues DeWalt decided the close the Fontaine prior to the date on which a ruling on the First Order was due, and did not seek to renew the License; thus, the delay did not result in appreciable harm.

The OLCC may suspend a liquor license without a hearing or notice to the affected party upon finding the activities are a serious danger to the public health or safety, and by providing specific reasons for such a finding in writing. OR. REV. STAT. 183.430(2) (2018); OR. ADMIN. R. 137-003-0560(1) (2018). Generally, the licensee is entitled to demand a hearing within ninety days of the suspension and, if requested, the OLCC must hold such hearing as soon as practicable after the demand and issue an order confirming, altering, or revoking the suspension. OR. REV. STAT. 183.430(2). Specifically, once a timely request for a hearing is received, the OLCC must refer the request to Office of Administrative Hearings ("Office") within seven days, the Office must complete a hearing and close the evidentiary record within thirty days of the referral and must issue a proposed or final order within fifteen days of closing the evidentiary record, and the OLCC must issue a final decision based on a proposed order within fifteen days of receiving such proposed order. OR. ADMIN. R. 137-003-0560(3) (2018).

/ / / / /

/ / / / /

PAGE 148 - OPINION AND ORDER

Assuming the outer limits of the statutory time-line provide adequate due process,[55] the OLCC had

sixty-seven days after Plaintiffs requested a hearing to issue a final decision. Plaintiffs requested a hearing

on November 12, 2013, just three days after the First Order was issued, making a final decision due mid-

January 2014. The Office scheduled the Hearing on December 4, 2013, and Webster closed the

evidentiary record the following day, well within the thirty-day requirement. Based on these dates,

Webster's proposed order was due December 20, 2013, and the OLCC's final decision was due January

4, 2014.

DeWalt made the decision not to pay December rent prior to December 10, 2013, the last day he

was able to pay rent without being in default under the terms of the Lease. Although DeWalt thought the

Landlord agreed to extend the deadline pending resolution of the First Order, the December 18, 2013

email makes clear the Landlord did not consent to DeWalt paying the rent late.[56] Rather, the email

established the Landlord notified DeWalt on Thursday, December 12, 2013, it considered him to be in

default. The Landlord rejected DeWalt's attempt to tender his December rent payment late and advised

DeWalt it considered the Lease to be in default as of December 11, 2013. Consequently, the Landlord

considered the Lease terminated nearly a week before Webster was obligated to issue a proposed order.

Additionally, in the December 31, 2013 letter, the Landlord cited Plaintiffs' violations of other terms

of the Lease, such as failure to conform to applicable laws and regulations with regard to the use of the

---

[55] Plaintiffs do not contend the statutes and regulations do not provide adequate due process. To the contrary, they object to Marks's failure to comply with the time-line contained therein.

[56] Moreover, the Lease specifically provided that: "[w]aiver by Landlord of any term, covenant or condition contained in this Lease may only be made by the an original written document signed by the waiving party." (First Merrithew Decl. Ex. E at 41.) Plaintiffs' failure to offer such waiver is contrary to DeWalt's belief the Landlord waived his obligation to pay the December rent in a timely manner.

Premises and failure to operate the Premises for the designated purposes due to the suspension of the License, as alternative grounds for terminating the Lease. All of these violations of the Lease occurred well before the deadline for Webster to issue a proposed order.

The record shows Plaintiffs were responsible, at least in part, for the delay in resolving the issues identified in the First Order. Plaintiffs knew of the First Order, and the manner of its service,, on November 12, 2013, the date they requested a hearing on the immediate suspension of the License. Yet they opted to not challenge the manner of service until December 5, 2013, the day after the Hearing occurred. Had Plaintiffs timely raised the issue of defective service, the decision whether to reinstate the License and to issue the Second Order could have occurred in November 2013, decreasing the delay of which Plaintiffs now complain. Furthermore, Plaintiffs' decision to not immediately seek a Hearing on the Second Order likely also interfered with a timely resolution of the issues identified in the First Order and the Second Order. The commonality of the issues in the First Order and Second Order allowed Webster to use the record from the Hearing to avoid, or significantly lessen, the evidence presented at a second hearing, minimizing any resulting delay. Plaintiffs' failure to avail themselves of available due process protections lessens any harm Plaintiffs suffered.[57]

2. Justification Offered by Marks

The state has a substantial interest in the safety of its citizens. This interest is recognized by the Oregon legislature, which explicitly authorizes the OLCC to suspend or cancel any liquor license if the OLCC reasonably believes:

---

[57] Plaintiffs concede they could have continued to offer food and entertainment at the Fontaine in the absence of a License.

That there is a history of serious and persistent problems involving disturbances, lewd or unlawful activities or noise either in the premises or involving patrons of the establishment in the immediate vicinity of the premises if the activities in the immediate vicinity of the premises are related to the sale or service of alcohol under the exercise of the license privilege. Behavior that is grounds for cancellation or suspension of a license under this section where so related to the sale or service of alcohol, includes but is not limited to obtrusive or excessive, noise, music or sound vibrations; public drunkenness; fights; altercations; harassment or unlawful drug sales; alcohol or related litter; trespassing on private property; and public urination. Mitigating factors include a showing by the licensee that the problems are not serious or persistent or that the licensee has demonstrated a willingness and ability to control adequately the licensed premises and patrons' behavior in the immediate vicinity of the premises which is related to the licensee's sale or service of alcohol under the licensee's exercise of the license privilege.

OR. REV. STAT. 471.315(1)(c) (2018). Marks issued the Rescission Order to allow the OLCC to remedy the service issues Plaintiffs identified after the Hearing. Marks's explained he reinstated the License and issued the Second Order because he wanted to receive a ruling on the merits as expeditiously as possible, in light of Plaintiffs' claim of improper service of the First Order. Marks believed the Second Order merely allowed the OLCC to complete the process initiated by the First Order. Marks's proffered justification for his actions are reasonably related to his goal of protecting the citizens of Portland and are reasonable under the circumstances.

### 3. Likelihood Interim Decision May Have Been Mistaken

The Second Order and resulting resuspension of the License relied on the same facts which gave rise to the First Order. Plaintiffs had the opportunity to contest the issues identified in the First Order at the Hearing, and they participated in the Hearing by presenting evidence and argument refuting the allegations. Moreover, during the period between the issuance of the First Order and the Hearing, the OLCC engaged in further investigation of the problems identified by the City Defendants in the Request and those delineated in the First Order. Marks had sufficient information from all of these sources to

determine the issuance of the Second Order was appropriate, if not necessary.

### D. Conclusion

The court finds DPI had a protected property interest in the License and DeWalt had a protected liberty interest in his right to pursue his chosen profession. Marks deprived DPI of his property interest but did not deprive DeWalt of his liberty interest. Furthermore, Marks's interest in protecting the public from the violence exhibited in the Shooting and protecting the neighborhood from the disruption caused by the Fontaine, and the Second Order supported by evidence the OLCC discovered and offered at the Hearing, justified the minimal harm Plaintiffs suffered as the result of any delay of a proposed order or final decision caused by the rescission of the First Order, the reinstatement of the License, and the issuance of the Second Order. Consequently, Marks is entitled to summary judgment on Plaintiffs' Second and Third Claims for Relief alleging due process violations.

### IV. Fourth Claim for Relief – Equal Protection

In their Fourth Claim for Relief, Plaintiffs allege a violation of their constitutional right to equal protection and seek, in addition to economic damages related to the loss of the License and the Fontaine, damages for loss of future business and reputation, emotional and mental distress, degradation, embarrassment, and humiliation, as well as punitive damages. The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. In other words, all persons similarly situated should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Accordingly, to establish a violation of the Equal Protection Clause, a plaintiff must establish he was treated differently from other similarly-situated individuals with respect to a governmental act, statute, or regulation. *Cleburne v. Cleburne*

*Living Ctr.*, 473 U.S. 432, 439-40 (1985). "Under this theory of equal protection, the plaintiff must show that the defendants' actions were a result of the plaintiff's membership in a suspect class, such as race." *Romero v. Yates*, No. 1:08-cv00669-LJO-MJS (PC), 2011 WL 1899826, at *5 (E.D. Cal. May 19, 2011) (citing *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005)). Discrimination also must be intentional such that "a defendant acted at least in part *because of* a plaintiff's protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (citing *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979))(emphasis in original).

As discussed above, the court has considered and determined that Plaintiffs' evidence of racial animus is insufficient to create a reasonable inference Defendants acted with the intent to discriminate against Plaintiffs because of DeWalt's race or DPI's imputed racial identity, or the race of the Fontaine's customers. Accordingly, Defendants are entitled to summary judgment on Plaintiffs Fourth Claim for Relief for violation of their constitutional rights to equal protection.

V. Fifth Claim for Relief – First Amendment Right to Free Speech/Free Expression

In their Fifth Claim for Relief, Plaintiffs allege Defendants intentionally targeted the Fontaine based on their choice of music for the purpose of curtailing Plaintiffs' speech and their right to play hip-hop music in violation of the First Amendment right to free speech and expression. "State action designed to retaliate against and chill political expression strikes at the very heart of the First Amendment." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). Accordingly, a city or state official violates a person's First Amendment rights if his actions "would chill or silence a person of ordinary firmness from future First Amendment activities" and the official intended to inhibit such activities by his actions. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999)(citations omitted).

Plaintiffs allege Defendants intended to inhibit, and in fact chilled or deprived, Plaintiffs of their right to play hip-hop music. Specifically, Plaintiffs allege Defendants' conduct forced Plaintiffs to attempt to change the format of the Fontaine and then, eventually, forced the Fontaine out of business. Defendants move for summary judgment and argue the Fontaine played more than hip-hop music, the playing of hip-hop music is not a message protected by the First Amendment, there is no evidence the Defendants acted with the intent to prevent the Fontaine from playing hip-hop music, and Defendants had reasonable grounds for their actions taken with regard to Plaintiffs.

At the outset, the court notes the parties do not provide a clear definition of the term "hip-hop." DeWalt explains his definition of "hip-hop" includes "old school rhythm and blues" for an older crowd, not the rap music preferred by a younger group. Marks offers evidence "hip-hop" and "rhythm and blues" are not interchangeable, because "hip-hop" was developed an entire generation after "rhythm and blues." When asked if he enjoyed hip-hop music, Kruger indicated the term would have to be defined before he answered the question. (Kruger Dep. 50:1-3, 23-25.) For the purposes of this opinion, the court will assume all references to "hip-hop" encompass the same type of music without defining what falls within that definition.

Plaintiffs rely heavily, if not exclusively, on *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002), in support of their First Amendment Claim. The plaintiffs owned a nightclub in Seattle, Washington, that played rap and hip-hop music on the weekends, and which attracted a predominantly African-American audience. *Id*. at 1051. The plaintiffs presented evidence that starting in early 1990, the defendants targeted their nightclub, as well as other venues playing rap or hip-hop music. *Id*. at 1051. In an internal Seattle police department memorandum dated January 1990, the department identified problems

associated with Hollywood Underground, a nightclub playing rap music on the weekends that drew gang members and rowdy youth. *Id*. at 1052. The memorandum identified alternative methods to deal with the problem, including early closure, change in music format, cooperation with the liquor board, and a "code violations strategy." *Id*. The Hollywood Underground eventually closed and Jersey's All-American Sports Bar then began playing rap music on the weekend. *Id*. In early 1992, two officers approached Jersey's owner and told him his business would be closed through various avenues if he did not change his clientele, who were identified as African-Americans that belonged in Tacoma or Seattle Central, but not downtown Seattle. *Id*. The defendants convinced the liquor board to alter Jersey's liquor license, forcing the bar to change its music format. *Id*.

In September 1992, the City of Seattle enacted an ordinance which allowed the defendants to institute abatement proceedings against any business it deemed a public nuisance. *Id*. Notes taken by a Seattle City Councilwoman explaining the purpose of the ordinance, specifically with regard to after-hours problems at clubs," provided:

> "You can control the kind of people that come in – By music you play" and "By people you let in." She wrote, "Hip-hop nights attract a boom-box crowd," and "Club patrons are not residents of the areas." "Black gangs hanging out are the problem," she noted. She also identified "Pinpoint abatement" as a solution to the problems and noted that the "After hours club issue is a small part of the problem of safety in the neighborhood."

*Id*. The City Attorney told a local newspaper:

> There is a relationship between a [music] format that draws young African-American males and gunfire and violence on the streets. This music format in late-night after-hours clubs is associated with criminal acts inside and outside the club. There are other clubs that have this music format where they've had this problem – violence, shootings, disorderly behavior. The bottom line is, race is not a refuge for criminal behavior. We have not said "change the music format." But we have pointed out the obvious problems with it . . . . The fact is the clientele that these clubs draw engage in this type of behavior. They either

have to control their clientele or change it.

*Id*. at 1051-52.

After the enactment of the ordinance, the defendants put pressure on the plaintiffs' nightclub, Celebrity, as well as Pier 70, both of which played rap and hip-hop music. *Id*. at 1052. The defendants initiated abatement proceedings against Pier 1 but agreed to halt the proceedings when Pier 71 agreed to stop playing hip-hop music. *Id*. at 1052-53. In April 1993, the defendants moved, apparently unsuccessfully, to have Celebrity's liquor license revoked, citing hundreds of 911 calls relating to the Celebrity and the "dramatic negative impact on neighboring community and police resources." *Id*. at 1052. The defendants "also made frequent fire inspections of the club, videotaped the club, provided off-duty police officers to other clubs but denied such assistance to Celebrity, made undercover drug buys at the club and performed criminal background checks on the club's owners." *Id*. The defendants deemed the Celebrity a public nuisance in December 1993 and, after discussions between the plaintiffs and the defendants as a result of which plaintiffs agreed to make certain changes, the parties entered into a voluntary correction agreement. *Id*. at 1053. The defendants then initiated abatement proceedings against the Celebrity in October 1994. *Id*. In response, the plaintiffs changed the name of the nightclub and changed the music format to "one that would attract a mainly Caucasian audience." *Id*. When this did not end the abatement proceedings, the plaintiffs entered into an agreement to sell the nightclub conditioned on the defendants' terminating the abatement proceedings. *Id*. The defendants initially agreed to terminate the abatement proceedings but withdrew the offer upon learning the plaintiffs had returned to playing hip-hop music. *Id*. The plaintiffs sued the defendants asserting, in part, a violation of their First Amendment rights to play the music of their choice, specifically rap and hip-hop. *Id*. at 1054.

Based on statute of limitations issues, both the district court and the Ninth Circuit identified the withdrawal of the settlement offer as the only relevant action supporting the First Amendment claim. *Id.* at 1050. The district court limited its analysis to that event, found it insufficient as a matter of law to support a constitutional violation, and dismissed the plaintiffs's federal law claims. *Id.* The Ninth Circuit reversed, finding that while the claim was limited to the withdrawal of the settlement offer, the court was obligated to consider background evidence in the record when analyzing whether a constitutional violation occurred. *Id.* The court found the plaintiffs "offered undisputed evidence that the withdrawal of the settlement offer depended on appellant's choice of music format," and the defendants agreed to postpone the abatement proceeding only after the plaintiffs agreed to stop playing rap music. *Id.* at 1063. The court also acknowledged the direct evidence of a racially discriminatory motive, citing the notes taken by the councilwoman and the comments of the city attorney, and acknowledged that similar treatment of other clubs playing rap and hip-hop music may be relevant evidence of an unconstitutional purpose. *Id.* at 1062.

*RK Ventures* makes clear that actions taken with the intent to curb a nightclub from playing a specific type of music may be actionable even if the venue plays more than one type of music throughout the week . The plaintiffs played rap and hip-hop music at the Celebrity only on certain nights of the week and in reversing the district court's grant of summary judgment against the plaintiffs' First Amendment claim, the Ninth Circuit relied on "strong evidence the City withdrew its December 5 settlement offer because it learned they were still playing rap music occasionally." *Id.* at 1063. That the Fontaine played "hip-hop" music only occasionally and regularly featured other types of music as well does not defeat Plaintiffs' First Amendment claim, provided they can present sufficient evidence Defendants engaged in conduct specifically intended to deter Plaintiffs from playing hip-hop music.

Defendants contend, and Plaintiffs agree, the "mode of analysis for determining the existence of a viable content-based discrimination claim is exactly the same as . . . for a race-based discrimination claim. (Pls.' Resp. at 55.) Not only must Plaintiffs show Defendants' actions "would chill or silence a person of ordinary firmness" from playing hip-hop in the future, but also that Defendants intended to inhibit such activities by their actions. *Mendocino*, 192 F.3d at 1300-01. "Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Kruger, Hales, and Marks all represented they were not aware of the type of music played at the Fontaine or did not know until after this lawsuit was filed the Fontaine played hip-hop, and Plaintiffs failed to present contrary evidence. In the absence of such knowledge, no basis exists from which a reasonable inference can be made that Kruger, Hales, and Marks, or any of them, took the challenged actions because of an intent to prevent the Fontaine from playing hip-hop. Thus, Kruger, Hales and Marks are entitled to summary judgment on Plaintiffs' First Amendment claim.

Marchetti and Jackson were present at the Meeting during which the Fontaine's "format" was discussed. DeWalt testified Marchetti suggested the Fontaine change its music and he assumed Marchetti meant rap or hip-hop music, but he does not remember her mentioning this type of music by name. Marchetti denies having knowledge of the type of music played at the Fontaine or making any reference to hip-hop music, and there is no evidence Jackson knew the type of music played at the Fontaine or that he referred to it at the Meeting. Neither Marchetti or Oden-Orr, DeWalt's attorney, remember any mention of hip-hop by anyone at the Meeting. Therefore, there is no direct evidence either Marchetti or

Jackson acted with the intent to prevent the Fontaine from playing hip-hop. These facts distinguish this case from *RK Ventures*, where the evidence established defendants specifically referenced the type of music played at the Celebrity and acted with the intent to end the practice.

Furthermore, the reference to the Fontaine's "format" at the Meeting was apparently made in response to DeWalt's experimenting with alternative formats, such as a lesbian club, before returning to the original format. In this context, the change in "format" did not relate to the type of music played, but rather the customer base targeted by the Fontaine. There is no evidence the Fontaine did not continue to play hip-hop for its alternative customer base or that the format change involved a change in music.

Finally, consideration of the "comparators" reveals other Portland nightclubs played hip-hop without suffering adverse consequences. DeWalt considered the New Copper Penny to be competition because it had a hip-hop night and catered to many of the Fontaine's customers, and there is no evidence Defendants targeted the New Copper Penny because it played hip-hop. Feldman, a promoter of hip-hop events, thought the Bureau specifically targeted the Crown Room because officers did not show up when he promoted hip-hop shows at other venues. Scott testified the Bureau's presence and imposition of fines forced the closure of the City Nightclub, at which he promoted a hip-hop show attended primarily by African-Americans, but did not engage in the same harassment of the Barrel Room or the Crown Room, which played hip-hop music for a primarily white crowd. Finally, Feldman admitted hip-hop shows and concerts still occur regularly in Portland. This also distinguishes this case from *RK Ventures*, where the evidence presented established a systematic targeting of all nightclubs that played rap or hip-hop music and the city enacted an ordinance, at least in part, for that very purpose.

Plaintiffs had a right protected by the First Amendment to express themselves by playing hip-hop

music.  However, unlike the plaintiffs in *RK Ventures*, Plaintiffs failed to present evidence Defendants

engaged in conduct with the intent to deprive Plaintiffs of this right.  Defendants are entitled to summary

judgment on Plaintiffs' claim for violation of the First Amendment.

## VI.  Seventh and Eighth Claims for Relief – Conspiracy

In the Seventh Claim for Relief brought under 42 U.S.C. § 1985(3), Plaintiffs allege Defendants,

with the exception of the City, conspired to deprive Plaintiffs of equal protection under the law by writing

pretextual and unsubstantiated reports, suspending the License, and effectively shutting down the Fontaine,

all because DeWalt is African-American.  Plaintiffs' Eighth Claim for Relief, a derivative of their Seventh

Claim for Relief, alleges the same defendants had knowledge of the conspiracy and negligently failed to

prevent it, in violation of 42 U.S.C. § 1986.  The Individual Defendants seek summary judgment on these

claims, arguing Plaintiffs have failed to meet their burden of offering concrete evidence showing actionable

conduct that resulted in injury or a meeting of the minds to discriminate against Plaintiffs based on DeWalt's

race.[58]

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the

purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection

---

[58] Marks also moves to dismiss against DPI, arguing it has no identifiable race and cannot be subjected to racial discrimination.  Marks relies on *Roberts v. Legacy Meridian Park Hosp., Inc.*, No. 3:13-CV-01336-SI, 2014 WL 294549 (D. Or. Jan. 24, 2014), in support of his motion.  Judge Simon did not engage in legal analysis or cite authority in concluding the corporate plaintiff had no race and could not be discriminated against because of race.  Instead, he merely agreed with the defendants' argument. *Id.* at *8.  This court has determined DPI has the racial identity of its sole shareholder for, at a minimum, purposes of a § 1981 race discrimination claim, and that this determination applies to all race discrimination claims brought under federal law.  Because Plaintiffs fail to adequately support a viable conspiracy claim in the first instance, these potentially conflicting outcomes need not be resolved here.

of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3) (2018). The

Supreme Court has made clear that to state a claim under § 1985(3), a plaintiff must allege: "(1) a

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of

the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in

furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived

of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners v. Scott*,

463 U.S. 825, 828-29 (1983) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971)). The

purpose of § 1985 is to remedy conspiracies by government officials that have "some racial, or perhaps

otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403

U.S. at 102. A plaintiff's failure to state a viable claim under § 1985 defeats the plaintiff's claim under §

1986 as well. *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988) ("A claim

can be stated under section 1986 only if the complaint contains a valid claim under section 1985.").

The Ninth Circuit succinctly described the evidence necessary to support a § 1985 claim in

*Mendocino Envtl. Center v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999). The court explained:

> To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the
> existence of an agreement or meeting of the minds to violate constitutional rights. The
> defendants must have, by some concerted action, intend[ed] to accomplish some unlawful
> objective for the purpose of harming another which results in damage. Such an agreement
> need not be overt, and may be inferred on the basis of circumstantial evidence such as the
> actions of the defendants. For example, a showing that the alleged conspirators have
> committed acts that are unlikely to have been undertaken without an agreement may allow
> a jury to infer the existence of a conspiracy. Whether defendants were involved in an
> unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long
> as there is a possibility that the jury can infer from the circumstances (that the alleged
> conspirators) had a meeting of the minds and thus reached a understanding to achieve the
> conspiracy's objectives. To be liable, each participant in the conspiracy need not know
> the exact details of the plan, but each participant must at least share the common objective

of the conspiracy.

*Mendocino*, 192 F.3d at 1301-02 (internal quotation marks and citations omitted). The court further cautioned "[d]irect evidence of improper motive or an agreement among parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action. Moreover, [q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." *Mendocino*, 192 F.3d at 1302 (internal quotation marks and citations omitted).

"Conspiracy is not itself a constitutional tort under § 1983." *Lacy v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012). Rather, claims alleging conspiracy may merely "enlarge the pool of responsible defendants by demonstrating their causal connections to the violation, the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired," and conspiracy claims are usually "alleged by plaintiffs to draw in private parties who would not otherwise be susceptible to a § 1983 action because of the state action doctrine." *Id.* As a result, a viable conspiracy claim under § 1985 does not exist without an underlying constitutional violation. *Id*.

Plaintiffs have failed to meet their burden to present evidence of discriminatory intent necessary to support their constitutional claims. Consequently, Plaintiffs are not able to sustain their § 1985 and, as a result their § 1986, conspiracy claims. The Individual Defendants are entitled to summary judgment on Plaintiff Seventh and Eighth Claims for Relief.

VII. Ninth Claim For Relief – Civil Rights 42 U.S.C. § 2000d

Plaintiffs allege the City, a recipient of federal funds, "subjected Plaintiffs to increased scrutiny and additional penalties in comparison to other similarly situated clubs" in violation of 42 U.S.C. § 2000d.

(Compl. ¶ 185.) Section 2000(d) provides: "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (2018). To state a claim under § 2000d, or Title VI, "plaintiffs must show that actions of the defendants had a discriminatory impact, and that defendants acted with an intent or purpose to discriminate based on plaintiffs' membership in a protected class." *Darensburg v. Metro. Transp. Comm'n,* 636 F.3d 511, 522 (9th Cir. 2011)

The Ninth Circuit uses Title VII standards to determine whether a plaintiff has presented a *prima facie* case of disparate-treatment discrimination in a Title VI action. *Evans v. Superior Health Services, Inc.,* 958 F.2d 376 (9th Cir. 1992). Under Title VII, "an individual suffers 'disparate treatment' when he or she is 'singled out and treated less favorably than others similarly situated on account of race or any other criterion impermissible under [Title VII].' " *Jauregui v. City of Glendale,* 852 F.2d 1128, 1134 (9th Cir. 1988)(quoting *Gay,* 694 F.2d at 537). As previously noted, a *prima facie* case of treatment requires proof of intentional discrimination. *Id.* A plaintiff may establish a triable issue regarding discriminatory intent through direct evidence, such as a defendant's use of racial epithets, or by presenting circumstantial evidence. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).

The court previously analyzed Plaintiffs' direct and circumstantial evidence of the City's intent to discriminate against Plaintiffs based on race, and found Plaintiffs failed to meet their burden of a genuine issue of material fact with regard to the City's discriminatory animus. This finding applies equally to Plaintiffs' Title VI claim. The City is entitled to summary judgment on Plaintiffs' Ninth Claim for Relief for violation of § 2000d.

Plaintiffs assert two state law claims: a claim for intentional interference with economic relations in their Tenth Claim for Relief, and a claim for intentional infliction of emotional distress in their Eleventh Claim for Relief.  Plaintiffs allege the Individual Defendants intentionally interfered with their business relationships with their customers, suppliers, and landlord by issuing pretextual violations and defamatory communications for the improper purpose of shutting down the Fontaine.  To prevail on a claim for intentional interference with economic relations, a plaintiff must establish six elements: "(1) the existence of a professional or business relationship (which could include, e.g., a contract or prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).  Marks contends Plaintiffs have failed to establish all of these elements except the existence of a business relationship and actions by a third party, while the City Defendants assert Plaintiffs failed to prove the latter three elements.

In their Eleventh Claim for Relief, Plaintiffs allege the Individual Defendants engaged in conduct intended to  inflict severe emotional and mental distress on DeWalt.[60]  Under Oregon law, a claim for

---

[59] The court acknowledges that in the absence of a viable federal claims, it need not accept supplemental jurisdiction over the state law claims.  However, this case has been pending more than four years, the court previously decided an extensively briefed motion to dismiss, and now a comprehensive motion for summary judgment.  Thus, the court finds appropriate accepting supplemental jurisdiction over Plaintiffs' state law claims.

[60] Plaintiffs concede DPI can not suffer emotional distress and, therefore, that DPI may not pursue a claim for intentional infliction of emotional distress.

intentional infliction of emotional distress lies only where the defendant intended to inflict severe emotional distress on the plaintiff, the defendant's acts were the cause of severe emotional distress, and the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 203 (1991), *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or. 532 (1995)(*citing Sheets v. Knight*, 308 Or. 220, 236 (1989)). It is the defendant's acts, rather than their motives, that must be outrageous. *Id*. at 204. Defendants move for summary judgment on DeWalt's claim for intentional infliction of emotional distress, arguing DeWalt has failed to offer sufficient evidence on each element.

Plaintiffs offer a single paragraph in opposition to the Defendants' arguments, in which Plaintiffs contend the court should deny Defendants' motion based on the proffered evidence of discriminatory intent. Plaintiffs assert:

> Defendants' arguments against the common law claims – that there was no improper purpose, improper means, or that the defendants did not commit an extraordinary transgression of the bounds of socially tolerable conduct – are all premised on the idea that plaintiffs cannot present sufficient evidence to allow a reasonable jury to infer racial discrimination. As explained above, plaintiffs have sufficient evidence, and a reasonably jury could conclude that defendants actions were motivated by racial animus, allowing them to find for the plaintiffs on all common law claims.

(Pls.' Resp. at 67.)

Alleged interference with economic relations must be wrongful "by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reasons of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978). Similarly, actions alleged in support of an intentional infliction of emotional

distress claim include only those situations where the defendant "'desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.'" *McGanty v. Staudenraus*, 321 Or. 532, 550 (1995)(quoting Restatement (Second) of Torts, § 46, comment i (1965)).  Additionally, conduct alleged in support of an intentional infliction of emotional distress claim must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Christofferson v. Church of Scientology of Portland*, 57 Or. App. 203, 211 (1982) (quoting Restatement (Second) on Torts, § 46, comment d (1965)).

Plaintiffs have failed to proffer evidence, either direct or circumstantial, sufficient under the Oregon standard to create an inference Defendants were motivated by racial animus or acted with the intent to discriminate against Plaintiffs based on race.  Consequently, Plaintiffs have failed to support their claim the Individual Defendants acted with improper motive or means or with an intent to inflict emotional distress on DeWalt, or engaged in socially intolerable conduct.  The Individual Defendants are entitled to summary judgment on Plaintiffs' state law claims.

X.  Qualified Immunity

The Defendants assert they are entitled to qualified immunity on Plaintiffs' constitutional claims.  As noted above, government officials performing a discretionary function are entitled to qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818.  Thus, a government official is entitled to qualified immunity unless his conduct both violated a constitutional right, and the constitutional right was clearly defined such that "it would be clear to [the official] that his conduct was unlawful in the situation he

confronted." *Saucier,* 533 U.S. at 201-02. Having determined that no constitutional violation occurred, the court need not evaluate whether Defendants would have been entitled to qualified immunity had they committed a constitutional violation.

*Conclusion*

The City Defendants' motion (ECF No. 125) for summary judgment and Marks's (ECF No. 116) motion for summary judgment are GRANTED in their entirety. Plaintiffs' motion (ECF No. 136) for partial summary judgment on their Second and Third Claims for Relief for due process violations is DENIED.

DATED this 26th day of August, 2019.


 /s/ John V. Acosta
     JOHN V. ACOSTA
United States Magistrate Judge